**NO. 24-1377**

*In The*
# United States Court Of Appeals
# For The Fourth Circuit

## BRADFORD M. KENDRICK,

*Plaintiff – Appellant,*

**v.**

## CARTER BANK & TRUST, INC.,

*Defendant – Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT DANVILLE**

_____

**BRIEF OF APPELLANT**

_____

**Terry N. Grimes**
**Kaley J. Gordon-Shupp**
**TERRY N. GRIMES, ESQ., PC**
**320 Elm Avenue, SW**
**Roanoke, VA 24016**
**(540) 982-3711**

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1377__　　　Caption: __Bradford M. Kendrick v. Carter Bank & Trust, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Bradford M. Kendrick__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.　　Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.　　Does party/amicus have any parent corporations? ☐YES ☑NO
　　　If yes, identify all parent corporations, including all generations of parent corporations:

3.　　Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
　　　If yes, identify all such owners:

- 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Terry N. Grimes                          Date:        05/01/2024

Counsel for: Appellant

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES .......................................................................... iii

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF THE ISSUES ...............................................................1

STATEMENT OF THE CASE.....................................................................1

    A.    Kendrick Dedicated His Life to Carter Bank .......................................2

    B.    Kendrick Performed Well.....................................................................2

    C.    The New CEO Strips Kendrick of His Duties .....................................4

    D.    The Bank Targets Kendrick and Other Older Workers .........................4

    E.    The Bank Creates the Young Professionals Group ..............................5

    F.    Age Discrimination Targets IT Workers .............................................6

    G.    Under van Dyke, Age Discrimination was Systemic ...........................7

    H.    Kendrick Complains About Age Discrimination to Vice Chair James Haskins, CAO Jane Ann Davis, President Phyliss Karavatakis, and CEO Litz van Dyke ...............................................10

    I.    The Bank Hires a New IT Director .....................................................11

    J.    Speare Tells Kendrick and Others in IT That They Are Not Getting Any Younger and the Bank Needs to be Hiring Younger People Because It Takes Older People Longer to Learn New Technology ........................................................................................13

    K.    The Bank Plans to End Kendrick's Employment...............................14

    L.    The Termination of Brad Kendrick ....................................................14

    M.    Administrative Process.......................................................................15

i

SUMMARY OF ARGUMENT ............................................................16

ARGUMENT ...............................................................................18

    Standard of Review....................................................................18

    Discussion ...............................................................................19

        A.    The District Court Used the Wrong Standard of Review .........19

        B.    The District Court Overlooked Key Evidence.........................20

        C.    The District Court Erred by Refusing to Permit Plaintiff to Depose Gov/Comm Committee and Board Chair James Haskins ...............................................................................22

        D.    The District Court Erred by Awarding Summary Judgment on the Age Discrimination Claim ...........................................29

            1.    Direct Evidence of Age Discrimination Exists..............31

            2.    Indirect Evidence of Age Discrimination Also Exists...............................................................................34

            3.    The Evidence is Also Sufficient Under *McDonnell Douglas* ...........................................................................37

        E.    The District Court Erred by Awarding Summary Judgment on the Hostile Environment Claim ............................................42

        F.    The District Court Erred by Awarding Summary Judgment on the Retaliation Claim ...........................................................44

        G.    The District Court Erred by Striking Plaintiff's Notice of Supplemental Facts ..................................................................49

CONCLUSION ...........................................................................51

REQUEST FOR ORAL ARGUMENT....................................................52

CERTIFICATE OF COMPLIANCE .....................................................53

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Armada (Singapore) Pte. Ltd. v. Amcol Int'l Corp.*,
    160 F.3d 1069 (N.D. Ill. 2016) .......................................................26

*Bass v. E.I. DuPont Nemours & Co.*,
    324 F.3d 761 (4th Cir. 2003)...........................................................43

*Birkbeck v. Marvel Lighting Corp.*,
    30 F.3d 507 (4th Cir. 1994)..............................................................34

*Bounds v. Town of Red Springs*,
    No. 5:20-CV-601-FL, 2022 U.S. Dist. LEXIS 498
    (E.D.N.C. Jan. 3, 2022) ..................................................................37

*Bos. Edison Co. v. United States*,
    75 Fed. Cl. 557 (Fed. Cl. 2007) ......................................................27

*Boyer-Liberto v. Fontainebleau Corp.*,
    786 F.3d 264 (4th Cir. 2015)...........................................................44

*Bradford M. Kendrick v. Carter Bank & Trust*,
    ECF No. 105, Case No. 4:19cv00047 (W.D. VA June 3, 2024).................7, 9

*Briggs v. Juul Labs, Inc.*,
    No. 5:22-CV-121-D, 2024 U.S. Dist. LEXIS 98488
    (E.D.N.C. June 3, 2024) .................................................................24

*Brinkley v. Harbour Recreation Club*,
    180 F.3d 598 (4th Cir. 1999).........................................................34

*Bryant v. Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999)......................................................50

*Burnopp v. Carter Bank & Trust*,
    ECF No. 52, Case No. 4:20cv00052 (W.D. Va. Jan. 10, 2023)......................7

*Chesemore v. All. Holdings, Inc.*,
No. 1:11 MC 43, 2011 U.S. Dist. LEXIS 108492
(N.D. Ohio Sep. 23, 2011)......................................................................28

*Davis v. Durham Mental Health Dev. Disabilities Substance Abuse Area Auth.*,
320 F. Supp. 2d 378 (M.D.N.C. 2004) ..........................................44

*DeMasters v. Carilion Clinic*,
796 F.3d 409 (4th Cir. 2015)..........................................................44

*Devlyne v. Lassen Mun. Util. Dist.*,
No. S-10-0286 MCE GGH, 2011 U.S. Dist. LEXIS 119173
(E.D. Cal. Oct. 14, 2011) ...............................................................27

*Duarte v. Truist Bank*,
2021 U.S. Dist. LEXIS 197784 (W.D.N.C. Oct. 14, 2021)..........................51

*Educ. Media Co. at Va. Tech, Inc. v. Isley*,
731 F.3d 291 (4th Cir. 2013)..........................................................18

*Funk v. Stryker Corp.*,
631 F.3d 777 (5th Cir. 2011)..........................................................50

*Goldberg v. B. Green and Co.*,
836 F.2d 845 (4th Cir. 1988) ........................................................31

*Guessous v. Fairview Prop. Invs., LLC*,
828 F.3d 208 (4th Cir. 2016)..........................................................38

*Hartsell v. Duplex Prods., Inc.*,
123 F.3d 766 (4th Cir. 1997)..........................................................44

*Hartsel v. Keys*,
87 F.3d 795 (6th Cir. 1996)............................................................35

*Hazen Paper Co. v. Biggins*,
507 U.S. 604 (1993)......................................................................37

*Kempcke v. Monsanto Co.*,
132 F.3d 442 (8th Cir. 1998).........................................................45

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991) .......................................................... 50

*Loeb v. Textron, Inc.*,
   600 F.2d 1003 (1st Cir. 1979) ....................................................... 33

*Lovelace v. Sherwin-Williams Co.*,
   681 F.2d 230 (4th Cir. 1982) ........................................................ 32

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ................................................... 32, 34, 37, 38

*Mey v. Phillips*,
   71 F.4th 203 (4th Cir. 2023) ......................................................... 19

*Miles v. Dell, Inc.*,
   429 F.3d 480 (4th Cir. 2005) ........................................................ 38

*Muldrow v. City of St. Louis*,
   144 S. Ct. 967 (2024) ................................................. 29, 30, 38, 43

*Newell v. Carter Bank & Trust*,
   ECF No. 57, Case No. 4:21cv00007 (W.D. Va. Feb 24, 2023) ...................... 7

*O'Reilly v. Marina Dodge, Inc.*,
   435 F. App'x 8 (2d Cir. 2011) ....................................................... 35

*Pain Ctr. of SE Indiana, LLC v. Origin Healthcare Solutions, LLC*,
   No. 1:13-cv-133-RLY-DKL, 2015 U.S. Dist. LEXIS 74732
   (S.D. Ind. June 10, 2015) ............................................................. 26

*Pamida, Inc. v. E.S. Originals, Inc.*,
   281 F.3d 726 (8th Cir. 2002) ........................................................ 26

*Parrish v. Immanuel Med. Ctr.*,
   92 F.3d 727 (8th Cir. 1996) .......................................................... 35

*Performance Sales & Mktg., LLC*,
   2012 U.S. Dist. LEXIS 131394 (W.D.N.C. Sept. 14, 2012) ................... 24, 25

*Peterson v. Mid-State Grp., Inc.*,
    54 F. Supp. 3d 1039 (E.D. Wis. 2014).....................................35, 36

*Phillips v. Stellarone Bank*,
    2012 U.S. Dist. LEXIS 97859 (W.D. Va. July 16, 2012) ...............8

*Premier Dealer Servs., Inc. v. Duhon*,
    No. 12-1498, 2013 U.S. Dist. LEXIS 150820 (E.D. La. Oct. 18, 2013).......27

*Quinlan v. Curtiss-Wright Corp.*,
    204 N.J. 239, 8 A.3d 209 (N.J. 2010)...............................45, 46, 47

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000)....................................................18

*Renaissance Greeting Cards, Ind. v. Dollar Tree Stores, Inc.*,
    227 F. App'x 239 (4th Cir. 2007).....................................19

*Samsung Elecs. Am., Inc. v. Chung*,
    No. 3:15-CV-4108-L, 2020 U.S. Dist. LEXIS 24992
    (N.D. Tex. Feb. 13, 2020)...........................................50

*Sanders v. Tikras Tech. Sols. Corp.*,
    725 F. App'x 228 (4th Cir. 2018).....................................38

*Shelton v. American Motors Corp.*,
    805 F.2d 1323 (8th Cir. 1987)..................................*passim*

*Spagnuolo v. Whirlpool Corp.*,
    641 F.2d 1109 (4th Cir. 1981), *cert. denied*,
    454 U.S. 860, 70 L. Ed. 2d 158, 102 S. Ct. 316 (1981) .........32, 33

*Swierkiewicz v. Sorema N. A.*,
    534 U.S. 506 (2002)....................................................31

*Texas Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981)....................................................38

*Texas v. Google LLC*,
    No. 4:20-CV-957-SDJ, 2024 U.S. Dist. LEXIS 109734
    (E.D. Tex. June 21, 2024)...........................................24

*Tolan v. Cotton*,
    572 U.S. 650 (2014)................................................................18, 20

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
    2000 U.S. Nos. 97 Civ. 6124 (JGK)(THK), 98 Civ. 3099 (JGK)(THK),
    2000 U.S. Dist. LEXIS 12669 (S.D.N.Y. Aug. 31, 2000) ...........................27

*U.S. v. Phillip Morris Inc.*,
    209 F.R.D. 13 (D.D.C. 2002) .......................................................26

*Van Den Eng v. Coleman Co.*,
    Nos. 03-C-0504, 03-C-1392, 2005 U.S. Dist. LEXIS 41748
    (E.D. Wis. Sept. 23, 2005) .........................................................28

*Wilhelm v. Blue Bell, Inc.*,
    773 F.2d 1429 (4th Cir. 1985), *cert. denied*, 475 U.S. 1016 (1986).........31, 32

**Statutes:**

15 U.S.C. § 1602 ...............................................................49

28 U.S.C. § 1291, *et seq.*.................................................*passim*

29 U.S.C. § 623 ...........................................................29, 30

42 U.S.C. § 2000e–2(a)(1) .....................................................30

**Rules:**

Fed. R. App. P. 4(a)(1)(A) .......................................................1

Fed. R. Civ. P. 56 ...............................................................19

Fed. R. Evid. 201 ...............................................................50

Va. Sup. Ct. R.. 3.7 ...........................................................23

W.D. Va. Civ. R. 11(c)(1) ......................................................49

**Other Authorities:**

Barbara T. Lindemann & David D. Kadue,
*Age Discrimination in Employment Law 5* (2003) ...............................35

## JURISDICTIONAL STATEMENT

Bradford M. Kendrick filed suit in the United States District Court for the Western District of Virginia against defendant Carter Bank & Trust, Inc. (the "Bank") for violation of the Age Discrimination in Employment Act, 28 U.S.C. § 1291, *et seq.* (JA38.) Kendrick appealed the district court's final order of March 29, 2024 granting the Bank's motion for summary judgment (JA4402.) This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which provides that "[t]he courts of appeals … shall have jurisdiction of appeals from all final decisions of the district courts of the United States." Kendrick timely filed a notice of appeal on April 25, 2024 (JA4403.) *See* Fed. R. App. P. 4(a)(1)(A). This appeal follows.

## STATEMENT OF THE ISSUES

1.    Did the district court err by granting the Bank's motion for summary judgment?

2.    Did the district court err by prohibiting Kendrick from deposing Board Chairman James Haskins?

3.    Did the district court err by striking Kendrick's Notice of Supplemental Facts concerning the Bank's court filings?

## STATEMENT OF THE CASE

The facts viewed in the light most favorable to Kendrick are as follows.

1

A.    Kendrick Dedicated His Life to Carter Bank.

Kendrick, now 68, was hired in 1985 by the Bank's founder and CEO, Worth Harris Carter, Jr., to work for one of the Bank's predecessors (Bank Services of Virginia) as a program analyst (JA523.) For 32 years he ran the information technology (IT) department at the Bank: "[e]verything related to IT fell under my responsibility." This included "[n]etwork support, ordering equipment, computer terminals. Any and all that was related to IT." The operation "ran 24/7." (JA524–526.) In 2009, Kendrick was promoted to Senior Vice President and in 2014 to Executive Vice President-Information Technology (EVP-IT) (JA524, JA534–535.)

B.    Kendrick Performed Well.

Kendrick performed exceptionally well as IT Director.  David Hart of NetBank Audits performed IT audits for the Bank from 2009 through 2017. According to Hart, "[w]ith respect to any assertion that Mr. Kendrick was not knowledgeable of what was going on with core processing systems and ATMs and FinTech programs and all of the other things that have some significance to the banking industry, that is false." (JA3234.) Hart was impressed with Kendrick's ability to "[r]un[] outdated systems and develop[] a new core system at a bank the size of Carter." (*Id.* at 3235.) As he put it: "I haven't come across too many IT officers that have done what Brad has and/or has his knowledge. . . . In my opinion, he was a very valuable asset that would be critical to a successful transition from the

existing system to the new system." (*Id.*) Bank President Phyllis Karavatakis, Executive Vice President and Chief Administrative Officer Jane Ann Davis, and bank consultant Timothy O'Rourke all agreed that Carter Bank needed Brad Kendrick to help get the new operating system going. (JA3234.) "Over the years, I have had several conversations with the FDIC and state examination teams. They were always very complimentary of Brad and his team. There were concerns about CoreSoft (the bank's operating system) but not the IT personnel." (JA3235.) Though Bank regulators had concerns about the Bank's operating system, they had no criticisms of Kendrick: "They didn't have criticisms of me. They had criticisms of Coresoft. Very, very important. But Mr. Carter wanted to keep pushing Coresoft." (JA542–543.) The bank regulators were also pleased with Kendrick's performance. (JA813.)

The Bank's core processing system, Coresoft, was flawed. But it was also Mr. Carter's "baby." (JA725–726.) NetBank's David Hart stated, "Mr. Kendrick had no choice but to support Mr. Carter with Coresoft." (JA3235.) Mr. Carter developed the system with Murthy Veeraghanta, chairman of VSoft Corporation based in Atlanta with facilities in India. Kendrick advised against using Coresoft "every chance [he] got." In his opinion: "We were not making progress. I didn't like what I saw in India. There was too much turnover at the development center. . . . and it was showing in our software, too many errors, too many bugs" but "Mr. Carter did not want to make a change." (JA535–536.)

3

C.      The New CEO Strips Kendrick of His Duties.

Kendrick's world changed when the Bank hired Litz van Dyke to serve as EVP (and later CEO) on July 26, 2016. (JA554, JA653, JA781, JA791.) Van Dyke was at the time 53 years old. (JA382.) From the moment van Dyke was hired, Kendrick's days at the Bank were numbered. In the summer of 2016, Mr. Carter developed cancer: "He was dying of cancer. He was in the hospital, at home." (JA553.) As the cancer progressed, his role at the bank diminished.  He passed away on April 7, 2017. (JA541–542.) Van Dyke wanted a younger workforce.  He immediately went after Kendrick, then age 60, and other older workers. (JA2912): "I [Kendrick] would say September [2016], all of a sudden I'm starting to not be invited to meetings except for IT Steering. I'm being left out." (JA554.)

D.      The Bank Targets Kendrick and Other Older Workers.

As early as February 2015 in a meeting concerning healthcare costs, the Bank recognized that "the overall age of our workforce is increasing." (JA3122.) Next, after van Dyke took over, Governance and Compensation (Gov/Com) Committee Chair and Board Vice-Chair James Haskins stated during a February 8, 2017 meeting that "we need *young*, qualified directors" (JA3129 (emphasis added).) Van Dyke also noted at deposition that "[t]here are some banks that have age limits for their board." (JA3161–3162.) Haskins also reported that at a Gov/Com committee meeting on June 16, 2020, a Bank consultant stated that the workforce must reflect "the *right*

4

*balance* of tenure, *age*, market representation diversity and expertise." (JA3140 (emphasis added).)

After van Dyke took over, he promptly hired 10 executives. None were older than 56,

| Name | Age | Title |
|------|-----|-------|
| Wendy S. Bell | 53 | EVP/Chief Financial Officer |
| Tony E. Kallsen | 50 | EVP/Chief Credit Officer |
| Bradford N. Langs | 51 | EVP/Chief Strategy Officer |
| Matthew M. Speare | 50 | EVP/Chief Information Officer |
| Arthur L. (Loran) Adams | 56 | EVP/Regulatory Risk Mgt. Director |
| Richard C. Owen | 47 | EVP/Mortgage Banking & Corp. Sales Director |
| John R. (Rich) Spiker, II | 50 | EVP/Chief Lending Officer |
| Tami M. Buttrey | 56 | EVP/Chief Retail Bank. Officer & Dir. of Delivery Channel |
| Chrystal B. Parnell | 41 | Senior VP/Chief Marketing & Communications Officer |
| Paul E. Carney | 51 | EVP/Chief Human Resources Officer |

(JA3049–3050.) Van Dyke made no bones about his preference for younger workers. He stated plainly that age "*would be a factor* in determining an appropriate candidate" for employment (JA3159–3160 (emphasis added).)

E.    The Bank Creates the Young Professionals Group.

To further the youth movement at the Bank, in August 2018 van Dyke created a "Young Professionals Group" headed by HR Paul Carney. (JA3066.) Membership was by invitation only. Anyone over the age of 40 was excluded. (JA3055–3058.) The ages of the nine members of the inaugural class ranged from 24 to 32 years of

age. The average age was 29. (JA3066; *see also* JA3072 (referencing Carney's "conference call with Young Professionals"); JA3055–3063.)

F.    Age Discrimination Targets IT Workers.

Though age *animus* infected the entire Bank, IT workers were hit particularly hard. Bank President Karavatakis pulled no punches. She told Kendrick plainly that she wanted younger people working in IT (JA768–769) and stated during several IT Steering Committee Meetings, "Brad you need to be finding your replacement." (JA769.) She also asked about the ages of Kendrick's staff. "And she would ask me also, how old is Diann [Nelson, age 66] and how old is Lee [Eldridge, age 64 (JA3125–3127)]. . . . And I said, well, they're older than me," to which Karavatakis responded, "well, you need to be finding their replacements too." (JA769; *see also* JA768–769 ("[Karavatakis] resented me being in charge of IT and she wanted younger people in IT.").)

Karavatakis had a particular "vendetta" against Kendrick: "I think she resented me being in IT. I think it was my age and back—going on these IT steering committee meeting numerous times at the meetings she would make a comment, Brad, you need to be looking for your replacement . . . . I think she wanted younger people in IT. I think she thinks that younger people can learn quicker." (JA765–766.)

G.     Under van Dyke, Age Discrimination was Systemic.

Age discrimination at the Bank was systemic under van Dyke. Discovery in this case was consolidated with cases filed by two other older workers who were fired by the Bank: Donna Burnopp, age 69, and Patricia Newell, age 67, in *Burnopp v. Carter Bank & Trust*, ECF No. 52, Case No. 4:20cv00052 (W.D. Va. Jan. 10, 2023) and *Newell v. Carter Bank & Trust*, ECF No. 57, Case No. 4:21cv00007 (W.D. Va. Feb 24, 2023). The summary judgment briefs and evidence in those cases was incorporated by reference below (*Bradford M. Kendrick v. Carter Bank & Trust*, ECF No. 105, Case No. 4:19cv00047 (W.D. VA June 3, 2024)), and are incorporated here as well (*Burnopp*, ECF Nos. 52-1–40, Case No. 4:20cv00052; *Newell*, ECF Nos. 57-1–26, Case No. 4:21cv00007.)  For example, like Kendrick, then 69-year-old regional manager Donna Burnopp worked for the Bank for more than 30 years and "had been in banking for 40-plus-years." (JA309.) When the Bank divided Burnopp's job into three roles and she applied for one of the roles—a job she had done for years—Karavatakis told her that "they had decided that there were other people that were more qualified for the positions and that they were going to look at me as maybe a special project position." (JA308.) Burnopp observed that "the three people that got the positions were all younger than [her]," and "[two] of them [she] supervised." (JA310.) The discrimination against older workers was readily

apparent. Burnopp observed that "when Mr. Carter passed away and that they were more or less taking out the old and bringing in the new." (JA318.)

> It just seemed to be the pattern that they had adopted, that they started talking about young employees and the different positions. They wanted to hire young tellers. . . . I think they have since developed the — what's it called — the young professionals training. So everything was geared towards young.

(JA312–313.) The Bank was "trying to more or less become a younger bank." (JA319.) As with Burnopp, the Bank told Kendrick he was no longer qualified to do the job he had done for decades and replaced him with a younger IT director.

Van Dyke has a history of age animus. Van Dyke was Chief Operating Officer at StellarOne during the events that resulted in a lawsuit against StellarOne for age discrimination in *Phillips v. Stellarone Bank*, 2012 U.S. Dist. LEXIS 97859 (W.D. Va. July 16, 2012) (JA2781–2782, JA554, JA778.)

Carter Bank also acted to ensure that employees retired "on time" — including a focus on making sure that employees saved "enough" for retirement (JA1312–1313.) Carter Bank's efforts were so successful that Carter Bank reworked its retirement plan to reduce the gifts and funds spent on celebrations because of the "increasing number of retirements" (JA3161.)

When the Bank updated technology, they assumed that the "older" employees would not be able to grasp the new technology. (JA1414 (Karavatakis: "[i]t is believed that some who are at retirement age will simply choose to retire because

they are not used to using technology"); *id.* at 1427 (Davis: "We have lost several employees due to their inability to learn the new system"); *id.* at 2412 (Karavatakis: "Some of the older retail staff is struggling with the new technology and expectations. We are definitely seeing some turnover in this staff."); *id.* at 2447 (Carney: "Those that are having trouble keeping up with the new system. We're working on a plan to transition."); *id.* at 2456 (Karavatakis: "This group is getting older and we expect more to be retiring in the future.").)

As of January 4, 2019, Chief HR Officer Carney was "working on a severance concept – what do we do with *these people*? Ask the group to make a list of these people and send to him." (JA2449 (emphasis added).) When asked about this, Karavatakis stated,

> Yes, I recall him working on it. I think that we did have some long-term employees that, as we — as rules changed, they didn't really have anywhere they could go into another job, so because of their long-term and working the way that they had worked until things changed, we felt like we needed to give them a severance package, so we had never had those before so we talked about it and put one together.

(JA2082–2083 (emphasis added).) Tami Buttrey summed up the Bank's plan well when she wrote on August 31, 2018, "This year we are transforming our technology transformation. Next year it needs to be an employee transformation" (JA2445.)[1]

---

[1] Buttrey and van Dyke had worked together in the past doing "consulting work." (*Bradford M. Kendrick v. Carter Bank & Trust*, ECF No. 190-6, Case No. 4:19cv00047, at 24–25 (W.D. VA June 3, 2024)).

H.   Kendrick Complains About Age Discrimination to Vice Chair James Haskins, CAO Jane Ann Davis, President Phyliss Karavatakis, and CEO Litz van Dyke.

In February 2017, Kendrick complained to then Vice-Chair Haskins that he "was being discriminated against because of my age because I was being bypassed and not being involved in management meetings. I was being left out of anything of running Carter Bank." (JA553.) Kendrick could not report the discriminatory treatment to Mr. Carter because "[h]e was dying of cancer." So, Kendrick called Haskins instead. "I called Jim Haskins from my office at the operations center in Martinsville . . . and I told him that I was being discriminated against because I'm being bypassed, and he listened." (*Id*.)

About a week later, Kendrick also complained to CAO Jane Ann Davis, who was "in charge of HR at the time." (JA555–556.) Then, about May or June 2017, after an IT Steering Committee, Kendrick also complained to Karavatakis and van Dyke. Karavatakis responded curtly, "going forward Litz and I will be deciding what your job duties are going forward and if you don't like the duties we give you, we don't have anything for you. And I knew what that meant." (JA557–558.) Having complained to no avail to the Vice Chair (and now Chair) of the Board of Directors, the CAO, CEO, and President of the bank, Kendrick did not complain to anyone else because "I was afraid to after that." (JA558–559 ("I didn't want to get fired so I said I better suck it up.").)

10

I.    The Bank Hires a New IT Director.

About a month later, van Dyke hired Matt Speare, age 50, as the new Chief Information Officer (CIO) on July 1, 2017 (JA653–654.) After Mr. Carter's death in April 2017, VP-IT Diann Nelson observed that the Bank was hiring younger employees: "it was like they were bringing in … younger people, putting them into positions over some of the people who had been there quite a number of years." (JA3039–3042.) Speare "took two of the operators" from Nelson's supervision: "it was like I wasn't supervising them anymore" (JA3037–3038) and assigned Nelson's duties to new hire Sonya Smith. Smith was 15 or 16 years younger than Nelson, about age 47. (JA3038–3039.) The transformation was such that when someone asked Nelson, "what is Matt and Sonja's position, and I said, well, that's your new Brad and Diann" (JA3039.) After 33 years of service, Nelson had enough and retired December 31, 2018 (JA3035–3036.)

Before Speare took over, as VP-IT Kendrick managed 35 people and seven department heads. His duties included,

- IT (In-house Operations 24 x 7, Networks 24 x 7, Cybersecurity, all hardware and software support and procurement)
- CoreSoft Software – Prepared agenda / information for IT Steering Committee meetings with VSoft Corporation
- Payments (Includes all ACH transactions; Debit Card processing)
- Bookkeeping (Includes all Day 2 processing)
- Reconcilements (Bank Recons, FED Recons, Research images as needed)
- Help Desk (Includes Application Support to 115+ locations; Escheatments)

- BCP (Enterprise wide Business Continuity Planning / Disaster Recovery planning / testing)
- Building Manager for Operations Center in Martinsville. (i.e. 32,000 square foot building.) Conducted most employee meetings.
- Managed 35 employees, of which, 7 were department supervisors.
- Performance evaluations and personnel reviews / hiring, etc. for the above listed departments.
- Prepared information for Board of Directors meeting / attended all BOD meetings and provided all updates to BOD concerning the above listed departments
- Prepared information for monthly Senior Management meetings / attended all of these meetings and provided all updates to the Senior Managers concerning the above listed departments.

After Speare took over, Kendrick was "stripped [of his duties]. I mentioned earlier that I had 35 employees, seven supervisors – out of the 35 there were seven supervisors that reported to me. And when Matt came in I had two people reporting to me, a switchboard operator and the janitor." (JA739–740.)

After Kendrick was demoted, the Bank assigned him the title of Chief Information Security Officer (CISO) and Business Continuity Plan (BCP) coordinator. The titles were sham titles: Kendrick had no job description and no duties (JA711–714.) Moreover, Kendrick was never told that he had been named CISO or BCP Coordinator. He learned of the appointment only while taking minutes at an IT Steering Committee meeting: "Matt Speare never sat down with me and told me via phone call, email, in person, Brad, you're the chief information security officer. I read it while I'm taking the minutes. . . . That's why I said it's a sham title." (JA749–750, JA815 ("I was given two sham titles. I was given chief information

12

security officer and nothing to do, and BCP coordinator and that was — I was not used when Covid-19 came along.").) Moreover, Kendrick did not "get a performance review in 2017, 2018, 2019, or 2020." (JA757.)

Nevertheless, hoping against hope, Kendrick interviewed with van Dyke for the CIO position. The interview did not go well: "[d]uring that interview we went through the CIO duties and at the end of the meeting Litz looked at me—because I told Litz when I went through the job descriptions, I said, Litz I've been doing probably 95 percent of these job duties. And he said, Brad, you don't know me and I don't know you, but you're not going to be the next CIO of this bank." (JA775.)

J.     Speare Tells Kendrick and Others in IT That They Are Not Getting Any Younger and the Bank Needs to be Hiring Younger People Because It Takes Older People Longer to Learn New Technology.

During the fourth quarter of 2017, Speare met with Kendrick and other IT workers and stated that "all of us sitting around this table are not getting any younger and we need to be hiring younger people because it takes longer for older people to learn the new technologies." (JA819 (echoing Karavatakis).) Speare then displayed two PowerPoint slides that "listed the number of employees in the Bank … and the average age, if I recall, was 47 years of age for the average age of Carter Bank & Trust employees." Speare then stated, "I've got another one for you," and displayed another slide that listed the average age of IT employees. (JA819–820.) To date, the

13

Bank has refused to produce the slides and claims they do not exist. Kendrick therefore prepared replicas of the slides for use during this litigation, as follows,

| Average Age – IT Employees    12-31-16 | | |
|---|---|---|
| # Employees | Total Ages | Average Age |
| 16 | 854.98 | 53.44 |

| Average Age – All Employees  12-31-16 | | |
|---|---|---|
| # Employees | Total Ages | Average Age |
| 935 | 44,204.39 | 47.28 |

(JA3079–3080.)

K.    The Bank Plans to End Kendrick's Employment.

In January 2019, the Bank put Kendrick on a "severance list" (JA3168.) CAO Jane Ann Davis testified at deposition that "severance is for [] someone that is going to be leaving the bank." (JA3054.)

L.    The Termination of Brad Kendrick.

Kendrick was terminated May 29, 2020. (JA845–846, JA864.) Kendrick's termination letter is dated May 27, 2020. (JA3169.) Although the signature block states "Matt Speare, Chief Information Officer," the letter is unsigned; Speare did not prepare the letter and testified at deposition in August 2022 that "I do not recall

ever seeing this document." (JA3119.) According to Speare, he "signed the final termination letter (dated May 29, 2020) and presented that to Mr. Kendrick." (JA3113). Speare told Kendrick plainly that he (Speare) had nothing to do with the termination of Kendrick's employment. (JA463, JA472–73). When asked at deposition whether he made the statement to Kendrick, Speare waffled: "So I would say that there was probably some wording to that effect." (JA3112.)

M.     Administrative Process.

After complaining to the highest levels of management without results, Kendrick filed a charge of discrimination with the EEOC, exhausted administrative remedies, and timely filed a complaint with the district court on December 2, 2019. After Kendrick filed an amended complaint on May 8, 2020, the Bank terminated his employment on May 29, 2020 allegedly because he "allowed confidential Carter Bank & Trust information to be posted on the PACER system" (he did not). (JA3169; JA76.) Kendrick timely filed a second charge with the EEOC, exhausted administrative remedies, and timely filed a second amended complaint on December 8, 2020 adding a claim for retaliatory discharge. (JA237.) On March 29, 2024, the district court granted the Bank's motion for summary judgment. (JA4402.) Kendrick timely filed a notice of appeal on April 25, 2024. (JA4403.)

 Further detailing of facts is reserved for argument.

# SUMMARY OF ARGUMENT

This is a case of systemic age discrimination. Bradford Kendrick ran the IT department at Carter Bank faithfully and well for more than 30 years. After the Bank's founder, Worth Harris Carter, Jr., died in April 2017, Litz van Dyke took over as CEO. Van Dyke wanted a younger workforce and immediately went after Kedrick and other older workers. No one was immune. From top to bottom, from directors to IT workers to branch employees, the Bank targeted older workers for separation from the Bank. Board Vice-Chair (and later Chair) James Haskins stated plainly that "we need *young*, qualified directors." Van Dyke also stated plainly that age "would be a factor" in hiring decisions and promptly hired 10 executives, none over the age of 56. Van Dyke also started a "Young Professionals Group." Membership in the group was by invitation only. No one over the age of 40 could join. The ages of the nine members of the inaugural class ranged from 24 to 32 years of age. The average age was 29.

Because of a stereotypical bias that older workers cannot learn new technology, Kendrick and other IT workers were hit particularly hard. After van Dyke took over, Kendrick was stripped of his duties and assigned two sham job titles—Chief Information Security Officer (CISO) and Business Continuity Plan (BCP) Coordinator—jobs with no job description and no duties. He learned of the sham titles only while he taking minutes during a meeting, part of his new clerical

16

duties. While he formerly supervised 35 employees in IT, he now supervised two, a switchboard operator and a janitor. In September 2017, the new CIO stated plainly in an IT meeting that "all of us sitting around this table are not getting any younger and we need to be hiring younger people because it takes longer for older people to learn the new technologies." Bank President Phyliss Karavatakis also told Kendrick that he "needed to be finding his replacement" and "resented [Kendrick] being in charge of IT and she wanted younger people in IT."

When Kendrick complained in February 2017 to Bank Vice-Chair James Haskins (Board Chair and CEO Worth Carter was dying of cancer and passed away in April 2017), a local attorney whose law firm had represent Kendrick in personal legal matters for decades, Haskins promised to investigate and get back to Kendrick. He never did. Kendrick also complained to van Dyke, Karavatakis and CAO Jane Ann Davis, to no avail.

Later, after suit was filed, the district court inexplicably refused to permit Kendrick to depose Haskins. Though other bank officers testified that the decision to terminate Kendrick was made at the Board level (Kendrick was an officer of the Bank), Kendrick was prohibited from deposing Haskins. The Bank did produce, however, an email stating that Kendrick was put on a "severance list" in January 2019, targeting him for separation from the Bank. After Kendrick filed a charge of discrimination with the EEOC and a complaint with the district court, the Bank

terminated his employment in May 2020 claiming that he "allowed confidential Carter Bank & Trust information to be posted on the PACER system" (he did not.) Kendrick intends to show in this appeal that the district court erred by awarding summary judgment, by refusing to permit the deposition of Board and Gov/Com committee chair James Haskins, and by refusing to consider evidence of the Bank's public court filings.

## ARGUMENT

### Standard of Review

The standards of review with respect to each of the issues are as follows.

1.    An appellate court reviews "a district court order granting summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party." *Educ. Media Co. at Va. Tech, Inc. v. Isley*, 731 F.3d 291, 297 (4th Cir. 2013) (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (citations omitted).; *see also Tolan v. Cotton*, 572 U.S. 650, 659 (2014) (reversing summary judgment where "the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion").

2.     In *Mey v. Phillips*, 71 F.4th 203, 217 (4th Cir. 2023), this Court recognized that the "district court has wide latitude in controlling discovery, and its rulings will not be overturned absent a showing of clear abuse of discretion." (cleaned up).

3.     Motions to strike are reviewed for abuse of discretion. *Renaissance Greeting Cards, Ind. v. Dollar Tree Stores, Inc.*, 227 F. App'x 239, 246 (4th Cir. 2007) (unpublished) (citations from other circuits omitted).

**Discussion**

**A.     The District Court Used the Wrong Standard of Review.**

To begin, the district court used the wrong standard of review with respect to summary judgment. Instead of viewing the evidence in the light most favorable to Kendrick as required under Rule 56, the district court instead viewed the evidence in the light most favorable to the Bank. For example, though Kendrick ran the IT department at the Bank for decades, the district court found as a matter of law that Kendrick's performance was deficient and that he merely "believed" that "he had already been performing the duties of a CIO." (JA4371, citing JA811.) Consequently, the district court overlooked evidence that Kendrick was a highly proficient IT manager. The Bank's own IT auditor stated that "any assertion that Mr. Kendrick was not knowledgeable of what was going on with core processing systems

and ATMs and FinTech programs and all of the other things that have some significance to the banking industry . . . is false." (JA3234.) Moreover,

> Running outdated systems and developing a new core system at a bank the size of Carter, is very impressive. I haven't come across too may IT officers that have done what Brad has and/or has his knowledge. . . . In my opinion, he was a very valuable asset that would be critical to a successful transition from the existing system to the new system.

(JA3235.) Karavatakis, Davis, and Timothy O'Rourke also agreed that Carter Bank needed Brad Kendrick to help get the new system going. (*Id*.) Kendrick also testified that he,

> [M]anaged two data centers . . . for approximately five to eight years . . . that's a long way from being complacent. . . . I was working morning, noon, and night, and weekends, and not taking vacations during that time. . . . And we didn't drop the ball. The regulators commented about that, that they were impressed with what we were doing . . . .

(JA812–813.) The district court therefore erred by finding as a matter of law that Kendrick's performance was not adequate. Here and throughout its opinion, the district court improperly viewed the evidence in the light most favorable to the Bank, not Kendrick. Here as in *Tolan,* summary judgment must therefore be reversed.

## B. The District Court Overlooked Key Evidence.

The district court also overlooked key evidence. For example, the district court overlooked the fact that in January 2019, the Bank put Kendrick on a confidential "severance list,"

20

CONFIDENTIAL

**From:** Matthew M. Speare <Matt.Speare@carterbankandtrust.com>
**Sent:** Friday, January 04, 2019 9:28 AM EST
**To:** Paul E. Carney <Paul.Carney@carterbankandtrust.com>
**Subject:** The severance list

Brad Kendrick

(JA3168.) Significantly, there was only one name on the list: Brad Kendrick. EVP/CAO Jane Ann Davis testified plainly that "severance is for . . . someone that is going to be leaving the bank." (JA3054.) From this evidence, the jury could easily find that the decision to separate Kendrick from the Bank was made in January 2019, not a later date. This evidence refutes the district court's finding that the Bank made the decision to terminate Kendrick's employment in May 2020 after Kendrick filed his second amended complaint. (JA4397–4398.)

The district court also overlooked the fact that after the Bank hired Speare as the new CIO in July 2017, Kendrick was stripped of his duties and assigned two sham titles, Chief Information Security Officer and Business Continuity Plan Coordinator — jobs with no job description and no responsibilities — and did not have a performance review from 2017–2020. (JA711–714, JA749–750, JA757, JA815.)

Questions of fact also exist with respect to who made the decision to terminate Kendrick's employment, and when, and why. To attempt to discover answers to those questions, Kendrick sought to depose Gov/Com and Vice Board Chair James Haskins.

### C.     The District Court Erred by Refusing to Permit Plaintiff to Depose Gov/Comm Committee and Board Chair James Haskins.

In February 2017, when Kendrick complained to Gov/Com and Vice Board Chair James Haskins, Haskins told Kendrick that he would "research and get back with [him]." (JA782–783.) He never did. After Mr. Carter died, Haskins became Chairman of the Board. The Board later made the decision to terminate Kendrick's employment. Former bank VP and IT employee Diann Nelson testified at deposition that Speare called her at Haskins' request and told her "that the Board of Directors voted to terminate" Kendrick (JA3043–3044; *accord* Speare, "It was communicated to me that the decision was made *by the board*." JA3120 (emphasis added).[2]

Haskins, a local attorney, wore many hats at the bank. At the time suit was filed, he served as Vice Chairman of the Board and Chaiman of the Governance and Compensation Committee. He also received Kendrick's complaint of age discrimination in February 2017. He and other members of his law firm also represented Kendrick for decades in personal legal matters. (*See* JA50–53.) He also served as counsel of record for the Bank in this proceeding at the time suit was filed through August 7, 2020 when he was replaced by present counsel. (JA230.)

---

[2] The Bank offered conflicting evidence as to who made the decision to terminate Kendrick. Though Nelson and Speare testified that the decision was made by the Board, Van Dyke disagreed and testified that "Matt Speare, Litz van Dyke and [HR] Paul Carney" made the decision. (JA3147–3148). Carney also testified that "Matt Speare, [Carney], and Litz van Dyke" made the decision. (JA3215).

Haskins is therefore a critical witness. The Bank opposed the deposition, however. As a result, Kendrick filed a motion to compel discovery. (JA218.) The original judge assigned to the case took the motion under advisement. (JA233, §4.)[3] After Haskins withdrew as counsel for the Bank (JA226),[4] the Bank filed a Motion for Protective Order to Preclude the Deposition of James W. Haskins. (JA256.) The question was briefed (JA260–306.) A magistrate judge granted the motion (precluding the deposition). (JA447.) The district court overruled plaintiff's objections (JA460) and prohibited the deposition. (JA3379 ¶B(1).)

In their respective holdings, both the magistrate and the district court cited tests not expressly adopted by the Fourth Circuit: the "apex doctrine" and the *Shelton* test. Neither of these doctrines originated within the Fourth Circuit, though they have been applied by district courts.[5]

---

[3] The original judge assigned to the case (Conrad) passed away May 20, 2021. The second judge (JA255) withdrew due to a possible conflict of interest on December 2, 2022. (JA2875). The third judge (Dillon) ruled on the objections to the magistrate's ruling and summary judgment.

[4] Haskins withdrew as counsel of record for the Bank because Rule 3.7 of the Virginia Rules of Professional Conduct prohibit an attorney from serving as counsel for a party and a witness in an adversarial proceeding.

[5] Both the magistrate and district court judges noted various district courts applying these tests. (*See* JA450–451 (apex doctrine), JA452–453 (*Shelton* test); JA3384 n. 5.)

First is the so-called "apex doctrine" which limits the ability of parties to depose high-ranking (i.e., apex) corporate executives who may or may not have individualized knowledge about a particular case. *See, e.g.*, *Texas v. Google LLC*, No. 4:20-CV-957-SDJ, 2024 U.S. Dist. LEXIS 109734, at *15–16 (E.D. Tex. June 21, 2024). Next is the *Shelton* test, which governs whether a party may depose opposing counsel. *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1987). As noted by the district court, both tests have similar, overlapping prongs. (JA3384–3385.) Both tests require some showing that other avenues for obtaining the same information have been exhausted and/or no other sources for this information exist. *See Briggs v. Juul Labs, Inc.*, No. 5:22-CV-121-D, 2024 U.S. Dist. LEXIS 98488, at *9 (E.D.N.C. June 3, 2024) (citing *Performance Sales & Mktg., LLC*, 2012 U.S. Dist. LEXIS 131394, at *3 (W.D.N.C. Sept. 14, 2012)) (the apex doctrine); *see also Shelton*, 805 F.2d at 1327 (outlining the three-pronged *Shelton* test).

The district court found that Plaintiff did not sufficiently demonstrate that he exhausted other avenues to obtain this information, and therefore did not satisfy either the apex doctrine or the *Shelton* test. (JA453, JA3386.) The court further noted that the Bank claimed Haskins continued to act as a "consulting" attorney, though he withdrew from the case as litigation counsel. (JA3385 n. 6.)

This ruling is error. First, the apex doctrine should not apply here. The stated purpose of the doctrine is to prevent parties from using discovery to "harass[] the opposition or inflat[e] its discovery costs" by needlessly deposing high-ranking executives, regardless of whether they have specific knowledge of a case. *Performance Sales & Mktg. LLC v. Lowe's Cos.*, No. 5:07-CV-00140-RLV-DLH, 2012 U.S. Dist. LEXIS 131394, at *16 (W.D.N.C. Sep. 14, 2012). Plaintiff's request to depose Haskins was not based on his status as a high-ranking corporate executive—it was based on his direct involvement in this case. Haskins served on the board of directors that voted to terminate Plaintiff and was the sole recipient of Plaintiff's initial age discrimination complaint. Further, Haskins promised to investigate Plaintiff's complaint, but apparently did not. Finally, there is evidence that Haskins directly made discriminatory remarks about older workers. The only person with knowledge of Kendrick's age discrimination complaint to the Board, other than Plaintiff, is Haskins—no other "less burdensome" avenues exist. Additionally, if the court were to find the apex doctrine applicable, the court should also find that Plaintiff properly exhausted any other means to obtain this information by deposing other board members,[6] none of whom could speak to the issues outlined above.

---

[6] On August 2, 2022 (JA1697–2459) and September 20, 2022 (JA2460–2573), plaintiff took the deposition of Vice Chairman of the Board of Directors and former Bank President Phyllis Karavatakis, and on August 3, 2022, plaintiff took the deposition of Board member and Chief Executive Officer Litz van Dyke. (JA2769–2833; JA3141–3166.) Neither knew exactly what Haskins knew.

*Shelton* is also inapplicable. Kendrick sought to depose Haskins in his capacity as Chairman of the Board of Directors and formerly Chairman of the Governance and Compensation Committee and Chairman of the Governance Committee, not in his capacity as counsel for the Bank. After *Shelton*, the Eighth Circuit clarified that *Shelton* only applies when a party seeks to depose opposing counsel about the current litigation and when such questioning would reveal litigation strategy; it does not apply to attorneys acting outside their role as counsel and when questioning does not concern litigation strategy. *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 730 (8th Cir. 2002); *also U.S. v. Phillip Morris Inc.*, 209 F.R.D. 13, 16–17 (D.D.C. 2002).

Subsequent holdings bear this out. In *Pain Ctr. of SE Indiana, LLC v. Origin Healthcare Solutions, LLC*, No. 1:13-cv-133-RLY-DKL, 2015 U.S. Dist. LEXIS 74732 (S.D. Ind. June 10, 2015), for example, plaintiffs moved to depose defendant's former general counsel who submitted a declaration stating that he did not provide business or financial advice to defendant's personnel and staff. *Id.* at \*2. Despite defendant's argument that the *Shelton* doctrine precluded the deposition, the court allowed the deposition to proceed. *Id.* at \*6. Critical to the court's decision was the fact that the record supported support plaintiffs' assertion that counsel had provided non-legal advice to defendant. *Id. See also, Armada (Singapore) Pte. Ltd. v. Amcol Int'l Corp.*, 160 F.3d 1069, 1070–71 (N.D. Ill. 2016) (compelling former general

counsel to sit for deposition and assert privilege on a question-by-question basis). In *Devlyne v. Lassen Mun. Util. Dist*., No. S-10-0286 MCE GGH, 2011 U.S. Dist. LEXIS 119173 (E.D. Cal. Oct. 14, 2011), plaintiff was not required to satisfy the three *Shelton* factors because defendant's in-house counsel was neither trial nor litigation counsel. *Id.* at \*5. In *Bos. Edison Co. v. United States*, 75 Fed. Cl. 557 (Fed. Cl. 2007) the court distinguished *Shelton* and permitted deposition of trial counsel where the focus of the deposition would be counsel's non-legal responsibilities as a consultant in the transaction underlying the litigation and the government was not seeking to discover litigation strategy or counsel's mental impressions of that strategy. *Id.* at 563. Similar here, Kendrick sought to depose Haskins with respect to discoverable factual matters.

Nor is the fact that Haskins once served as defense counsel a bar to his deposition. Where the attorney whose deposition is sought is not trial counsel for a party, courts are less likely to restrict the deposition. *See Premier Dealer Servs., Inc. v. Duhon*, No. 12-1498, 2013 U.S. Dist. LEXIS 150820 (E.D. La. Oct. 18, 2013) (denying plaintiff's motion to quash the deposition of plaintiff's corporate attorney, in-house counsel and Senior Vice-President of Legal, Compliance and Human Resources); *see also U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co*., 2000 U.S. Nos. 97 Civ. 6124 (JGK)(THK), 98 Civ. 3099 (JGK)(THK), 2000 U.S. Dist. LEXIS 12669, at \*\*12–13 (S.D.N.Y. Aug. 31, 2000) (taking depositions of transactional

lawyers "will not be disruptive of the litigation, or raise significant privilege issues, as would be more likely if they were acting as trial counsel."). In the original *Shelton* holding, the Eighth Circuit did not prohibit deposition of in-house counsel who was not acting as litigation counsel and who would be deposed regarding matters in which in-house counsel acted more as a business advisor than in a legal capacity. *Shelton*, 805 F.2d at 1327; *see also Van Den Eng v. Coleman Co.*, Nos. 03-C-0504, 03-C-1392, 2005 U.S. Dist. LEXIS 41748, at *5–6 (E.D. Wis. Sept. 23, 2005) ("Depositions of trial counsel implicate concerns such as disrupting the effective operation of the adversarial system and disqualification of counsel due to their testimony as witnesses that are not present when in-house counsel is deposed.").

Moreover, the Bank's argument below that Haskins cannot be deposed because he is allegedly "a continuing consulting attorney on litigation matters and strategy in the cases at bar" (JA262) also fails. *See e.g., Chesemore v. All. Holdings, Inc.*, No. 1:11 MC 43, 2011 U.S. Dist. LEXIS 108492, at *2–3 (N.D. Ohio Sep. 23, 2011) (ruling that previous counsel could be deposed even where such previous counsel allegedly continued "consulting with the trial team and have had substantial input into the preparation of the litigation strategy and defense.").

Haskins is a critical witness. He received Kendrick's age discrimination complaint and promised to investigate, has knowledge of any investigation that followed, and knows who made the decision to terminate Kendrick's employment

and why. In short, he was not only in the room when it happened, as Chair of the Gov/Com and Board Chair, he likely participated in the decision to assign sham titles to Kedrick, ostracize him, and terminate his employment. The district court's failure to order the deposition hamstrung plaintiff throughout the discovery process and on summary judgment. The record below was therefore never fully developed. Plaintiff requests therefore that this Court remand with instruction to permit the deposition.

### D. The District Court Erred by Awarding Summary Judgment on the Age Discrimination Claim.

The ADEA provides that it shall be unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623. Kendrick filed suit against the Bank under the ADEA alleging that the Bank harassed of discriminated against him "with respect to the compensation, terms, privileges, or conditions of employment" and that the Bank retaliated against him "for engaging in protected activity, including but not limited to filing a complaints of age discrimination and harassment with the EEOC" and the district court. The district court granted summary judgment to the Bank with respect to both claims. The ruling is error.

In *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), decided after the district court issued its opinion, the Supreme Court clarified in a Title VII case that the employee "need show only some injury respecting her employment terms or

conditions" for her claim to be actionable. *Id.* at 977. The Court criticized the lower court's imposition of a judicially imposed test not found in the statute and noted specifically that the courts below "rewrote" the statute, "compelling workers to make a showing that the statutory text does not require." *Id.* at 975. Justice Kavanaugh in his concurrence went further and stated that "the text of Title VII does not require a separate showing of some harm. *The discrimination is harm*." *Id.* at 980 (emphasis added). The operative language in Title VII and the ADEA is identical.[7] *Muldrow* is therefore equally applicable here. Here as in *Muldrow*, the district court erred by going beyond the statute and requiring Kendrick to make a showing that the text of the ADEA does not require. Moreover, this court should find that the evidence here is sufficient to meet the test established by the Supreme Court in *Muldrow* "with room to spare." *Id.* at 977.

Without restating the evidence *seriatim*, after the Bank hired him, Speare told Kendrick and other IT workers that they were not getting any younger and that the Bank needed to be hiring younger people because it takes older people longer to

---

[7] Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Similarly, the ADEA provides that it shall be unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623.

learn new technology, the Bank stripped Kendrick of his duties and assigned two sham titles with no job description and no duties, ostracized Kendrick and excluded him from meetings necessary to do the job, targeted Kendrick for severance and separation from the company, then terminated his employment. During this same time, the Bank created a "Young Professionals Group" limited to persons under the age of 40, and provided that membership was by invitation only. The Bank created no similar group for Kendrick or other older workers. This evidence should have been more than sufficient to overcome summary judgment.

### 1.    Direct Evidence of Age Discrimination Exists.

Turning to the district court's analysis, the district court erred by finding no direct evidence of age discrimination. (JA4376.) "[I]f a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002)*; see also Goldberg v. B. Green and Co.*, 836 F.2d 845, 848 (4th Cir. 1988) (stating that a plaintiff could prove discrimination with "direct evidence of a stated purpose to discriminate"). The direct evidence here is on par with the evidence in *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429 (4th Cir. 1985), *cert. denied*, 475 U.S. 1016 (1986). In *Wilhelm* the Fourth Circuit found that discharged employees introduced ample evidence suggesting that the company had fired them because of their age. *Id*. at 1433. For example, one of the plaintiff's immediate supervisors told him that the company (Blue

31

Bell) "cannot stand these five and six percent commission rates" and that "eventually Blue Bell is going to have $15,000 a year college boys for salesmen. . . . so, in time they will have all young college guys on a salary, being paid expenses and going around taking inventory in Blue Bell accounts." *Id.* at 1433. The same supervisor stated that "older people tend to become complacent whereas younger people generally have more drive and ambition" and that "younger salesmen do a much better job than older salesmen" and "in the not too distant future, all . . . salesmen would be young, college boys . . . ." *Id.* at 1433–34. The Fourth Circuit concluded that this evidence was sufficient to survive a motion for a directed verdict or a judgment notwithstanding the verdict. *Id.* at 1434.

In *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230 (4th Cir. 1982), the Fourth Circuit held that direct evidence of age discrimination is sufficient to overcome a motion for a directed verdict or judgment notwithstanding the verdict. With respect to ruling upon a sufficiency motion in an age case, the Fourth Circuit stated:

> The first question is whether plaintiff's evidence may have carried the original production burden without need to invoke the *McDonnell-Douglas* presumption. This may have occurred, for example, through direct evidence of a stated purpose to disfavor because of age. . . . If this is the judicial assessment, inquiry of course ceases, no further production burdens are put in play, and the motion can be denied.

*Id.* at 240 (internal citation omitted). Further, in *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109 (4th Cir. 1981), *cert. denied*, 454 U.S. 860, 70 L. Ed. 2d 158, 102 S. Ct. 316

(1981) the Fourth Circuit held that where the plaintiff in an age case relies primarily upon direct evidence of a discriminatory motive by the employer, the case "simply does not fit the mold of the McDonnell Douglas formula." *Id*. at 1113 n. 2 (*quoting Loeb v. Textron, Inc*., 600 F.2d 1003, 1018 (1st Cir. 1979)).

Bank President Karavatakis told Kendrick plainly that she wanted younger people working in IT and added, "Brad you need to be finding your replacement. And she would ask me also, how old is Diann [Nelson, age 64] and how old is Lee [Eldridge, age 66 (JA3125–3127)] . . . . And I said, well, they're older than me," to which Karavatakis responded, "well, you need to be finding their replacements too." (JA769.) Kendrick also stated that Karavatakis "resented me being in charge of IT and she wanted younger people in IT." (JA768–769.) Speare also met with IT personnel in the fourth quarter of 2017 and stated that "all of us sitting around this table are not getting any younger and we need to be hiring younger people because it takes longer for older people to learn the new technologies." (JA819 (echoing Karavatakis).) Speare then displayed PowerPoint slides that "listed the number of employees in the Bank, the aggregate total of the ages, I think it was 40 some thousand[sic], and the average age, if I recall, was 47 years of age for the average age of Carter Bank & Trust employees." (JA819–820.) With respect to Haskins' statement about the Bank wanting "young" directors, a jury may find, as did the district court (Conrad) at the hearing of this matter on July 17, 2020, that "the

comments about the age of directors, while not actionable in and of themselves, indicate a mindset of the board" and "may impute the decisions that were made about employees of the bank . . . as reflecting on the mindset of the bank leadership" (JA198–199) and that age discrimination indeed infected many of the employment decisions at the Bank. (*Id.*)

## 2.    Indirect Evidence of Age Discrimination Also Exists.

A plaintiff can prove discrimination in two ways: through "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue" or through the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999). No matter which method of proof is used, the ultimate question "is a straightforward one—whether plaintiff[] successfully demonstrated that [swas] the victim[] of . . . discrimination on the part of [her employe" *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511 (4th Cir. 1994).

Even if this Court does not find direct evidence, sufficient indirect evidence exists to overcome summary judgment. For example, Karavatakis' claim that Kendrick "didn't know the new technology. He understood programming back in 1985. He understood how to program. I don't think he understood the way technology had moved forward. I think he was afraid of technology" (JA1733) is quintessentially a stereotypical characterization that older workers cannot learn new

technology. Federal courts have regularly found that such statements "are consistent with common ageist stereotypes—namely, that older workers are 'resistant to change' and are unable or unwilling to learn or adapt to new technology." *Peterson v. Mid-State Grp., Inc*., 54 F. Supp. 3d 1039, 1044 (E.D. Wis. 2014), citing *Hartsel v. Keys*, 87 F.3d 795, 802 (6th Cir. 1996) (stating that the assumption that "older workers are more resistant to change and are adverse to learning new methods . . . is the very type of ageist stereotype that the ADEA was enacted to address"). *See also Parrish v. Immanuel Med. Ctr*., 92 F.3d 727, 734 (8th Cir. 1996) ("The ADEA was enacted to combat stereotypes regarding the ability of older employees to keep pace with changes in the work place."); *O'Reilly v. Marina Dodge, Inc*., 435 F. App'x 8, 12 (2d Cir. 2011) ("A common stereotype of elderly people is that they resist change and new approaches."); Barbara T. Lindemann & David D. Kadue, *Age Discrimination in Employment Law 5* (2003) (identifying as stereotypical the view that "older workers are unable or unwilling to learn or adapt to new technology").

The Bank states in 2018 Board Minutes under a section entitled, "President and CEO Report," that "[m]ost of our employees are upbeat and excited about the new business model. Some of the older retail staff is struggling with the new technology and expectations." (JA2412.) Speare's deposition testimony also revealed an ageist view of Kendrick:

> A . . . [Mr. Kendrick had] a lack of the ability to be able to lead in an organization that needed to modernize its practices . . . . [I]t became

35

apparent that Mr. Kendrick was not capable of understanding, not just the newer, or the changing of that underlying technology, nor apparently did he want to spend the time and effort required to be able to learn that new suite of products that would be coming in.

(JA3115–3116.) From this evidence,

A jury could reasonably conclude that these stereotypes colored [defendant]'s assessment of Peterson's abilities and attitude. It may be that because of these stereotypes, [defendant] was more likely to jump to the conclusion that [plaintiff] would be unable to learn the new computer system and that he was resistant to the changes being made in the service department. Because of these stereotypes, [defendant] may have judged [plaintiff]'s performance and attitude more harshly than he would have judged the performance and attitude of a younger worker.

*Peterson v. Mid-State Grp., Inc*., 54 F. Supp. 3d 1039, 1044 (E.D. Wis. 2014).

Particularly when viewed in light most favorable to plaintiff, a jury may well find that the Bank's ageist stereotype negatively "colored [the Bank's] assessments of [Kendrick's] abilities and attitude" which in turn fueled the Bank's negative employment actions. Courts around the country have consistently held that this is the very essence of age discrimination:

The facts alleged in the complaint raise a reasonable inference that plaintiff's putative constructive discharge was caused by assumptions regarding his abilities because of his age, "the very essence of age discrimination." The repeated alleged assumption that plaintiff was more likely to injure himself, with a reasonable inference drawn that this assumption was based upon plaintiff's age, is the kind of "stereotypical assumption[] that the ADEA sought to eradicate."

*Bounds v. Town of Red Springs*, No. 5:20-CV-601-FL, 2022 U.S. Dist. LEXIS 498, *12–13 (E.D.N.C. Jan. 3, 2022) (internal citations omitted). *See also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610–11 (1993) ("It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age . . . . The employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity.").

In addition, as stated supra, not one of the ten (10) executives hired by van Dyke was over 56 years of age. Van Dyke testified unequivocally that age "*would be a factor* in determining an appropriate candidate" for employment (JA3159–3160 (emphasis added).) Truer words were never spoken. Having conceded that age was a factor in employment decisions, it is for the jury to determine in this case whether age was a "but for" factor. Moreover, the Bank created a "Young Professionals Group." Membership in the group was by invitation only. The Bank dictated that no one over the age of 40 could join the group. The average age of people in the group was 29. The direct and indirect evidence of age discrimination here should have been sufficient to overcome summary judgment.

### 3. The Evidence is Also Sufficient Under *McDonnell Douglas*.

Under the *McDonnell Douglas* burden-shifting framework, plaintiff must (1) establish a *prima facie* case of discrimination; if a prima facie cases is presented,

then (2) the burden shifts to defendant "to show a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action"; if defendant makes such a showing, then (3) "the burden shifts to the plaintiff to prove that the reason is pretextual." *Sanders v. Tikras Tech. Sols. Corp.*, 725 F. App'x 228, 229 (4th Cir. 2018) (per curiam) (citing *McDonnell Douglas*, 411 U.S. at 802–04; *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)).

In order to show a *prima facie* case of disparate treatment under the ADEA, a plaintiff must establish four elements: (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he was performing satisfactorily at the time of his adverse employment action, and (4) the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination." *Miles v. Dell, Inc.*, 429 F.3d 480, 484–87 (4th Cir. 2005) (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253).

The district court erred by concluding that Kendrick could not establish a prima facie case and did "not complete the McDonnell-Douglas analysis." (JA4379.) The first element is not in dispute. *Muldrow*, decided after the district court issued its opinion, disposes of the second and fourth elements. With respect to the third element, as stated *supra*, the jury could find from the evidence that Kendrick's performance was adequate. Finally, the district court erred by finding as a matter of law that "the Bank has provided a legitimate, non-discriminatory reason for

Kendrick's termination that defeats Kendrick's claim." (JA4386.) The court found as a matter of law that Kendrick "took confidential bank and customer information" from the bank "in violation of Carter Bank's policies and his Pledge of confidentiality" and "allowed confidential Carter & Bank Trust information to be posted on the PACER system, which made the confidential information available to the public." (*Id.*) This is not true.

First, the information was not "confidential." The Bank's own policy defines "confidential information" as follows,

> Confidential information includes all nonpublic information that might be of use to competitors, or unfavorable to us or our customers if disclosed. Confidential information includes, but is not limited to, the following: (1) information marked "Confidential," "Private," "For Internal Use Only," or similar legends, (2) technical, financial or economic information relating to past, current and future products, services or research, (3) business or marketing plans or projections, (4) earnings and other internal financial data, (5) personnel information, (6) vendor and customer lists and (7) other non-public information that, if disclosed, might be of use to CB&T's competitors, harmful to CB&T or its vendors, customers or other business partners, or constitute a violation of securities laws. CB&T directors, officers and employees, are entrusted with confidential information that must be safeguarded at all times.

(JA949.) By the Bank's own standard, none of the documents in question contained confidential information. None of the information in question "might be of use to competitors, or unfavorable to us or our customers if disclosed."

Moreover, the district court overlooked the fact that early on during these proceedings, Kendrick went above and beyond to ask the Bank to identify which documents it considered "confidential." (JA131.) Despite repeated request, then counsel for the Bank (Haskins) refused to identify which documents or portions thereof it deemed "confidential" and even vigorously opposed entry of a protective order. This is unheard of in employment litigation. Because the Bank would not state what it considered confidential, *plaintiff* (not defendant) filed a motion for a protective order (JA105) again asking the Bank to state what documents it believed to be confidential. Inexplicably, the Bank *opposed* that motion (JA136), necessitating a hearing. At the hearing on June 18, 2020, plaintiff asked the court to order the Bank to identify which documents it deemed to be confidential: "I've emailed counsel, said 'Just tell us what you think is confidential.' . . . So, again, I think a protective order needs to be entered. The defense needs to produce the documents. If things are confidential, stamp them 'confidential.'" (JA154.) The court agreed and stated that "we'll have a protective order" and noted that "the entry of the order is not stipulated or agreed upon." (*Id.* at JA160–161.)

As to the Bank's suggestion that bank regulators might consider certain matters confidential, the court stated plainly that "[i]f the FDIC wanted to, it could ask to intervene in this case" and noted that "there's some remedy that the FDIC and the Virginia regulatory authorities can pursue." (*Id.* at JA159–160.) When the Bank

suggested a month later that the "FDIC and the Commonwealth of Virginia, the banking division, [may wish to] intervene under Rule 24," the district court responded, "If they want to, that's fine." (JA200.) They never did. The Bank is estopped therefore from complaining that any alleged "confidential" information was filed with the court.  In something akin to contributory negligence under tort law, the Bank contributed to the very problem it later complained about.

Next, the information provided by van Dyke at deposition concerning "trade secrets" is similar to "confidential information." According to van Dyke and the Bank's policy, employees are permitted to provide documents containing "trade secrets" to counsel (JA3151–3157), and the Bank has a policy that specifically prohibits retaliation against employees who act as a whistleblower. When asked to define a "trade secret," van Dyke testified that "trade secrets" include "how we do business, things that would give us a competitive advantage over our competitors, you know, things like that" (JA3153)—a definition that is virtually identical to the Bank's definition for "confidential information." Van Dyke also testified that he had never received nor was he aware of any training concerning what is and is not a trade secret. (JA3154; *see generally id.* at JA3151–3157.) CAO Jane Ann Davis, who was over HR and works "with our training and development department," said the Bank has "**never** provided proper training, education or accountability to our employees. *We need to do a better job of this*." (JA3053, JA3063–3064, JA3075 (emphasis

added).) Given that neither Kendrick nor the Bank's CEO received any training concerning "trade secrets" or "confidentiality," that according to the CEO the definitions of the two are highly similar, and that the Bank's own policy provided that an employee could provide certain documents to his attorney, the jury may well find that Kendrick reasonably believed that he could provide the documents in question to his attorney. Again, the district court erred by viewing the evidence in the light most favorable to the Bank and resolving the question in the Bank's favor.

Nor did Kendrick "allow" the exhibit to be filed on PACER. Kendrick merely "forwarded it to my attorney but I had nothing to do with uploading or anything." (JA836, JA844–845 ("I sent the information over to my attorney. I have no way of uploading something or okaying something for the PACER. To be honest with you, I don't know what PACER really does. I have no passwords to PACER."); JA895 ("But again, I'm not the attorney and didn't work on this document as far as putting it together.").) The district court erred therefore by finding as a matter of law that the Bank had a legitimate, non-discriminatory reason for discharging Kendrick.

### E.    The District Court Erred by Awarding Summary Judgment on the Hostile Environment Claim.

To establish a hostile environment claim under the ADEA, plaintiff must show "(1) that he experienced unwelcome harassment; (2) that the harassment was based on his age; (3) that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) that there is

some basis for imposing liability on the employer." (JA184–185 (citing *Bass v. E.I. DuPont Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003)).)

The district court's sole reason for granting summary judgment was a finding as a matter of law that the harassment was not "pervasive enough to alter the conditions of Kendrick's employment." The ruling is error. The ruling is also foreclosed by *Muldrow* and is otherwise perplexing. The harassment negatively impacted every aspect of Kendrick's work, every day. Summarizing the evidence discussed *supra*, the jury may well find that the fact that the Bank stripped Kendrick of his duties, assigned two sham job titles with no job description and no responsibilities, ostracized him, told him plainly that "we don't have anything for you," told him and other IT workers that they weren't getting any younger and that the IT department needed younger workers, and that Kendrick and other older IT workers needed to be looking for their replacements, created an extremely hostile work environment. Kendrick and other older workers who dedicated their entire working lives to the Bank were suddenly worth nothing. Moreover, van Dyke and Karavatakis plainly had a "vendetta" against Kendrick (JA764), and others fed on their animus. For example, based on things he "heard . . . from Karavatakis" (JA2711), credit officer David Peterson, Karavatakis' friend of more than 30 years, told Matthews Young consultant Timothy O'Rourke that Kendrick "was in his position for two basic reasons. He was an ass kisser and a back stabber." (JA2705.)

Further, as shown *supra*, the age animus infected the Bank top to bottom, from directors to IT workers such as Kendrick to branch managers and other employees. For reasons stated by the district court (Conrad) early on in its memorandum opinion (JA185–187), the question of whether the harassment was pervasive was "quintessentially a question of fact." (JA185 (quoting *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 733 (4th Cir. 1997))). Summary judgment should therefore have been denied.

**F.    The District Court Erred by Awarding Summary Judgment on the Retaliation Claim.**

To establish a retaliation claim, the plaintiff must show that (1) he engaged in protected activity, (2) that an adverse employment action was taken against him, and (3) that there was a causal connection between the protected activity and the adverse employment action. *Davis v. Durham Mental Health Dev. Disabilities Substance Abuse Area Auth.*, 320 F. Supp. 2d 378, 408 (M.D.N.C. 2004). The goal of anti-discrimination statutes is "to root out the 'cancer [of discrimination] in [the] workplace.'" *DeMasters v. Carilion Clinic*, 796 F.3d 409, 418 (4th Cir. 2015) (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 284 (4th Cir. 2015)). This is especially true in retaliation cases, "where Title VII must be read to provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination, because effective enforcement could . . . only be expected if employees felt free to approach officials

44

with their grievances." *Id.* (cleaned up; internal citations omitted). The district court erred by finding that Kendrick did not engage in protected activity and that there was no evidence of causation.

Kendrick's complaints about age discrimination to the Gov/Com and Vice-Chair of the Board of Directors, the President, and the HR Director and Chief Administrative Officer of the Bank, filing two charges of discrimination with the EEOC, and filing suit, are all unquestionably protected activity. The district court's ruling is therefore error. The district court narrowly ruled, however, that Kendrick's removal and disclosure of confidential documents "cannot be considered protected activity." (JA4396.) This ruling is error.

The jury may find that Kendrick's removal of documents from the Bank and provision of documents to counsel does not foreclose a retaliation claim. *Kempcke v. Monsanto Co.*, 132 F.3d 442, 445 (8th Cir. 1998), is instructive. There the court reversed an award of summary judgment in an ADEA case involving an employee who removed documents from an employer and described the employee's conduct as "at least arguably oppositional or litigation activity, because it placed documents that might evidence discrimination in the hands of a legal professional who would litigate the issue on [plaintiff]'s behalf if he could not resolve the matter informally with Monsanto." Similarly in *Quinlan v. Curtiss-Wright Corp.*, 204 N.J. 239, 8 A.3d 209 (N.J. 2010), the executive director of human resources, believing that the

company had discriminated against her when it promoted a man less qualified than her and made him her supervisor, gathered approximately 1800 documents and provided them to her attorney. When the company fired her for theft of the documents and violation of company policies, she filed suit for sex discrimination and retaliation. Notably, "[a]fter finding that the attorney's use of the documents was itself protected and rejecting the argument that it was disruptive, the court concluded that plaintiff could prevail on her retaliation claim if the jury believed that she was fired because of what the attorney did, rather than because she continued to take and copy documents." *Id.* 204 N.J. at 251. The jury agreed with the plaintiff and awarded compensatory and punitive damages. *Id.* 204 N.J. at 244. The trial court denied the company's motion for a new trial and "found that there was ample basis for the jury to conclude that defendant had covered up its discrimination both before and during trial, that it terminated plaintiff, a long-time employee, with no intermediate discipline, and that it used the terms 'theft' and 'breach of trust' in her termination letter in an effort to conceal its true motivation for her dismissal." *Id.* 204 N.J. at 253. The jury in the case at bar may find the same thing.

On appeal, looking to federal precedent, the Supreme Court of New Jersey developed a test that balanced the rights of employers and employees and affirmed the judgment of the trial court. With respect to the removal of documents, the court noted that if an employee removed a document, "looked at it, copied it and shared it

with an attorney for the purpose of evaluating whether the employee had a viable cause of action or of assisting in the prosecution of a claim, the factor will favor the employee." *Id.* 204 N.J. at 269. The court noted that "[w]hen presented with that question, the jury found for plaintiff, concluding that she was the victim of retaliatory discharge" and found "no warrant to interfere with that finding." *Id.* 204 N. J. at 273. Here, Kendrick believed that the Bank's code of conduct policy permitted him to share information with an attorney, and he "followed company policy to give [the information] to his attorney (JA574, JA686.) Carter Bank can hardly complain if Kendrick misunderstood the policy, for the Bank has "*never* provided proper training, education or accountability to our employees. *We need to do a better job of this*." (JA3053, JA3063–3064, JA3075 (emphasis added).)

Furthermore, it is undisputed that Kendrick had nothing to do with filing the exhibit in question: "I forwarded it to my attorney but I had nothing to do with uploading or anything." (JA836; JA844–845 ("I sent the information over to my attorney. I have no way of uploading something or okaying something for the PACER. To be honest with you, I don't know what PACER really does. I have no passwords to PACER.").) With respect to any violation of bank policy, Kendrick "did follow the Code of Conduct along with the whistleblower policy." (JA847–848.) Again with respect to the filing, Kendrick testified,

> Q      All right. So if you'll – you understand that the January 25th, 2017 minutes are what you filed publicly, correct?

A     You keep saying that I filed publicly.

Q     Through your attorney.

A     No, I just gave them to my attorney. I didn't file anything.

(JA854.) According to Kendrick, he was terminated "because I filed the lawsuit with the bank . . . I think the bank used me filing the lawsuit and they thought by me giving my attorney documents . . . that that was the opportunity to get rid of an old man with Carter Bank due to age." (JA862–863.) Stating further, Kendrick testified that "the documents that I gave to [counsel], that excuse is not a legitimate reason to terminate me because, again, between the code of conduct policy that the board of directors approved and we were all trained on along with the whistleblower policy allowed me to provide my attorney the documents." (JA864.) Whether filing an exhibit on PACER is a form of protected activity appears to be a question of first impression in this circuit. The district court erred therefore by concluding that Kendrick did not engage in protected activity.

Next, for reasons stated *supra*, a triable question of fact exists with respect to whether Kendrick's discharge was causally related to the fact that he complained to the highest levels of management about age discrimination, filed two charges of discrimination with the EEOO, then filed suit against the Bank. Moreover, because the district court prohibited Kendrick from deposing the Board Chair, and there is evidence that the Board made the decision to terminate Kendrick's employment, Kendrick was prohibited from developing evidence as to that point.

Next, with respect to any alleged violation of the Gramm-Leach-Bliley Act (GLBA), 15 U.S.C. § 1602 (JA4394), there is none. The statute provides that "a financial institution may not . . . disclose to a nonaffiliated third party any nonpublic personal information." Nothing Kendrick did violated the statute. Kendrick did not disclose "any nonpublic personal information" to a "nonaffiliated third party," and filing the exhibit with the district court is not a violation of the statute. The district court's finding that "the publication of the documents nevertheless violated the GBLA [sic]" is therefore error. In response to defendants' statement that "the FDIC and the Commonwealth of Virginia, the banking division" may wish "to intervene under Rule 24," the district court (Conrad, J.) responded early during these proceedings, "[i]f they want to, that's fine." (JA200.) Neither the state nor the federal agencies ever intervened.

### G.    The District Court Erred by Striking Plaintiff's Notice of Supplemental Facts.

Finally, the district court struck Kendrick's Notice of Supplemental Facts (JA3563) on the grounds that it violated Local Rule 11(c)(1). It does not. The rule provides in pertinent part that "[n]o further *briefs* (including letter briefs) are to be submitted without first obtaining leave of court." *Id.* (emphasis added). Kendrick did not file a supplemental brief. Kendrick filed complaints filed by the Bank in the Circuit Courts for the City of Martinsville and Henry County, Virginia (JA3565–4188) and the Bank's published Personal Information Policy (JA4189–4190). All of

the complaints are a matter of public record. It is well-settled that the court may "consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991) ("the documents are required by law to be filed with the SEC, and no serious question as to their authenticity can exist"). Similarly, in *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999), after discussing Rule 201 and the applicable case law, the Eleventh Circuit "approve[d] of the Second Circuit's practice of judicially noticing relevant documents legally required by and publicly filed with the (SEC)." Similarly in *Samsung Elecs. Am., Inc. v. Chung*, No. 3:15-CV-4108-L, 2020 U.S. Dist. LEXIS 24992, *7 (N.D. Tex. Feb. 13, 2020), the court noted that "[c]ourts routinely take judicial notice of public records, including court documents and trademark registrations," citing *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011)("[T]he district court took appropriate judicial notice of publicly-available documents and transcripts . . . which were matters of public record directly relevant to the issue at hand.") (citation omitted). The Bank's filings contain customer names, addresses, social security numbers, and account information, none of which the Bank regarded or treated as confidential. The Bank cannot have it both ways. The Bank cannot file documents containing customer names, addresses, social security numbers, and account information, then terminate Kendrick for filing the exhibit in question, which in any event was removed from PACER shortly after filing at the Bank's request.

The case cited by the district court, *Duarte v. Truist Bank*, 2021 U.S. Dist. LEXIS 197784 (W.D.N.C. Oct. 14, 2021), is inapt. There, plaintiff filed a "Supplemental Memorandum as to Defendant's Motion for Summary Judgment." *Id.* at *5. The memorandum included an "Expert Report of Randall A. Snyder" and an "Expert Report Jennifer Clowery." (DKT Nos. 61-2 and 61-4.) Unlike the case at bar, neither report was a matter of public record. The supplemental brief was therefore struck by the court. In contrast here, the complaints in question are a matter of public record. The Bank cannot argue prejudice, for it filed the complaints. The district court therefore erred by granting the motion to strike.

The district court also overlooked the Bank's SEC filings detailing the highly contentious litigation between the Bank and West Virginia Governor Jim Justice and the Bank (JA4191–4396) all of which is very much a matter of public record. *See* https://investors.cbtcares.com/filings/documents/ (choose "Current Reports" from dropdown; select 8-K filings from January 25, February 15, and March 8, 2024).

## CONCLUSION

Kendrick therefore requests entry of an order reversing the judgment of the district court and remanding the case for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Kendrick requests oral argument.

Respectfully Submitted,

BRADFORD M. KENDRICK

By____/s/ *Terry N. Grimes*_____
Terry N. Grimes, Esq. (VSB No. 24127)
Kaley J. Gordon-Shupp, Esq. (VSB No. 96992)
TERRY N. GRIMES, ESQ., P.C.
320 Elm Avenue, SW
Roanoke, VA  24016
(540) 982-3711 – Telephone
(540) 345-6572 – Facsimile
tgrimes@terryngrimes.com
k.gordon-shupp@terryngrimes.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments): This document contains 12,719 words.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface using Microsoft Word in 14 point Times New Roman.

Respectfully Submitted,

BRADFORD M. KENDRICK

By    /s/ *Terry N. Grimes*
Terry N. Grimes, Esq. (VSB No. 24127)
Kaley J. Gordon-Shupp, Esq. (VSB No. 96992)
TERRY N. GRIMES, ESQ., P.C.
320 Elm Avenue, SW
Roanoke, VA  24016
(540) 982-3711 – Telephone
(540) 345-6572 – Facsimile
tgrimes@terryngrimes.com
k.gordon-shupp@terryngrimes.com

*Counsel for Appellant*