## 24-1377

# United States Court of Appeals
### *for the*
# Fourth Circuit

---

BRADFORD M. KENDRICK,

*Plaintiff/Appellant,*

— v. —

CARTER BANK & TRUST, INC.,

*Defendant/Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA AT DANVILLE

## BRIEF OF APPELLEE

King Fitchett Tower
Joshua Richard Treece
Christine S. Ward
WOODS ROGERS VANDEVENTER
  BLACK PLC
10 South Jefferson Street, Suite 1800
Roanoke, Virginia 24038
(540) 983-7541

*Counsel for Appellee*

CP COUNSEL PRESS    (800) 4-APPEAL • (JOB 811032)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-1377__        Caption: _Bradford M. Kendrick v. Carter Bank & Trust, Inc._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Carter Bank & Trust (incorrectly identified in the pleadings as "Carter Bank & Trust, Inc.")_____
(name of party/amicus)

_____

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

       Carter Bankshares, Inc.


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                             ☑ YES ☐ NO
      If yes, identify all such owners:
       Effective on November 20, 2020, Carter Bankshares, Inc. became the parent bank holding
       company of Carter Bank & Trust.  Carter Bankshares, Inc. is publicly held.

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _s/ King F. Tower_____    Date: _____May 2, 2024_____

Counsel for: _Carter Bank & Trust_____

- 2 -

[ Print to PDF for Filing ]

**<u>TABLE OF CONTENTS</u>**

**Page**

TABLE OF AUTHORITIES ...............................................................iv

STATEMENT OF THE CASE..........................................................1

    A.    Relevant Carter Bank Background.........................................4

    B.    Relevant Kendrick Background ............................................7

    C.    Carter Bank Suffered from Substantial Technological Deficits Under Kendrick's IT Leadership............................................7

        i.    Regulatory and management concerns with CoreSoft..............10

    D.    To Address Pressing Regulatory Concerns with Technological Shortcomings and The Lack of Adequate Succession Planning, Carter Bank Hired Independent Management Consultants .....................................................11

        i.    MYC independently concluded Kendrick was not qualified to be CIO and the Bank should recruit externally.....................................................................12

        ii.    Kendrick's age was not a factor in the MYC report................13

    E.    Age Was Not a Factor in Hiring Matt Speare .....................14

    F.    The Impacts of Hiring Speare Are Not Related to Age ......15

    G.    Kendrick's February 2017 Complaint that He Was "Not Being Involved in Meetings" Was Not, In Fact, Related to His Age ..............................................................................16

        i.    Kendrick did not report any purported age-based harassment between February or June 2017 and the date of filing of his first EEOC Charge in October 2019.............................................................17

        ii.    Kendrick's "harassment" allegations are not, in fact, age-based...................................................................18

    H.    Kendrick Relies on Purported Comments in 2017 that Are Immaterial, Stray Remarks Unconnected to Any Adverse Action.................................................................18

i

i.    Karavatakis's alleged 2017 statements that "the Bank needed to be finding replacements" for her, Kendrick and others do not relate to adverse action against Kendrick or reflect discriminatory animus ...............................18

ii.    Speare's alleged 2017 statement that "all of us sitting around the table are getting older" and "the Bank needs to hire younger employees" does not relate to adverse action against Kendrick.............................................................20

iii.    Succession planning statements related to Board members do not relate to Kendrick or adverse action against him .............................................................................21

I.    Kendrick Relies on Unsupported, Generalized Conspiracy-style Allegations of "Systematic Discrimination," and Immaterial Allegations Relating to Burnopp and Newell...................22

J.    Carter Bank's Young Professionals Group Is Immaterial .................23

K.    Kendrick Violated His Pledge of Confidentiality, Wrongfully Took Confidential Information and Was Terminated for Legitimate, Nondiscriminatory and Nonretaliatory Reasons.............24

L.    Kendrick's Post-Termination Evidence Is Misrepresented and Immaterial.........................................................................25

i.    Board succession planning statements in June 2020 do not relate to Kendrick or adverse action against him ..............25

ii.    Van Dyke's deposition testimony is also mischaracterized and immaterial .............................................26

SUMMARY OF ARGUMENT ................................................................28

ARGUMENTS AND AUTHORITIES ....................................................30

I.    THE DISTRICT COURT'S DECISION TO GRANT CARTER BANK'S MOTION FOR SUMMARY JUDGMENT WAS CORRECT ...........................................................30

a.    The District Court Applied the Correct Standard ....................30

b.    The District Court Properly Granted Summary Judgment on Kendrick's Disparate Treatment Claim ...............................32

ii

   i. The district court correctly found no direct evidence of discrimination.................................32

   ii. Kendrick's miscellaneous "evidence" is not direct or circumstantial evidence of discrimination ...............................................37

   iii. The district court correctly found Kendrick failed to make a *prima facie* showing of discrimination ...............................................40

   iv. Even if Kendrick could have made a *prima facie* case, he failed to overcome the Bank's legitimate, non-discriminatory grounds for termination .................42

  c. The District Court Properly Granted Summary Judgment on Kendrick's Hostile Work Environment Claim....................................................44

  d. The District Court Properly Granted Summary Judgment on Kendrick's Retaliation Claim.............................44

II. THE DISTRICT COURT CORRECTLY OVERRULED KENDRICK'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDERS PRECLUDING THE DEPOSITION OF JAMES HASKINS ...........................................................47

  a. Kendrick Expended His Deposition Limit and No Deposition Remained for Haskins or Anyone Else .................47

  b. Haskins Has No Material Information that Is Relevant to Summary Judgment ...............................................48

  c. Kendrick Failed to Timely Revisit His Objections to the Motion for a Protective Order.............................................51

  d. The District Court Correctly Found No Clear Error in the Magistrate Judge's Conclusion that Kendrick Failed to Exhaust Alternative Means to Obtain the Information He Sought from Haskins.......................................52

III. THE DISTRICT COURT PROPERLY STRUCK KENDRICK'S NOTICE OF SUPPLEMENTAL FACTS .................55

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Abramson v. Am. Univ.*,
   1988 WL 152020 (D.C. Cir. 1998) ....................................................40

*Allen v. Brown Advisory, LLC*,
   2020 WL 5603760 (W.D. Va. 2020) ..................................................54

*Arthur v. Pet Dairy*,
   593 F. App'x 211 (4th Cir. 2015).................................................. 33, 37

*Birkbeck v. Marvel Lighting Corp.*,
   30 F.3d 507 (4th Cir. 1994), *cert. denied*, 513 U.S. 1058 (1994) ................ 34, 35

*Bos. v. Blue Cross & Blue Shield of Kansas, Inc.*,
   431 F. App'x 763 (10th Cir. 2011)................................................. 36-37

*Brinkley v. Harbour Recreation Club*,
   180 F.3d 598 (4th Cir. 1999), *overruled on other grounds by
   Desert Palace v. Costa*, 539 U.S. 90 (2003) ........................................35

*Chapotkat v. Cty. of Rockland*,
   2014 WL 1373531 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 24
   (2d Cir. 2015) ..........................................................................37

*Cole v. Fam. Dollar Stores of Md., Inc.*,
   811 F. App'x 168 (4th Cir. 2020)........................................... 28, 33, 37

*Collier v. Serv. Am. Corp.*,
   934 F. Supp. 168 (D. Md. 1996)........................................................35

*Cooper v. Omni Ins. Co.*,
   2015 WL 1943802 (D.S.C. 2015) ......................................................55

*Dauphin v. Hennager*,
   727 F. App'x 753 (4th Cir. 2018)......................................................52

*Denio v. Asplundh Tree Expert Co.*,
   92 F.3d 1177 (4th Cir. 1996) ...........................................................39

*Desert Palace v. Costa*,
   539 U.S. 90 (2003) .....................................................................35

*Dockins v. Benchmark Commc'ns*,
　176 F.3d 745 (4th Cir. 1999) ...............................................................35

*EEOC v. Clay Printing Co.*,
　955 F.2d 936 (4th Cir. 1992) ...............................................................34

*Evans v. Techs. Applications & Serv. Co.*,
　80 F.3d 954 (4th Cir. 1996) .................................................................31

*Foster v. Univ. of Md.-E. Shore*,
　787 F.3d 243 (4th Cir. 2015) ........................................................ 29, 45

*Gross v. FBL Fin. Servs., Inc.*,
　557 U.S. 167 (2009) ..................................................................... *passim*

*Harper v. Arrow Elecs.*,
　2021 WL 37665 (D. Colo. 2021), *aff'd*, 2021 WL 6071625
　(10th Cir. 2021) ..................................................................................37

*Harris v. Forklift Sys., Inc.*,
　510 U.S. 17 (1993) ..............................................................................44

*Hazen Paper Co. v. Biggins*,
　507 U.S. 604 (1993) ...................................................................... 37, 39

*Hopper v. Hallmark Cards, Inc.*,
　87 F.3d 983 (8th Cir. 1996) .................................................................38

*Johnson v. Harvey*,
　2007 WL 201225 (E.D. Ark. 2007).....................................................37

*Johnson v. Portfolio Recovery Assocs., LLC*,
　682 F. Supp. 2d 560 (E.D. Va. 2009) ..................................................46

*Kelly v. Stafford Tractor Co.*,
　2009 WL 425356 (N.D. Ga. 2009).......................................................36

*Kempcke v. Monsanto Co.*,
　132 F.3d 442 (8th Cir. 1998) ...............................................................45

*Khan v. FedEx Corp.*,
　2015 WL 3455177 (E.D. Va. 2015), *aff'd sub nom. Kahn v. FedEx Off.
　& Print Servs., Inc.*, 628 F. App'x 201 (4th Cir. 2016) ......................40

*Kitlinski v. U.S. Dep't of Justice*,
　994 F.3d 224 (4th Cir. 2021)................................................................52

v

*Krodel v. Young*,
  748 F.2d 701 (D.C. Cir. 1984), *cert. denied*, 474 U.S. 817 (1985)......................38

*Laughlin v. Metro. Wash. Airports Auth.*,
  149 F.3d 253 (4th Cir. 1998) ......................................................... 45, 46

*Martin v. Scott & Stringfellow, Inc.*,
  643 F. Supp. 2d 770 (E.D. Va. 2009), *aff'd*, 352 F. App'x 778
  (4th Cir. 2009) ........................................................................... 34-35

*Mereish v. Walker*,
  359 F.3d 330 (4th Cir. 2004) ...................................................................34

*Monster Energy Co. v. Vital Pharm., Inc.*,
  2020 WL 2405295 (C.D. Cal. 2020) ......................................................54

*Muldrow v. City of St. Louis*,
  601 U.S. 346 (2024) ......................................................... 28-29, 41, 44

*Netter v. Barnes*,
  908 F.3d 932 (4th Cir. 2018)......................................................... 45, 46

*Newell v. Carter Bank & Tr.*,
  2023 WL 2142974 (W.D. Va. 2023)......................................................23

*O'Day v. McDonnell Douglas Helicopter Co.*,
  79 F.3d 756 (9th Cir. 1996)......................................................... 28, 46

*Orlando v. Neal*,
  2023 WL 7413343 (W.D. Va. 2023)......................................................55

*Performance Sales & Mktg., LLC v. Lowe's Cos.*,
  2012 WL 4061680 (W.D.N.C. 2012)......................................................53

*Perkins v. Int'l Paper Co.*,
  936 F.3d 196 (4th Cir. 2019) ......................................................41

*Phelps v. Yale Sec., Inc.*,
  986 F.2d 1020 (6th Cir. 1993), *cert. denied*, 510 U.S. 861 (1993)......................35

*Phillips v. StellarOne Bank*,
  2012 WL 3762448 (W.D. Va. 2012)......................................................23

*Quinlan v. Curtiss-Wright Corp.*,
  8 A.3d 209 (N.J. 2010) ......................................................45

*Ranowsky v. Nat'l R.R. Passenger Corp.*,
   244 F. Supp. 3d 138 (D.D.C. 2017), *aff'd*, 746 F. App'x 23
   (D.C. Cir. 2018) .......................................................................36

*Rea v. Martin Marietta Corp.*,
   29 F.3d 1450 (10th Cir. 1994) ..............................................38

*Rivers v. United States*,
   2021 WL 864561 (W.D. Va. 2021) .......................................56

*RLI Ins. Co. v. Nexus Servs., Inc.*,
   2020 WL 2311668 (W.D. Va. 2020) .....................................54

*Scott v. Harris*,
   550 U.S. 372 (2007) ..............................................................33

*Shelton v. Am. Motors Corp.*,
   805 F.2d 1323 (8th Cir. 1987) ............................... 50, 53, 54

*Shoaf v. Kimberly-Clark Corp.*,
   294 F. Supp. 2d 746 (M.D.N.C. 2003) .................................46

*Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*,
   28 F. Supp. 3d 465 (D. Md. 2014), *aff'd*, 885 F.3d 271 (4th Cir. 2018)..............54

*Smith v. McDonough*,
   2024 WL 2804428 (D.N.M. 2024) .......................................44

*Tafas v. Dudas*,
   530 F. Supp. 2d 786 (E.D. Va. 2008) ...................................55

*Tolliver v. Trinity Par. Found.*,
   2017 WL 3288119 (D. Del. 2017)..........................................38

*Wai Man Tom v. Hosp. Ventures LLC*,
   980 F.3d 1027 (4th Cir. 2020) ..............................................50

*Warch v. Ohio Cas. Ins. Co.*,
   435 F.3d 510 (4th Cir. 2006), *cert. denied*, 549 U.S. 812 (2006) .......................35

*Zuniga v. City of Dallas*,
   2024 WL 2734956 (N.D. Tex. 2024) ....................................44

## Statutes and Other Authorities:

15 U.S.C §§ 6801–09 ...................................................................42

15 U.S.C. § 6802 .................................................................................45

18 U.S.C. § 1833(b) ............................................................................43

28 U.S.C. § 636(b)(1) .........................................................................52

28 U.S.C. § 636(b)(1)(a) .....................................................................52

Fed. R. Civ. P. 72(a) ...............................................................29, 48, 52

Fed. R. Evid. 702 ...............................................................................31

W.D. Va. Civ. R. 11(c)(1) .......................................................30, 55, 56

## STATEMENT OF THE CASE

Plaintiff, Bradford Kendrick, was terminated from Carter Bank on May 29, 2020 because he wrongfully and indisputably took confidential bank and customer information from Carter Bank, along with confidential records of the Federal Deposit Insurance Corporation ("FDIC") and the Virginia Bureau of Financial Institutions ("BFI") related to Carter Bank, without authorization, in violation of Carter Bank's policies and his Pledge of Confidentiality to Carter Bank, and "[o]n May 8, 2020, [he] allowed confidential Carter Bank & Trust information to be posted on the PACER system, which made the confidential information available to the public. The confidential information, labeled as 'Exhibit 1,' [to Kendrick's First Amended Complaint] included the confidential minutes of the Carter Bank & Trust Board of Directors' Meeting from January 25, 2017, which contained non-public personal information of Bank customers and other confidential and sensitive information affecting Carter Bank & Trust." JA3169-3170 (termination letter); *see also* JA4406-4420 (SEALED Exhibit 1) (Kendrick, through his counsel, disclosing wrongfully taken confidential customer loan and customer business information to the public, requiring affirmative actions by Carter Bank's counsel to seal the records)[1]; JA833-834, JA841-844, JA851-853.

---

[1] Following Kendrick's wrongful disclosure, breach of confidentiality and termination, counsel for Kendrick had to answer for Kendrick's wrongful taking of FDIC and BFI confidential supervisory information from Carter Bank. *See, e.g.,*

Kendrick's actions constituted an alarming breach of his legal duties and confidentiality obligations owed to Carter Bank and its customers. *See, e.g.*, JA1071-1095, JA683-718. While Kendrick recognized the unauthorized disclosure of confidential customer information to the general public by any employee is a terminable offense, JA581, the circumstances here are more egregious. At the time Kendrick breached his obligations and Pledge of Confidentiality to the Bank and its customers, he was the Bank's *Chief Information Security Officer* ("CISO") and had recently revised and published Carter Bank's Acceptable Use Policy. JA566-569, JA927-938.[2] Thus, not only was he an officer with fiduciary duties and confidentiality obligations, he was admittedly the "tip of the spear" for the Bank's "information security" at the time of his breaches. JA709-711.

Despite Carter Bank's plainly legitimate, nondiscriminatory and nonretaliatory grounds for terminating Kendrick, and for all other actions taken by the Bank with respect to Kendrick, Kendrick asserted claims against Carter Bank under the ADEA for disparate treatment and harassment (Count 1), and retaliation (Count 2). JA252-253.

---

JA833-836, JA1056-1058 (admitting FDIC and BFI documents were "wrongfully taken from the bank," and certifying their destruction).

[2] 2019 Acceptable Use Policy, "Prepared/Revised By: Brad Kendrick, CISO." JA927-928 (defining "Confidential Information" and further stating: "In the event that there is any uncertainty about the appropriate classification for certain information, the bank's policy is to treat the information as confidential.").

2

Kendrick's disparate treatment claim is largely based on long time-barred allegations that he should have been promoted to the newly-created Chief Information Officer ("CIO") position in July 2017, that he was denied a raise in 2017, and that he was stripped of duties and excluded from meetings when Carter Bank's first-ever CIO, Matt Speare, was hired in 2017. JA181-182; JA4374-4375; *see generally* JA237-254. The district court, however, previously and correctly dismissed all of Kendrick's claims for alleged disparate treatment that purportedly occurred *prior to October 19, 2018* on the grounds that any such claims are untimely as a matter of law. JA181-182 (Memo. Op., June 30, 2020). Kendrick does not dispute or appeal the correctness of the district court's June 30, 2020 dismissal of all of Kendrick's claims for alleged disparate treatment that purportedly occurred *prior to October 19, 2018*. *See generally* Appellant Br.

Nonetheless, Kendrick assiduously avoids the impact of that ruling and attempts to rely on those same, untimely disparate treatment allegations to support purported harassment and retaliation claims many years later. *Id.* The district court, however, correctly granted summary judgment to Carter Bank on all of Kendrick's claims, and properly acted within its discretion when denying Kendrick's attempts to depose Carter Bank's former counsel of record and Chairman of the Board of Directors (the "Board") and when striking Kendrick's Notice of Supplemental Facts.

### A.    Relevant Carter Bank Background

Carter Bank was created in 2006. JA523, JA972. Prior to 2017, Carter Bank operated under the sole-proprietor-management-style of Worth Harris Carter, Jr., CEO and Chairman of the Board of Carter Bank. JA613-614, JA979. During Mr. Carter's tenure as Chairman and CEO, the management culture "was to first seek approval of [Mr. Carter] on most all decisions before making a final decision." JA620, JA979. "One example of this autocratic culture was characterized by [the fact that Mr. Carter] made individual base salary decisions for each teller [across all bank locations] annually." JA620-621 ("So for a bank of 900 plus employees, he[ was] the sole person making compensation decisions[.]"); JA979-980.

Mr. Carter's management style and structure had notable disadvantages. For example, the Bank did not have a well-established Human Resources ("HR") department or structure until Paul Carney was hired as Senior Vice President, HR Director in August 2018. JA1109-1110, JA1176, JA1194. And "there were no documented performance reviews for anyone in the organization prior to [Carney] coming to the organization." JA1184, JA763; *see* JA532-534 (Kendrick admitting Mr. Carter had annual salary increase discussions with him prior to 2017, but there were no "written performance reviews"). While Carney began working to implement performance reviews as part of newly constituted HR practices in 2019, performance

reviews did not become standard practice within the Bank until 2020. JA2759, JA763.

Carter Bank is regulated by the FDIC and BFI (collectively, the "regulators" or "examiners"). JA1056-1058, JA2015-2017. As of 2016, Carter Bank had grown to a total asset size of nearly $5 billion, and the "single point of control and authority [exercised by Mr. Carter could] no longer effectively manage the Bank to satisfy regulators and was seen as a weakness in the management of Carter Bank & Trust manifesting itself throughout the organizational design." JA622, JA980-981. In addition to concerns expressed by regulators, all involved—including Mr. Carter, the Board and executive management—realized Carter Bank had grown to such a degree that Mr. Carter's sole-proprietor-management-style and structure presented an undue risk to the Bank, through lack of succession planning and otherwise. JA971, JA613. Under the then-current structure, if—heaven forbid—Mr. Carter (who was 79 years old) was hit by a bus, the Bank "would be reacting and having to implement a structure that should have been implemented before." JA622.

In July 2016, Mr. Carter hired Litz Van Dyke, "a seasoned banker with [25 years' experience and] strategic skills in all operational functions of commercial banks," including serving as Chief Operating Officer of a $3 billion commercial bank. JA982. Van Dyke was hired as an Executive Vice President to address "the regulatory issues the Bank was facing as well as restructuring the Bank" in a manner

that could ultimately survive if Mr. Carter decided to step away. JA626-627, JA980, JA2770-2771. Mr. Carter, himself, wanted to restructure because "[t]he Bank structure was being criticized by the examiners, and if the restructuring didn't take place, [Mr. Carter] feared that the examiners would take harsher action towards the Bank." JA2271-2272.

To assist in this process and address regulatory concerns, the Board and Mr. Carter, as Chairman, hired a management consulting firm, Matthews, Young & Associates, Inc. ("MYC") to conduct an independent "Strategic Leadership Analysis" and develop a "Remedial Governance and Management Plan" for Carter Bank. JA2778-2779; *see* JA969-998 (the "Final Report: Strategic Leadership Analysis and Remedial Governance and Management Plan for Carter Bank & Trust") (November 23, 2016) (hereinafter the "MYC Report").

In late 2016, Mr. Carter's health was declining, and regulatory concerns were increasing. JA980. This caused "the Board to take corrective, stabilizing actions of naming [Phyllis] Karavatakis as President and the hiring of Litz Van Dyke as Executive VP." JA980; *see* JA626-627 (Kendrick agreeing these were stabilizing actions). In April 2017, Mr. Carter passed away. JA1515, JA2780. Thereafter, Van Dyke was named CEO, and Karavatakis (who is older than Kendrick) continued as President. JA1711, JA1718, JA2780, JA629-630.

**B.    Relevant Kendrick Background**

Kendrick has a two-year associate's degree from Patrick Henry Community College. JA520-521. He has computer programming training, and in 2017, while employed by Carter Bank, he became a Certified Information Security Manager ("CISM"). JA521-522.

In 2006, when Carter Bank was formed, Kendrick became Vice President, Data Processing Manager. JA524. In 2009, Kendrick became Senior Vice President, Data Processing Manager. JA529. In 2014, Kendrick became Executive Vice President of Information Technology ("IT"). JA534. He held this position until Carter Bank hired a CIO in July 2017, at which point Kendrick became Executive Vice President, CISO. JA2756-2758, JA1857-1858, JA2782-2783, JA711. Kendrick retained his Executive Vice President title until his termination in 2020. JA747.

**C.    Carter Bank Suffered from Substantial Technological Deficits Under Kendrick's IT Leadership**

Prior to Carter Bank hiring Speare as its first-ever CIO in July 2017, Kendrick was the executive in charge of Carter Bank's IT infrastructure. JA728-729. Under Kendrick's leadership, Carter Bank suffered from major technological deficits that impaired operations and its ability to compete with peer banks. "It became evident [to Speare] during [his] first 30 days in the role [of CIO] that the bank was 20+ years behind peers in technology and products underlying business processes." JA2767. As he must, Kendrick agrees with Speare's assessment. JA808-809; *see also* JA655

7

(prior to 2018, Carter Bank was "absolutely" "behind the times"), JA660 (agreeing the IT infrastructure was deficient), JA983.

During Kendrick's executive control of IT, all teller transactions across the Bank were done manually. JA541-542. An online teller process was not implemented until shortly after Speare joined as CIO in July 2017. JA541-542. During Kendrick's executive control of IT, unlike its peer banks, Carter Bank had no mobile or online banking for customers. JA653. Mobile and online banking were only implemented after Speare was hired. JA653. Carter Bank even lacked ATMs throughout Kendrick's leadership of IT. *See, e.g.*, JA1571-1572.

Kendrick's lack of technological prowess was recognized by Mr. Carter, before his passing, and had previously resulted in Kendrick receiving lower proposed compensation than other executive managers, such as Karavatakis: "Mr. Carter said... [Kendrick] is not quite as knowledgeable with new technology such as mobile banking." JA1587-1588, JA1692-1693 (Nov. 15, 2016 Government and Compensation ("Gov/Com") Committee Minutes).

A similar professional assessment was reached by Speare in January 2019, before Kendrick filed any EEOC charge alleging age discrimination. JA2744-2749, JA2762. In response to questions about implementing a potential severance policy

(which was never implemented[3]), Speare offered Kendrick up for consideration as a

potential candidate, stating:

> Brad Kendrick
>
> - Currently in the CISO role and is highly compensated and this is
> considered a leadership role
>     o Lack of leadership skills
>     o Lack of understanding of the underlying technologies
>     o Unable to develop a strategy or execute upon one
>     o Is an "order-taker", waits to be told what to do

JA2762.

Kendrick's own purported expert[4] agreed Kendrick was "not quite as

knowledgeable with new technology." JA1587-1588. And, although his interactions

with Kendrick were extremely limited, Hart testified that "everybody agrees that

[Kendrick]'s a follower. There's been no dispute that he's a follower." JA1605.

---

[3] At an executive meeting in January 2019, Carney stated he "[wa]s working on a severance concept—what do we do with these people? Asked the group to make a list of these people and send to him." JA334 (Jan. 4, 2019 Senior Weekly Management meeting minutes). The Bank "had not historically used [severance agreements] in the past," and Carney wanted to prepare agreements in case the Bank elected to offer severance to any employees. JA1120-1121.

[4] David Hart ("Hart") was offered by Kendrick as a purported expert witness. In reality, he is nothing more than a fact witness from NetBank, a third-party auditor of Carter Bank, who was only on-site at Carter Bank for 1–3 weeks *per year* between 2006 and 2016. *See, e.g.*, JA1568, JA1604. Notably, Hart only interacted with Kendrick **8–10 hours per year** *between 2012 and 2016* and had limited interactions with Kendrick in years prior to 2012. *See, e.g.*, JA1568, JA1573-1575. He did not interact with Kendrick or audit Carter Bank after 2016. JA1568, JA1573-1575.

As discussed *infra*, MYC, the independent management consultants, reached similar conclusions with respect to Kendrick's lack of advanced technology skills, leadership and strategic planning back in November 2016, when Mr. Carter was running the Bank, and their independent assessment led to the hiring of Speare as CIO. *See generally* JA981-983.

###### i.     Regulatory and management concerns with CoreSoft

Under Kendrick's executive leadership in IT, the Bank operated using a core system called "CoreSoft." The "core" system is the overarching software system that maintains all of the Bank's critical customer information, and which Kendrick described as the "nucleus" for all other IT systems. JA602. Thus, "if there are problems with CoreSoft that maintains all the customer information for the bank, the bank has got major problems." JA602.

The Bank's regulators had serious and substantial concerns with CoreSoft. *See, e.g.*, JA601 (Kendrick testifying that "[t]he regulators were on our case about CoreSoft"), JA540, JA542 (the regulators "absolutely" took issue with CoreSoft). Kendrick agreed with the regulators' criticisms of CoreSoft. JA542-543, JA608 ("[W]e needed to get off CoreSoft like yesterday.").

Throughout Kendrick's oversight of IT, the problems with CoreSoft swelled. For example, the Bank maintained a "top 10" list of issues with CoreSoft that ballooned to *35* "*top 10*" issues. JA733. And, the Bank had to establish an IT

Steering Committee, chaired by Kendrick, solely to address issues with CoreSoft. JA2777, JA2784, JA1513-1514.

Carter Bank was attempting to develop CoreSoft to sell to other banks (as a software product under a separate entity), rather than procuring a tried, tested, and mainstream core system used by nearly every other major and peer bank in the industry. *See* JA537, JA608. There is no dispute that CoreSoft was a failed project that Kendrick was involved with until 2017, and ***Kendrick lacked experience with other mainstream core systems*** (such as FiServ) that were needed to address the pressing regulatory concerns. *See, e.g.*, JA811 (Kendrick agreeing he only had experience with the deficient CoreSoft system prior to 2017); *cf.* JA660, JA673-674, JA998-1003 (Speare had substantial experience at other major banks, with other mainstream core systems, and Speare previously served as CIO for the 14th largest bank holding company, managing a 1000+ IT staff and a budget of $300 million).

### D. To Address Pressing Regulatory Concerns with Technological Shortcomings and The Lack of Adequate Succession Planning, Carter Bank Hired Independent Management Consultants

In November 2016, when Mr. Carter was still CEO and Chairman of the Board, Carter Bank hired MYC to study and analyze concerns that had been flagged for resolution by bank regulators. JA603. The regulators' concerns specifically

referred to the lack of adequate succession planning for the Board,[5] the most senior executive levels of management, and the CEO (Mr. Carter), along with concerns over Carter Bank's technological shortcomings, particularly the deficient CoreSoft system. JA601, JA616-617.

> ### i.    MYC independently concluded Kendrick was not qualified to be CIO and the Bank should recruit externally

In 2016, MYC interviewed and conducted management exams of Kendrick and other executive managers to assess their leadership, management styles and skills. JA606. In its Final Report, MYC reached the following conclusions, among others:

> EVP-IT Bradford Kendrick has built and maintained a low cost, secure in-house IT function that has handled the Bank's basic needs.
> ...
> Our observation of Kendrick and confirmed in other management interviews is that *he is risk averse and lacks the strategic perspective of a Chief Information Officer*. **Kendrick would be better suited for a role in cyber security area or operations management as he currently manages the Operations Center facility.**
> ...
> Finally, the **Bank should recruit a CIO that has a broad perspective of Management Information and Control Systems, emerging technologies, and the services available in the "FinTech" world the Bank's future customers are demanding**…. The current [technology] infrastructure is deficient and needs to be upgraded in order to create

---

[5] Kendrick agreed that Carter Bank's directors, pursuant to regulatory directives, "recognize[d] the need for succession planning of current directors as most of them [were] in their late 70s and early 80s [in 2016]." JA618-619. Kendrick, of course, agreed that "[t]he succession plan for directors... has nothing to do with [Kendrick]," because he was never a director and director succession planning did not refer or relate to Kendrick. JA617.

an effective and efficient operation. **Brad Kendrick has been effective in managing and controlling the risk to the organization related to technology**. ***However, it is our belief that his skill set is not suited to fill the role of CIO***. **Mr. Kendrick is probably best suited to continue to manage data security and operational areas within his current purview.**

JA981-983 (emphasis added).

### ii.    Kendrick's age was not a factor in the MYC report

The MYC report determined that Karavatakis, who is *older* than Kendrick, was "well qualified with experience and expertise to execute the strategy of the bank" as President. JA630. Similarly, MYC determined that David Peterson, who is the *same age* as Kendrick, was "well-qualified with experience and expertise to be *promoted* to the role of [C]hief [C]redit [O]fficer." JA634 (emphasis added), JA650. In contrast, Kendrick, who is the same age or younger than Peterson and Karavatakis, was found *not* to be "suited to fill the role of CIO," and the Bank was advised that it "should recruit a CIO that has a broad perspective of Management Information and Control Systems, emerging technologies, and the services available in the 'FinTech' world the Bank's future customers are demanding." JA983.

Kendrick testified he does not have any reason to believe the MYC report was based on his age. JA650-652. And this is evidenced by the fact that Karavatakis was determined to be qualified as President, Peterson was found to be qualified for a promotion, and Kendrick was found not to be suited for the role of CIO, yet they were all the same age or older than Kendrick. Further, MYC's conclusions are

13

facially reasonable based on the indisputably deficient state of Carter Bank's IT infrastructure under Kendrick's leadership prior to 2017, which was corroborated and criticized by the Bank's regulators, and Kendrick's admitted lack of experience with any mainstream core system, or any core system other than CoreSoft. *See* JA811.

### E.    Age Was Not a Factor in Hiring Matt Speare

The Bank implemented MYC's recommendations by hiring Speare. Kendrick interviewed Speare and thought Speare was qualified for the CIO position. JA805-807. Significantly, Kendrick admits that Speare had "a broad perspective of management information and control systems," and "the experience with emerging technologies and services available in the fintech world that the customers are demanding." JA660.

Lee Eldridge, who is older than Kendrick, was asked by Kendrick to testify on his behalf. JA1546-1547. Eldridge was Vice President, Network Manager in the IT department, and reported to Speare from the time Speare was hired in 2017 until Eldridge voluntarily retired in June 2021. JA1548-1549, JA1554. Eldridge was familiar with both Speare's and Kendrick's technical qualifications. JA1550-1551. Eldridge testified that Speare was qualified to be CIO, and compared to Kendrick, Speare's experiences "are tremendously at a higher level than what we did at Carter

Bank & Trust." JA1550-1551. Even though Eldridge was asked by Kendrick to testify on his behalf, Eldridge testified:

> [T]he conversation went something to the effect that he said that he wanted me to testify, that he felt like he was being discriminated against, and there had been some sort of presentation on a screen about company employees and ages and stuff.
>
> And I think I told him something to the effect that I don't recall the screen, *nor did I believe that there was an age discrimination type thing going on*.

JA1546-1547 (emphasis added). Eldridge flatly testified he is not aware of *any* facts that lead him to believe the Bank discriminated against Kendrick or anyone based on age, JA1550, he never witnessed harassment against Kendrick, or anyone else, based on age, JA1551-1552, he never heard Speare say anything that he thought was discriminatory based on age or other factors, and it would stand out in his mind if he did, JA1553-1554.

## F.    The Impacts of Hiring Speare Are Not Related to Age

Although Kendrick complains about the impact that hiring Speare had on his own duties and responsibilities in 2017, it is plain based on the record that age was not a basis for those impacts or a factor in the analysis. JA2771, JA2775-2776 (after Speare was hired, "the CIO took over many of these areas of responsibility" previously under Kendrick); JA746-747 (Kendrick agreeing it was "only natural" that those portions of his duties he believed were CIO-level duties—before any such

position existed—would transfer to the eventual CIO after that position was created and filled).

Kendrick's position as CISO was not a "sham title." Like Speare, Kendrick's role was based on MYC's admittedly nondiscriminatory strategic management assessment. JA650-652, JA982 (Kendrick "would be better suited for a role in cyber security area or operations management"), JA983 ("Mr. Kendrick is probably best suited to continue to manage data security and operational areas within his current purview."), JA2767-2768 (discussing Kendrick's expected duties as CISO), JA816-818. Further, the district court previously disposed of the 2017 impacts because Kendrick did not file his first EEOC Charge until October 19, 2019. JA181-182 (Memo. Op., June 30, 2020).[6]

### G. Kendrick's February 2017 Complaint that He Was "Not Being Involved in Meetings" Was Not, In Fact, Related to His Age

Kendrick claims that in February 2017, he reported being harassed on the basis of his age because "[he] was not being involved in meetings." JA780-786. There is, however, no material dispute that age was not a factor in that decision. At the time, Carter Bank was transitioning from CoreSoft to FiServ, the replacement, mainstream core system with which Kendrick had no experience, and Carter Bank was working to recruit a CIO with the requisite experience. JA1842-1843

---

[6] Prior to October 19, 2018, the Business Continuity Program responsibilities were assigned and assumed by the CIO, Speare. JA1562, JA1187.

16

("[Kendrick's] presentation[s] [were] from Coresoft and we made the decision... [that] we were going forward with Fiserv... so there was no need for [Kendrick] to present information that was not pertinent."); JA1842-1843 ("There was no need for him to come to a Board meeting after" the decision to move away from CoreSoft); *see* JA2781.

### i.    Kendrick did not report any purported age-based harassment between February or June 2017 and the date of filing of his first EEOC Charge in October 2019

Carter Bank has numerous policies that prohibit harassment or discrimination on the basis of age or any other protected status. *See, e.g.*, JA919-926 (No Harassment Policy), JA939-966 (Code of Conduct); JA918 (Kendrick policy acknowledgment); *see also* JA588-590. These policies require reporting and prohibit retaliation. *See, e.g.*, JA919-926, JA944-945, JA952-953. Kendrick, however, did not report any purported age-based harassment or discrimination between February or June[7] 2017 and the time Kendrick filed his first (and untimely) EEOC Charge on October 19, 2019. JA557-559.

---

[7] Kendrick claims he met with Karavatakis and Van Dyke in May or June 2017, and Karavatakis told him "going forward [Van Dyke] and I will be deciding what your job duties are going forward and if you don't like the duties we give you, we don't have anything for you," but there is no dispute this statement by Karavatakis was made, if at all, after Carter Bank followed MYC's recommendation to look outside the organization for a CIO, and around the time Speare was interviewed for the position. *See, e.g.*, JA804-806, JA557-559; JA1759-1780 (Kendrick's duties were not reduced prior to hiring Speare).

### ii. Kendrick's "harassment" allegations are not, in fact, age-based

While Kendrick contends he complained of "harassment" in and prior to 2017, in reality, he was merely complaining that Karavatakis and Peterson (who are the same age or older) did not get along with him. As reflected in his deposition and the substance of his first EEOC Charge, Kendrick's "harassment" allegations were not, in fact, age-based. JA766-768 (alleging Karavatakis and Peterson would make fun of his voice because they were trying to be "funny or cute"); JA771 (agreeing that if Karavatakis was "upset about something [he] reported to NETBank, she's not upset with [him] because of [his] age"); *see generally* JA1025-1026 (first Charge alleging non-age-based "harassment" and "retaliation").

### H. Kendrick Relies on Purported Comments in 2017 that Are Immaterial, Stray Remarks Unconnected to Any Adverse Action

Rather than identify any actual, age-based harassment, Kendrick relies on purported comments in 2017 that are immaterial, stay remarks that do not directly refer to Kendrick or to any adverse action taken against him, and do not reflect any discriminatory animus.

### i. Karavatakis's alleged 2017 statements that "the Bank needed to be finding replacements" for her, Kendrick and others do not relate to adverse action against Kendrick or reflect discriminatory animus

Kendrick alleges that prior to Mr. Carter's passing in April 2017, Karavatakis allegedly told him: "We are both not as young as we used to be, and we need to be

finding our replacements." JA877-879, JA249; *cf.* JA769 (paraphrasing this "we" statement or alleging a related, contemporaneous statement: "Brad, you need to be finding your replacement"). Kendrick alleges that in this same conversation, Karavatakis also stated "the Bank needed to be finding replacements for Diann Nelson (VP-IT Operations) and Lee Eldridge (VP-Network Manager)," both of whom, along with Karavatakis, are older than Kendrick. JA249, JA878-879.

To the extent these allegations relate to Kendrick, the undisputed evidence shows the comments did not refer to Kendrick's termination, more than *three years later*, and Kendrick was never replaced, even after he was terminated. *See, e.g.*, JA871-873. Further, Kendrick admits that when these alleged comments were made, the Bank was focused on addressing regulators' concerns that senior executive management positions lacked sufficient succession planning. *See, e.g.*, JA617. Karavatakis, Kendrick, Nelson and Eldridge were all senior executives and in positions the regulators identified as needing succession planning. When Kendrick was asked if Karavatakis was simply referring to succession planning with her comments, Kendrick responded "I guess.... I don't know if it was succession planning or wanting to get rid of me." JA877. It is undisputed that Karavatakis played no role in the decision to terminate Kendrick *more than three years after* her

19

purported comments. JA1760.[8] Regardless, Karavatakis made this statement, if at all, in reference to *her* and other senior executives without any apparent discriminatory animus toward Kendrick.

Eldridge and Nelson both voluntarily retired years later; neither were terminated and replaced. JA1554, JA3126, JA2840. And Eldridge and Nelson never heard Karavatakis make any such comment. *See, e.g.*, JA2839-2840, JA1556, JA1550. Karavatakis remains employed as a Senior Executive Vice President and a Board member. JA1714, JA1765, JA1828. Thus, it is apparent Karavatakis's statement was nothing more than a succession planning remark that led to no adverse action for anyone referenced.

> **ii.     Speare's alleged 2017 statement that "all of us sitting around the table are getting older" and "the Bank needs to hire younger employees" does not relate to adverse action against Kendrick**

Kendrick next claims that in the fourth quarter of 2017, Speare gave a presentation with the average age of employees, and allegedly said "all of us sitting around the table are getting older" and "the Bank needs to hire younger employees." JA248-249 (Second Am. Compl.); JA819 (expanding the alleged statement to include: "we need to be hiring younger people because it takes longer for older people to learn the new technologies"). According to Kendrick, this statement was

---

[8] Only Van Dyke, Carney and Speare were involved in the termination decision. JA2773, JA2743, JA1146.

made in passing: "he didn't dwell [on it]," "it was maybe two minutes," "but he made that statement." JA819-821. With the exception of Kendrick, all seven employees who purportedly attended this meeting with Kendrick, and Speare himself, deny or do not recall any such PowerPoint or statements by Speare. *See, e.g.*, JA1059-1070 (affidavits attesting to the same); JA821. Nelson believes this or a similar statement may have been made, not by Speare, but by Kendrick's purported expert and NetBank employee, Hart. JA2835-2837.

In any event, this purported statement refers to everyone, including Speare, the indisputable fact that "all of us sitting around the table are getting older," and refers only to "hiring." It does not directly refer to Kendrick, has no bearing on any adverse action against him, and is far removed from his termination on May 29, 2020. Further, the statement alleged in the Complaint is in line with the succession planning concerns expressed by regulators.

### iii. Succession planning statements related to Board members do not relate to Kendrick or adverse action against him

Kendrick admits that statements relating to the composition of the Board and regulatory pressures to address Board succession planning have absolutely no connection to Kendrick, who was not a Board member, or to any employment decision at issue. JA617 (agreeing "[t]he succession plan for directors… has nothing to do with [him]," because he was never a director and director succession planning did not refer or relate to Kendrick); JA618-619 (agreeing the Board, pursuant to

21

regulatory directives, "recognize[d] the need for succession planning of current directors as most of them [were] in their late 70s and early 80s [in 2016]").

Nonetheless, Kendrick cites an out-of-context statement from the Board's Gov/Com Committee on February 8, 2017, that "we need young, qualified directors," to support his claims. Appellant Br. at 4, 16. This, however, is the context in which the statement appears:

> Management was excused from the meeting, and the examiners met with James Haskins and Warren Matthews. *Mr. Haskins said the* [Bank's] **examiners** *were serious about the bank getting on with what they wanted us to do. He said* **they asked how the bank was doing finding new directors to replace those who have recently resigned or passed away***. Mr. Haskins said we need young, qualified directors who can make significant contributions to the board.* The examiners also want the bank to hire a CFO.

JA3129 (emphasis added). In addition to expressly referencing succession planning concerns, this statement contains no discriminatory animus, in no way relates to employees, such as Kendrick, or employment actions with respect to Kendrick, and was made more than three years prior to Kendrick's termination.

## I.    Kendrick Relies on Unsupported, Generalized Conspiracy-style Allegations of "Systematic Discrimination," and Immaterial Allegations Relating to Burnopp and Newell

Kendrick baldly alleges that age discrimination at the Bank was "systemic" under Van Dyke. Appellant Br. at 7–9. To support this conclusion, he refers to a lawsuit filed against *StellarOne* in 2012, and separate lawsuits filed by former

employees, Donna Burnopp and Patricia Newell. *Id.* None of these lawsuits or allegations are remotely material to Kendrick's claims.

*Phillips v. StellarOne Bank*, 2012 WL 3762448 (W.D. Va. 2012) involved different parties—more than a decade ago—and there was no finding of discrimination by anyone. JA779. Carter Bank was initially granted summary judgment on the age claims in *Newell v. Carter Bank & Tr.*, 2023 WL 2142974, at *5–8 (W.D. Va. 2023), finding Carter Bank had legitimate, non-discriminatory reasons for her termination, there was no pretext and no retaliation, but that decision was vacated following notice of settlement. *Newell*, 2023 WL 8535244 (W.D. Va. 2023) (vacating). *Burnopp v. Carter Bank & Tr.*, was likewise resolved with no finding of discrimination.

Unlike Kendrick—an IT executive in Martinsville, Virginia, under Speare—Burnopp and Newell were retail-side employees in Northern Virginia, operating under different managers. Burnopp admitted she does not have personal knowledge that Kendrick was treated differently because of his age. JA311. And she does not have personal knowledge relating to Kendrick's termination. JA315. Moreover, Van Dyke played no role in any adverse action relating to Newell or Burnopp.

## J.    Carter Bank's Young Professionals Group Is Immaterial

In an effort to identify *any* reference to age at Carter Bank, Kendrick claims that its Young Professionals Group is somehow evidence of a discriminatory animus.

23

This was just one of many development programs for Carter Bank employees. *See, e.g.*, JA1132-1133. The Bank, however, has similar opportunities for others that are generally not offered to young professionals. JA1517-1518 ("[W]e have several opportunities for more senior employees.... [I]t doesn't matter what your age is; you just have to be a seasoned employee with the Bank."); *see also* JA1132-1133.

In fact, it is undisputed that Kendrick obtained certification as a CISM in 2017, while employed by the Bank. JA522; *see also* JA79 (Kendrick alleging he was taking "online courses for WorkFusion certification"). Regardless, the Young Professionals Group has nothing to do with Kendrick or any employment decision made with respect to Kendrick. There is no evidence that Kendrick ever asked to join this group, complained about the group, or sought and was denied similar opportunities.

### K. Kendrick Violated His Pledge of Confidentiality, Wrongfully Took Confidential Information and Was Terminated for Legitimate, Nondiscriminatory and Nonretaliatory Reasons

Kendrick was terminated from Carter Bank on May 29, 2020 because he wrongfully and indisputably took confidential bank and customer information from Carter Bank, without authorization, in violation of Carter Bank's policies and his Pledge of Confidentiality, and "[o]n May 8, 2020, [he] allowed confidential Carter Bank & Trust information to be posted on the PACER system, which made the

confidential information available to the public...." JA3169-3170; *see also* JA4406-4420, JA833-834, JA841-844, JA851-853.

As he must, Kendrick readily admits to taking this information. *See generally* JA683-718; *see also* JA835-836. Kendrick all but concedes to doing so surreptitiously. JA704. Kendrick's conduct was a clear violation of his legal duties, a breach of Carter Bank's policies, and a violation of his Pledge of Confidentiality. *See, e.g.*, JA967; JA1071-1095, JA3169-3170. Further, Kendrick recognized the unauthorized disclosure of confidential customer information to the general public by any employee is a terminable offense. JA581. Kendrick, therefore, was plainly terminated for legitimate, nondiscriminatory and nonretaliatory reasons.

## L.    Kendrick's Post-Termination Evidence Is Misrepresented and Immaterial

Because Kendrick is unable to identify anything beyond stray remarks wholly unconnected to Kendrick or to adverse action against him, he attempts mischaracterize evidence following his termination to support his broad-sweeping, but unsupported, discrimination narrative. Appellant Br. at 4–5.

### i.    Board succession planning statements in June 2020 do not relate to Kendrick or adverse action against him

Kendrick mischaracterizes a statement relating *solely* to Board succession planning as a statement that "the *workforce* must reflect 'the right balance of tenure, age, market representation diversity and expertise.'" Appellant Br. at 4–5 (emphasis

altered). The context, however, makes clear the challenged statement refers only to Board member succession planning, not to the "workforce" or employees:

> The Committee discussed **Board succession planning** and reviewed two professional articles on the topic, recommended by [consultants] Pearl Meyer. They discussed being strategic in **planning for succession** and looking ahead at the next 2–3 years. **We need to achieve the right balance of tenure, age, market representation diversity and expertise**.

JA3140 (June 24, 2020 Board minutes) (emphasis added). In addition to referencing only Board succession planning, this statement contains no discriminatory animus, in no way relates to employees, such as Kendrick, or employment actions with respect to Kendrick. Moreover, diversity is not discriminatory, and the mention of diversity and succession planning does not change the undeniably non-ageist composition of the Board. JA618-619.

### ii. Van Dyke's deposition testimony is also mischaracterized and immaterial

In response to deposition questions related to the same June 2020 Board succession planning statement that "[Carter Bank] need[ed] to achieve the right balance of tenure, age, market representation diversity and expertise [on the Board]," Van Dyke recognized there is no age limit for Board members, and there has never been any effort to replace Board members based on age. JA3158-3162. Unlike the majority of its peer banks, Carter Bank has always rejected age limits for Board members, and Van Dyke personally stated in Board meetings that "he is not an

advocate of having an age limit for the Board. He believes the best way to determine the effectiveness of a director is by the evaluation process." JA2545.

When Van Dyke was asked during his deposition if age "would be a factor" if, *hypothetically*, *all* Board members and *all* employees across the Bank were 85 years old, Van Dyke merely said age "could be" a factor for succession planning considerations to ensure "continuity as you have openings." JA3158-3160. But Van Dyke further testified that he does not believe that "age is a determining factor of whether a director is a productive member of the Board." JA3162. Nonetheless, Kendrick mischaracterizes Van Dyke's testimony to falsely allege that Van Dyke "stated plainly that age 'would be a factor' in hiring decisions," and falsely alleges that age discrimination was systemic. Appellant Br. at 16. This is a gross mischaracterization of Van Dyke's response to succession planning comments regarding a hypothetical, under which there is no diversity among ages and all employees across a 900 plus employee bank are *all* 85 years old. His testimony has no bearing on any *actual decision* made with respect to any employee.

Regardless, this testimony relates only to hiring for succession planning purposes. It has no connection to Kendrick or any adverse action taken against him. Further, it speaks to diversity of ages and contains no discriminatory animus.

## SUMMARY OF ARGUMENT

The district court properly granted Carter Bank summary judgment because Kendrick failed to establish his ADEA claims for disparate treatment, harassment, and retaliation. The undisputed facts demonstrate that no fair-minded jury could ever return a verdict for Kendrick on any of his claims, and Kendrick has not and cannot present any evidence of specific facts from which a reasonable jury could find in his favor. *Cole v. Fam. Dollar Stores of Md., Inc.*, 811 F. App'x 168, 171 (4th Cir. 2020).

There is no direct evidence of discrimination. Kendrick cannot even satisfy his *prima facie* case for disparate treatment under the *McDonnell Douglas* burden-shifting framework, and he cannot establish pretext. Kendrick's disparate treatment claim is largely based on time-barred allegations related to the Bank's hiring of Speare in 2017, which the district court correctly dismissed as untimely. JA181-182. Kendrick's remaining "evidence" amounts to stray comments and speculative theories that have no bearing on *Kendrick's* employment or any adverse action taken against him. Ultimately, Kendrick failed to create a genuine dispute of material fact that age was the "but-for" in-fact cause for the Bank's alleged adverse actions against him. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).

Kendrick likewise failed to establish a *prima facie* case of harassment. No reasonable jury could find that Kendrick was subject to age-based harassment or harassment that rose to the level of "severe or pervasive." And *Muldrow v. City of*

28

*St. Louis*, 601 U.S. 346 (2024) does not alter the elements of Kendrick's harassment claim that he failed to meet.

The district court correctly granted summary judgment on Kendrick's retaliation claim because he failed to show (1) that the conduct for which he was terminated was protected activity, or (2) that retaliation was the but-for cause and "real reason" for his termination. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015).

The district court correctly overruled Kendrick's objections to the magistrate judge's discovery orders precluding the deposition of James Haskins. Kendrick's recycled arguments were considered and correctly rejected at least four times in the proceedings below. JA447-454, JA3243, JA3378-3392, JA17. The magistrate judge's orders were not clearly erroneous or contrary to law, Fed. R. Civ. P. 72(a), and the district court did not abuse its discretion. Regardless, Kendrick knowingly and voluntarily expended his deposition limit set by the magistrate judge without reserving any deposition for Haskins, and the deposition limit was not clearly erroneous or contrary to law. JA491-492, JA3330-3331. Moreover, Haskins is not alleged to have any material, undeveloped information relevant to summary judgment, and Kendrick failed to timely revisit his objections—prior to expending his deposition limit, prior to the close of discovery or prior to summary judgment.

Finally, the district court properly struck Kendrick's Notice of Supplemental Facts because he failed to obtain leave of court, in violation of Local Rule 11(c)(1).

## ARGUMENTS AND AUTHORITIES

I.    **THE DISTRICT COURT'S DECISION TO GRANT CARTER BANK'S MOTION FOR SUMMARY JUDGMENT WAS CORRECT.**

a.    **The District Court Applied the Correct Standard.**

Kendrick alleges the district court applied the wrong standard of review when discussing Kendrick's qualifications for the CIO position in 2017 and did not view the evidence in the light most favorable to Kendrick. Appellant Br. at 19–20 (citing JA4371). The district court, however, correctly concluded that any disparate treatment claim related to the CIO position is time-barred and immaterial. JA4374, JA4378.

Regardless, the evidence cannot support any reasonable inference that Kendrick's age played any role in MYC's independent determination that "[Kendrick's] skill set is not suited to fill the role of CIO," JA981-983, or the Bank's decision to follow MYC's recommendations when hiring Speare as its first-ever CIO. *See supra* §§ (C)–(F); JA650-652 (Kendrick acknowledging he has no reason to believe the MYC Report was based on his age). And the court correctly observed that the parties agree "Speare had significantly more technological experience than Kendrick, who was only familiar with the admittedly problematic Coresoft system." JA4371 (citing JA811); *see also* JA660.

30

Nonetheless, Kendrick relies heavily on his purported third-party expert, Hart, to allege he "performed well" and was qualified for the CIO position. *See, e.g.*, Appellant Br. at 2–3, 19–20. Hart's testimony cannot give rise to any reasonable inference that could support his claims. As an initial matter, Hart admitted Kendrick was "not quite as knowledgeable with new technology." JA1587-1588. Further, Hart was only on-site at Carter Bank for 1-3 weeks *per year* between 2006 and 2016. JA1568, JA1604. Hart only interacted with Kendrick ***8-10 hours per year*** *between 2012 and 2016* and had limited interactions with Kendrick prior to 2012. *See, e.g.*, JA1568, JA1573-1575. Hart did not interact with Kendrick or audit Carter Bank after 2016. JA1568, JA1573-1575, JA1618-1619. Moreover, Hart flatly admitted that MYC's consulting expertise is beyond the scope of his own knowledge and expertise, and he was not "criticiz[ing] their findings." JA1595, JA1598-1601 (Hart recognizing MYC's analysis is not within his bailiwick, and MYC's Report is what he would expect to see in an independent report of a management consultant), JA1607-1611. Finally, Kendrick's own purported expert admitted it was Kendrick's failure to follow policy led to his termination. JA1625.

No reasonable juror could find Kendrick's own subjective beliefs or Hart's opinions based on his limited interactions with Kendrick prior to 2016 could support his claims. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996); Fed. R. Evid. 702. And the district court correctly concluded that Hart's

testimony and declarations do not create a genuine issue of material fact. JA4379, JA4399-4400.

> **b.    The District Court Properly Granted Summary Judgment on Kendrick's Disparate Treatment Claim**

The district court recognized that Kendrick's non-time-barred disparate treatment claims relate only to the alleged lack of performance reviews in 2019 and 2020, and his termination. JA4374-4375.[9]

> **i.    The district court correctly found no direct evidence of discrimination**

The district court correctly found no direct evidence of age discrimination or retaliation. JA4375-4376. As the Fourth Circuit recently reiterated: "derogatory comments are direct evidence of discrimination [only] if they are (1) 'related to the protected class of persons of which the plaintiff is a member'; (2) 'proximate in time to the complained-of adverse employment decision'; (3) 'made by an individual with

---

[9] While Kendrick previously alleged he was stripped of his "Executive Officer" title, there is no material dispute that Kendrick was never stripped of his "Executive Officer" title. JA747 (Kendrick admitting his "Executive Officer" title remained the same until his termination); JA2756, JA2758, JA1857-1858. While he was removed as a "*named* officer," for shareholder reporting purposes under Section 16 of the Securities Exchange Act of 1932, in the Bank's 2017 Annual Report to shareholders (and as reflected in the 2018 preliminary Proxy Statement to shareholders, filed in April 2018, and final Proxy Statement to shareholders, filed in June 2018), this discrete action occurred prior to October 19, 2018 and is likewise time-barred. JA243 (Second Am. Compl.); JA181-182. Further, a "named officer" designation for purposes of SEC shareholder reporting rules is wholly unrelated to the terms and conditions of Kendrick's employment.

authority over the employment decision at issue'; and (4) 'related to the employment decision at issue.'" *Cole*, 811 F. App'x at 175 (internal citation omitted); *see also Arthur v. Pet Dairy*, 593 F. App'x 211, 219 (4th Cir. 2015).

The district court, therefore, correctly held the following are not direct evidence of discrimination: (1) Karavatakis's alleged statements *prior to* April 27, 2017, *more than three years* prior to Kendrick's termination, that they should be "finding [their] replacements"[10]; (2) Speare's alleged statements in the fourth quarter of 2017—again *years prior* to Kendrick's termination—that "[a]ll of us sitting around this table are not getting any younger and we need to be hiring younger people because it takes longer for older people to learn the new technologies";[11] (3) statements in 2017 related to *regulatorily required* succession planning for the Board—even though Kendrick agreed "[t]he succession plan for directors... has nothing to do with [him]";[12] and (4) Van Dyke's deposition testimony in response to questions related to *Board succession planning* in June 2020, and the notation that

---

[10] JA4375-4376; *see supra* § (H)(i).

[11] JA4375-4376, JA819-820; *see supra* § (H)(ii); *cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

[12] JA4375-4376, JA617-619; *see supra* § (H)(iii).

"[Carter Bank] need[ed] to achieve the right balance of tenure, age, market representation diversity and expertise [on the Board]."[13]

None of the above are direct (or even circumstantial) evidence of age discrimination or retaliation against Kendrick because they do not reflect any discriminatory animus. The Fourth Circuit (even prior to *Gross*) has "consistently held, along with other circuits, that general or ambiguous remarks referring to the process of generational change create no triable issue of age discrimination," even when such statements are made by decision-makers. *Mereish v. Walker*, 359 F.3d 330, 336–37 (4th Cir. 2004) (statement by *decision-maker* that "he must protect 'the young, bright, junior scientists'" and comments by another high-ranking official on the "aging" workforce, "aging technologically of the skills of the work force" and "hiring" "younger or different technology skills" were legitimate because the speaker was concerned with succession planning), *abrogated in part on mixed-motive grounds by Gross*, 557 U.S. at 177–80.[14]

---

[13] JA4375-4376; *see supra* § (L).

[14] *See, e.g.*, *EEOC v. Clay Printing Co.*, 955 F.2d 936, 942–43 (4th Cir. 1992) (statements by *decision-makers* and other company officials that company needed to "attract newer, younger people" or "young blood," and statement that "if employees had been there 10 years or more, they needed to move on" were not probative of age discrimination); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511–12 (4th Cir. 1994) (statement by *decision-maker* that "there comes a time when we have to make way for younger people" insufficient to create "inference of age bias" because it is a stray remark that merely reflects a fact of life), *cert. denied*, 513 U.S. 1058 (1994); *Martin v. Scott & Stringfellow, Inc.*, 643 F. Supp. 2d 770, 782–83

Moreover, where, as here, stray remarks are unconnected to any employment decision at issue, they do not constitute evidence of discrimination. *See, e.g.*, *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), *overruled on other grounds by Desert Palace v. Costa*, 539 U.S. 90 (2003); *Collier v. Serv. Am. Corp.*, 934 F. Supp. 168, 171 (D. Md. 1996) (recognizing "[p]laintiff must show a nexus between the alleged discriminatory remarks and the employment decision at issue" and "[t]he Fourth Circuit has placed this barrier extremely high"); *Dockins v. Benchmark Commc'ns*, 176 F.3d 745, 749 (4th Cir. 1999) (statement that plaintiff was a "dinosaur" was not probative because it was not connected to the employment decision at issue); *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006), *cert. denied*, 549 U.S. 812 (2006), *abrogated in part on mixed-motive grounds by Gross*, 557 U.S. at 177–80. Thus, remarks must also be proximate in time to adverse action to be considered relevant. *See, e.g.*, *Birkbeck*, 30 F.3d at 511–12 (finding comment that "there comes a time when we have to make way for younger people" irrelevant because it was made over two years before discharge of plaintiffs and is too remote in time); *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1026 (6th Cir. 1993) (finding comment made one year prior to termination decision too remote), *cert. denied*, 510 U.S. 861 (1993).

---

(E.D. Va. 2009) (statement that mortgage-backed trading was a "young people's game and that [plaintiff] was too old to want to be a trader" was not direct evidence of age discrimination), *aff'd*, 352 F. App'x 778 (4th Cir. 2009).

The statements in 2017 are far removed, and in no way proximate to Kendrick's termination in 2020, they do not relate to any adverse action against Kendrick, and they plainly do not refer or relate to the decision to terminate Kendrick for *his own decision* to wrongfully take and facilitate the public disclosure of confidential Bank and customer information in violation of law and Carter Bank policies.

The statements regarding regulatorily required succession planning with the Board in no way relate to Kendrick, who was not a Board member. JA617. Further, all of these statements, if they were made, related to permissible succession planning for executives and Board members—which was a primary focus of regulatory concerns.

Succession planning is an obvious necessity for corporations, and "there is *nothing even vaguely discriminatory* about a company engaging in succession planning, as companies are required to prepare for change and maintain operational continuity." *Ranowsky v. Nat'l R.R. Passenger Corp.*, 244 F. Supp. 3d 138, 145 (D.D.C. 2017), *aff'd*, 746 F. App'x 23 (D.C. Cir. 2018) (emphasis added); *Kelly v. Stafford Tractor Co.*, 2009 WL 425356, at *11 (N.D. Ga. 2009) ("There is nothing in age discrimination jurisprudence that would prevent a company from succession planning."); *Bos. v. Blue Cross & Blue Shield of Kansas, Inc.*, 431 F. App'x 763,

767 (10th Cir. 2011) ("We also reject the notion that any mention of succession planning is tantamount to [evidence of] pretext [under the ADEA.]").

Thus, "[a]n employer's concern with succession planning, continuity, and the passing on of institutional memory is understandable[, and] *[a]ge in this context is thus correlated with legitimate employer concerns*." *Johnson v. Harvey*, 2007 WL 201225, at *4 (E.D. Ark. 2007); *see Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) (the ADEA was enacted to preclude discrimination on the basis of "inaccurate and stigmatized stereotypes"; it does not preclude employers from taking age-related concerns into consideration); *Chapotkat v. Cty. of Rockland*, 2014 WL 1373531, at *8 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 24 (2nd Cir. 2015) (same and citing cases).[15]

### ii. Kendrick's miscellaneous "evidence" is not direct or circumstantial evidence of discrimination

Kendrick claims Carter Bank's Young Professional Group, which has no connection to his employment or any action taken with respect to him, is evidence of a discriminatory animus. It is not. *See supra* § (J); *Harper v. Arrow Elecs.*, 2021 WL 37665, at *10 (D. Colo. 2021), *aff'd*, 2021 WL 6071625 (10th Cir. 2021)

---

[15] Even if there was direct evidence (and there is none), "direct evidence of age discrimination [is] not always… sufficient to create a question of fact for trial in the ADEA context" where a plaintiff must establish but-for causation. *Cole*, 811 F. App'x at 175 (internal citation and quotation marks omitted); *Gross*, 557 U.S. at 177–78; *Arthur*, 593 F. App'x at 220–21.

("[Plaintiff's supervisor's] comment about a 'Young Professionals' event being 'for young people' or 'millennials,'… does not create or support an inference of age discrimination."); *Tolliver v. Trinity Par. Found.*, 2017 WL 3288119, at *9 (D. Del. 2017) (finding "young professionals initiative" did not support plaintiff's *prima facie* case of age discrimination).

Kendrick likewise claims that the ages of just ten executives *hired* by Van Dyke is somehow probative of alleged discrimination toward Kendrick. It is not. This evidence has no connection to Kendrick's termination, or actionable adverse action. Kendrick has no claim related to disparate impacts of hiring practices, and this small slice of information has no statistical relevance whatsoever. *Cf. Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984), *cert. denied*, 474 U.S. 817 (1985) ("In individual disparate treatment cases, however, statistical evidence is less significant because the ultimate issue is whether the particular plaintiff was the victim of an illegitimately motivated employment decision."); *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1456 (10th Cir. 1994) (statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of discrimination or pretext); *Hopper v. Hallmark Cards, Inc.*, 87 F.3d 983, 989 (8th Cir. 1996) ("[Plaintiff's] statistics showed that managers over the age of forty were more likely to be discharged than those under forty, but failed to show that those discharged were similarly situated, qualified individuals who were singled out for

adverse employment decisions based on their age.… **The statistical evidence, therefore, did not raise a reasonable inference of age discrimination. Any other conclusion would require that we resort to speculation**.") (emphasis added).

Contrary to Kendrick's argument, no action or alleged statement with respect to Kendrick was ever based on "inaccurate and stigmatized stereotypes." Kendrick's lack of knowledge of the specific technology needed by the Bank was based on *actual* knowledge and facts, and Kendrick's own admitted inexperience with these technologies, including any mainstream core technology that was required to address pressing regulatory concerns. *See, e.g.*, JA811; JA1587-1588; *see also* JA1693 ("Mr. Carter said… [Kendrick] is not quite as knowledgeable with new technology such as mobile banking"); JA981-983 (MYC's independent study stating: "[I]t is our belief that [Kendrick's] skill set is not suited to fill the role of CIO.").

Further, Kendrick's lack of technological prowess, which was an indisputable and legitimate concern for an *Executive Vice President of IT*, is analytically distinct from age-based stereotypes. *See, e.g.*, *Denio v. Asplundh Tree Expert Co.*, 92 F.3d 1177 (Table), at *3 (4th Cir. 1996) (noting—before *Gross* was decided—that "'[w]hen the employer's decision is wholly motivated by factors other than age,... [e]ven if the motivating factor is correlated with age,' that decision is not contrary to the ADEA") (quoting *Hazen Paper Co.*, 507 U.S. at 611).

Finally, Kendrick cannot rely on impermissible "me too" evidence to demonstrate alleged discriminatory animus by the Bank. Any evidence of alleged discrimination against Burnopp or Newell is irrelevant and immaterial to Kendrick's employment and the Bank's actions with respect to Kendrick. *See, e.g.*, *Khan v. FedEx Corp.*, 2015 WL 3455177, at *10 (E.D. Va. 2015), *aff'd sub nom. Kahn v. FedEx Off. & Print Servs., Inc.*, 628 F. App'x 201 (4th Cir. 2016) (coworker's declaration, "subjectively assert[ing]" his own discriminatory treatment, "[wa]s a combination of impermissible 'me too' evidence and inadmissible speculation") (citing *Abramson v. Am. Univ.*, 1988 WL 152020, at *2 (D.C. Cir. 1998) (refusing to expand plaintiff's disparate treatment claim into a "general examination of every act allegedly taken against every dissatisfied minority [faculty] member")).

### iii. The district court correctly found Kendrick failed to make a *prima facie* showing of discrimination

The district court correctly held that Kendrick cannot make a *prima facie* case of disparate treatment based on the lack of performance reviews in 2019 and 2020 because he failed to establish the lack of reviews was an adverse action. JA4377-4379. There is no genuine material dispute that performance reviews were not a standard or normal practice at the Bank prior to 2020, and were not a standard or normal practice for all employees who reported to Speare until *after* Kendrick's employment ended. *See, e.g.*, JA2759 (Kendrick did not receive reviews because "[it] was still not a practice" for Speare's employees; performance reviews started

40

to be "encouraged in 2019, but did not become… normal practice until 2020");
JA763. In fact, Kendrick never had *any* written performance reviews during his
employment. JA1184; JA532-534. The lack of performance reviews was, therefore,
his *status quo*, not an adverse action.

Kendrick claims *Muldrow*, 601 U.S. at 355, affects the analysis. It does not.
In *Muldrow*, the Supreme Court held that an employee who was involuntarily
transferred still "must show some harm respecting an identifiable term or condition
of employment" to support a *prima facie* discrimination claim under Title VII. *Id.*
Here, the district court correctly recognized that Kendrick failed to show "how the
lack of performance evaluations affected the terms and conditions of *his own*
employment," and offered "*no* evidence" of adverse effects. JA4378 (emphasis in
original). The court, therefore, correctly recognized that Kendrick could not make
out a *prima facie* case based on the lack of performance reviews. JA4377-4379; *see*
*Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207 (4th Cir. 2019) ("Perkins has not
offered evidence indicating [his employer's] failure to give him annual reviews
adversely affected the terms, benefits and conditions of his employment. Thus,
Perkins' claim about annual reviews fails the third requirement of a disparate
treatment claim.") (internal citation omitted).

The district court likewise correctly held that Kendrick cannot make a *prima
facie* case of disparate treatment based on his termination because "Kendrick was

not performing satisfactorily when he violated the Bank's Code of Conduct and confidentiality policy," and "Kendrick *concedes* that the dissemination of confidential documents in violation of the Bank's policies is a terminable offense." JA4379-4380 (citing cases) (emphasis in original). Further, Kendrick "fail[ed] to demonstrate that his termination occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" JA4381.

### iv. Even if Kendrick could have made a *prima facie* case, he failed to overcome the Bank's legitimate, non-discriminatory grounds for termination

Even if Kendrick could satisfy his *prima facie* case, there can be no dispute that Carter Bank had legitimate, nondiscriminatory reasons for all actions taken with respect to Kendrick. Further, there is absolutely no evidence of pretext, and Kendrick cannot carry his burden to establish but-for causation.

In an effort to support pretext, Kendrick argues the information he took, including the Board minutes containing customer loan and business information filed on PACER, was not confidential. Appellant Br. at 39–42. There is, however, no genuine material dispute that this information was unquestionably confidential under law[16] and company policy. In his capacity as CISO, Kendrick *himself* revised Carter Bank's Acceptable Use Policy stating:

> Confidential Information consists of non-public customer and consumer information, critical bank/corporate information… or

---

[16] Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C §§ 6801–09.

proprietary/critical data of bank affiliates or partners…. In the event that there is any uncertainty about the appropriate classification for certain information, the bank's policy is to treat the information as confidential.

JA927-928; JA566-568. He signed the Pledge of Confidentiality, "pledg[ing] to observe the strictest secrecy on the subject of all accounts of all individuals and businesses dealing with the bank," and not to disclose to "unauthorized persons" "[c]onfidential information relating to [the Bank], its customers and suppliers," including "personal information about customers," "banking transactions," or "approval or denial of credit." JA967. And he admits disclosing confidential customer information to the general public is a terminable offense. JA581; *see* JA937.

Kendrick next argues that procedural history relating to the Protective Order which governed *discovery*, should "estop" the Bank from alleging that the information Kendrick wrongfully took while employed is confidential. The Protective Order and procedural history are irrelevant. Kendrick did not validly obtain this information through litigation and discovery. He took it from the bank without authorization, and in violation of company policy. JA686, JA701-708.[17]

---

[17] Kendrick half-heartedly alleged his breaches were permitted by Carter Bank's Whistleblower Policy, JA455, and/or the Defend Trade Secrets Act's ("DTSA") immunity provision in Carter Bank's Code of Conduct, JA947. *See* 18 U.S.C. § 1833(b). They were not. The Whistleblower Policy only protects individuals that engage in "lawful act[s]" related to reporting financial crimes or fraud against shareholders. JA455. Kendrick, of course, never engaged in any such lawful act to

43

**c.**     **The District Court Properly Granted Summary Judgment on Kendrick's Hostile Work Environment Claim**

The district court correctly held that no reasonable jury could find that Kendrick was subject to age-based harassment that rose to the level of "severe or pervasive." JA4388-4390. As discussed *supra*, Kendrick was not subject to age-based harassment or any harassment that could rise to the level of objectively severe or pervasive conduct.

Kendrick claims *Muldrow* foreclosed the district court's conclusion that age-based harassment was not pervasive enough to alter the conditions of Kendrick's employment. Appellant Br. at 43. Kendrick is mistaken. *Muldrow* did not alter the "severe or pervasive" element of a harassment claim. *See, e.g.*, *Zuniga v. City of Dallas*, 2024 WL 2734956, at *3 n.3 (N.D. Tex. 2024) (recognizing *Muldrow* did not "lower[]… the level of harassment [plaintiff] needs to show to make out the claim") (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *Smith v. McDonough*, 2024 WL 2804428, at *8 (D.N.M. 2024).

**d.**     **The District Court Properly Granted Summary Judgment on Kendrick's Retaliation Claim**

The district court correctly found that Kendrick failed to present any evidence of specific facts from which a reasonable jury could find that he was terminated for

---

report financial crimes or fraud against shareholders through his conduct. *Cf.* JA191-193. The DTSA has no connection to Kendrick's claims. JA690.

engaging in protected activity because he fails to show (1) the conduct for which he was terminated was protected activity, or (2) that retaliation was the but-for cause of his termination. JA4391-4398; *Foster*, 787 F.3d at 252 (plaintiff must present evidence to "establish both that the employer's reason [for the termination] was false and that retaliation was the real reason for the challenged conduct") (internal citation and quotation marks omitted).

 Kendrick cites *Kempcke v. Monsanto Co.*, 132 F.3d 442, 447 (8th Cir. 1998), wherein an employee gave "innocently acquired documents to his attorney," and a state court case addressing the parameters of a state statute that *expressly* varies from federal law, *Quinlan v. Curtiss-Wright Corp.*, 8 A.3d 209, 220 (N.J. 2010). These cases are inapposite. Neither are binding, and neither involved illegal actions. The Fourth Circuit recognized that "[i]t is black letter law that illegal actions are not protected activity." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (applying Title VII); *Netter v. Barnes*, 908 F.3d 932, 940 (4th Cir. 2018) ("Netter's unauthorized review and duplication of confidential personnel files did not constitute protected opposition or participation activity. Therefore, Netter cannot prevail.") (internal citation omitted).

The GLBA, 15 U.S.C. § 6802, provides in pertinent part that "a financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides

or has provided to the consumer a notice that complies with section 6803 of this title." Kendrick was an Executive Officer of Carter Bank at the time he wrongfully took and disclosed this information without authorization. JA747. And Kendrick admitted he did not obtain customer approval or give them the right to "opt out" before disclosing the non-public customer information to either his attorney or the public. JA853. At a minimum, his unauthorized taking of this information constitutes theft. *Laughlin*, 149 F.3d at 259 (recognizing "such activity could be considered theft") (citing *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 761 (9th Cir. 1996) (describing similar activity as "stealing")).

Neither of Kendrick's cases involved the disclosure of sensitive and confidential customer or bank information to the public. Indeed, the relevant federal authority demonstrates that Kendrick cannot state a retaliation claim as a matter of law—particularly where, as here, all evidence shows that Kendrick was terminated for his "serious" breaches that he himself agreed constitute a terminable offense, and there is no evidence whatsoever of pretext. JA581; *see, e.g.*, *Netter*, 908 F.3d at 940; *Laughlin*, 149 F.3d at 259; *Johnson v. Portfolio Recovery Assocs., LLC*, 682 F. Supp. 2d 560, 582 (E.D. Va. 2009); *Shoaf v. Kimberly-Clark Corp.*, 294 F. Supp. 2d 746, 757 (M.D.N.C. 2003).

## II. THE DISTRICT COURT CORRECTLY OVERRULED KENDRICK'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDERS PRECLUDING THE DEPOSITION OF JAMES HASKINS.

Haskins served as lead litigation counsel representing Carter Bank in this lawsuit until August 27, 2020. JA231. Haskins and his firm serve as counsel for Carter Bank in various other capacities, and Haskins serves as the Bank's Chairman of the Board and former Chairman of the Gov/Com Committee. JA261, JA3379. Haskins and his firm conferred with counsel for Woods Rogers when Woods Rogers took over as counsel of record in this action. JA3283.

Kendrick sought to depose Haskins as the *first* witness in the case, but was precluded from doing so, without prejudice, because Kendrick had not sought alternative means to obtain information by deposing other Board members, who were not the Chairman and former counsel for the Bank, and Kendrick did not show that despite other discovery efforts, no other reasonable alternatives existed to obtain the same information. JA264, JA453, JA3386.

### a. Kendrick Expended His Deposition Limit and No Deposition Remained for Haskins or Anyone Else

Thereafter, on September 26, 2022, Kendrick was limited to eleven depositions. JA491-492. At that time, he had deposed six individuals, including Karavatakis and Van Dyke, who were executives and Board members. JA3328-3330. After having notice of his limit, Kendrick elected not to use *any* of his five remaining depositions to depose any of the ten, non-executive Board members, who

were not the Chairman and counsel for the Bank. JA2329-2333 (listing 13 Board members around the time of Kendrick's termination); *see* JA2669, JA2574, JA2834, JA1512, JA13 (Kendrick took five, non-Board member depositions after October 19, 2022).

Instead, Kendrick knowingly and voluntarily exhausted his deposition limit on non-Board members, without even reserving one for a potential deposition of Haskins. JA3330-3331. Thus, not only did Kendrick fail to exhaust other avenues for discovery from any of the remaining ten, non-executive Board members, he chose not to reserve a deposition for Haskins. JA491-492.

Kendrick cannot establish the deposition limit set by the magistrate was clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a). Because he voluntarily expended his limit and was not entitled to additional depositions (of Haskins or anyone else), his other challenges to the district court's May 18, 2023 Order, JA3378-3392, can and should be dismissed as moot. *Cf.* JA3386-3389.

### b.    Haskins Has No Material Information that Is Relevant to Summary Judgment

In any event, the district court properly precluded Kendrick from deposing Haskins after the close of discovery because Haskins has no material information that could alter the analysis on summary judgment. Kendrick admits he had a *single* conversation with Haskins in February 2017, during which Kendrick alleged he was being discriminated against because he was "not being involved in meetings."

48

JA780-786; *see supra* § (G). Kendrick admits that Haskins merely "listened" and said only that he would "research [the *StellarOne* case]" Kendrick mentioned and get back to him. JA783-784. Kendrick admittedly had no material contact with Haskins after February 2017. JA785-786. Neither party disputes the content of that single conversation in February 2017. JA3288. Thus, there was no dispute for purposes of summary judgment. Regardless, Kendrick's alleged exclusion from meetings in 2017 is time-barred and immaterial. *See also supra* § (G).

There is likewise no material dispute that Haskins was not involved in the decision to terminate Kendrick, or any other adverse action with respect to him. The decision to terminate Kendrick was made only by Carney, Speare, and Van Dyke. JA2773, JA2743, JA1146, JA3258-3261, JA3338-3340, JA3296. The Board played no role in that decision. JA1760. Carter Bank produced all of its relevant Board and committee minutes, and the Board minutes show Kendrick's termination was never discussed. JA2317 (Apr. 2020 minutes), JA2329-2333 (May 2020 minutes), JA2337-2342 (June 2020 minutes). Nonetheless, Kendrick relies on two individuals who were not on the Board to claim they "heard" the Board was involved, but this cannot overcome the indisputable fact that the Board was not involved. JA1760; *cf.* JA4382 (district court correctly finding Board involvement would be immaterial, in any event).

Kendrick fails to identify *any* "undeveloped" information Haskins might possess that would be material for purposes of summary judgment. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (internal citations omitted). Even if Haskins were deposed with respect to these circumstances—contrary to the apex doctrine and *Shelton* test—the outcome on summary judgment would remain the same.

Instead, Kendrick vaguely contends, without citation, that Haskins "directly made discriminatory remarks about older workers." Appellant Br. at 25. No such evidence exists. In his requests to depose Haskins, Kendrick cited five statements Haskins made during Board (or Board subcommittee) meetings. *See* JA285-286; JA3129; JA3140. These statements, however, relate *only* to permissible succession planning for Board members, and have absolutely no connection whatsoever to Kendrick or "workers" generally. JA266-267. None of these statements are relevant or material. Four statements were made in 2017—three years before Kendrick's termination. *See* JA285-286, JA266-267; *supra* § (H)(iii). One statement was made in June 2020—a month after Kendrick's termination. *See supra* § (L). None are relevant to Kendrick or his claims. JA617-619.

Finally, these statements and the context in which they arose are memorialized in Board minutes, which were produced and speak for themselves. Thus, Haskins's

50

statements were in the record and undisputed for purposes of summary judgment, obviating any purported need for Kendrick to obtain such information from Haskins. This, perhaps, is the reason Kendrick elected not to depose any of the other ten, non-executive Board members or reserve a deposition for Haskins before expending his deposition limit.

> c. **Kendrick Failed to Timely Revisit His Objections to the Motion for a Protective Order**

The district court correctly noted that at the time the Bank moved for a protective order to preclude Haskins's deposition, Kendrick had not taken any depositions in this case. JA264, JA3386, JA3328-3330. Although the Order granting the protective order was without prejudice, Kendrick failed to raise the issue again at any time prior to exhausting his deposition limit, the close of discovery, or summary judgment. *See, e.g.*, JA3243 ("Kendrick did not seek relief to depose anyone associated with the bank before the end of discovery."). He did not present the issue to the district court until after the court initially set the hearing on summary judgment. JA16. Thus, Kendrick failed to timely revisit his objections to the magistrate judge's order granting the protective order, and he should be precluded from doing so here.

### d. The District Court Correctly Found No Clear Error in the Magistrate Judge's Conclusion that Kendrick Failed to Exhaust Alternative Means to Obtain the Information He Sought from Haskins

Kendrick improperly assigns error to both the district court's ruling on Kendrick's objections, finding no clear error in the magistrate judge's conclusion that Kendrick did not "exhaust[] other avenues to obtain this information," and the magistrate judge's ruling that Kendrick "did not satisfy either the apex doctrine or the *Shelton* test." Appellant Br. at 24–25. Only the district court's order overruling Kendrick's objections to the magistrate judge's orders precluding Haskins's deposition is properly before this Court. *See Dauphin v. Hennager*, 727 F. App'x 753, 756 (4th Cir. 2018) (internal citation omitted); *see also* 28 U.S.C. § 636(b)(1)(a); JA3382.

Kendrick's collateral attacks on the applicability of the apex doctrine and the *Shelton* test, as well as Haskins's status as former lead litigation counsel and consulting attorney on this matter, are inapposite. The district court's deferential role, as the reviewing court, is only to "consider timely objections and modify or set aside any part of the order that is clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1); JA3382-3383 (standard of review). This Court reviews that ruling for abuse of discretion. *See Kitlinski v. U.S. Dep't of Justice*, 994 F.3d 224, 233 (4th Cir. 2021). And the district court did not abuse its discretion.

As the district court recognized, "the issue of whether to preclude Haskins' deposition presented 'an interesting intersection of'" the apex doctrine and the *Shelton* test, which both limit a party's ability to conduct certain depositions. JA3384. The apex doctrine creates a rebuttable presumption against deposing "a high-ranking corporate executive,"[18] and the *Shelton* test must be satisfied to depose an opposing party's attorney.[19]

Kendrick argues the apex doctrine should not apply because he sought to depose Haskins based on his involvement in the case, not his status as a high-ranking corporate executive. Appellant Br. at 25. Kendrick's motivations for deposing Haskins are immaterial because he does not dispute that Haskins was a high-ranking corporate executive. Indeed, the district court correctly recognized that "[n]either party appears to dispute that Haskins is an apex executive." JA3385. Accordingly, the district court did not abuse its discretion in declining to set aside the portion of the magistrate judge's order applying the apex doctrine.

Kendrick argues the *Shelton* test is inapplicable because he does not seek to depose Haskins in his capacity as counsel for the Bank. Appellant Br. at 26. In reviewing Kendrick's objections, the district court acknowledged his argument that Haskins was not actively serving as trial counsel. *See* JA3385 ("Neither party

---

[18] *Performance Sales & Mktg., LLC v. Lowe's Cos.*, 2012 WL 4061680, at *4 (W.D.N.C. 2012) (internal citations omitted).

[19] *Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1987).

appears to dispute that Haskins... **served** as lead litigation counsel for Carter Bank in this case.") (emphasis added). The district court's decision not to set aside the portion of the magistrate judge's order applying the *Shelton* test to Carter Bank's former litigation counsel, and former counsel of record in this case, was not an abuse of discretion, because the magistrate's legal conclusions were not "contrary to law." *Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 28 F. Supp. 3d 465, 479 (D. Md. 2014), *aff'd*, 885 F.3d 271 (4th Cir. 2018) (internal citation and quotation marks omitted); *Allen v. Brown Advisory, LLC*, 2020 WL 5603760, at *3 (W.D. Va. 2020) (applying *Shelton* test, where attorney was not counsel of record but "ha[d] an attorney-client relationship with the [opposing party], and he ha[d] provided legal advice and assistance on matters related to the pending litigation"); *Monster Energy Co. v. Vital Pharm., Inc.*, 2020 WL 2405295, at *11 (C.D. Cal. 2020) (applying *Shelton* in determining whether to quash subpoenas served on non-parties who "previously represented" the plaintiff and were not "current counsel").

Kendrick acknowledges both doctrines require a showing that other avenues to obtain the information have been exhausted. *See* Appellant Br. at 24; *see also RLI Ins. Co. v. Nexus Servs., Inc.*, 2020 WL 2311668, at *2 (W.D. Va. 2020) (apex doctrine); *Allen*, 2020 WL 5603760, at *2 (*Shelton* test). On appeal, Kendrick offers no arguments or evidence that he has satisfied the apex doctrine or the *Shelton* test. Instead, he summarily states that if the Court finds that the apex doctrine applies, it

should find that Kendrick "properly exhausted any other means to obtain this information by deposing [two] other board members," because "[n]either knew exactly what Haskins knew." Appellant Br. at 25 & n.6. Not so. *See Cooper v. Omni Ins. Co.*, 2015 WL 1943802, at *7 (D.S.C. 2015) ("The mere fact that Defendant desires to get [attorney]'s 'version of events' is not enough to meet Defendant's burden [to depose her].").

Based on the relevant timing and the facts before the magistrate judge, the district court did not abuse its discretion. JA3533-3534; *see Tafas v. Dudas*, 530 F. Supp. 2d 786, 796 n.3 (E.D. Va. 2008) ("A [d]istrict [c]ourt must assess whether a [m]agistrate [j]udge's decision was 'clearly erroneous or contrary to law' only based on the facts ***actually before*** the [m]agistrate [j]udge.") (emphasis added).

## III.    THE DISTRICT COURT PROPERLY STRUCK KENDRICK'S NOTICE OF SUPPLEMENTAL FACTS.

Kendrick argues the district court erred by striking Kendrick's first Notice of Supplemental Facts ("Notice") in violation of Local Rule 11(c)(1). *See* W.D. Va. Civ. Rule 11(c)(1). He equivocates about the nature of his filing, claiming it is not a "brief" within the meaning of Local Rule 11(c)(1), but rather state court "complaints" that "are a matter of public record." Appellant Br. at 49–50. The semantics are irrelevant. "Even if unauthorized filings 'introduce no new allegations' and were filed to 'correct the record,'... they still may not be submitted without leave of court." *Orlando v. Neal*, 2023 WL 7413343, at *3 (W.D. Va. 2023)

(citing W.D. Va. Civ. Rule 11(c)(1)); *see also Rivers v. United States*, 2021 WL 864561, at *2 (W.D. Va. 2021), *report and recommendation adopted sub nom. Rivers v. Bowman*, 2021 WL 1175222 (W.D. Va. 2021) (explaining that "unadorned requests to amend [pleadings] or add unidentified 'newly discovered... evidence' violate specific 'rules governing the substance of motions filed in civil cases'") (citing W.D. Va. Civ. Rule 11(c)(1)).

The fact that Kendrick's Notice contains publicly available documents has no bearing on whether he violated Local Rule 11(c)(1). It is undisputed that Kendrick did not obtain leave of court before filing his Notice. Accordingly, the district court did not abuse its discretion in granting the Bank's motion to strike Kendrick's first Notice. It also correctly declined to consider Kendrick's subsequent Notices of Supplemental Facts, which he (again) did not obtain leave of court to file, as part of the summary judgment record. JA4401.

Respectfully Submitted,

/s/ Joshua Richard Treece
King Fitchett Tower
Joshua Richard Treece
Christine S. Ward
WOODS ROGERS VANDEVENTER
BLACK PLC
10 South Jefferson Street, Suite 1800
Roanoke, Virginia  24038
(540) 983-7541

*Counsel for Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [12,986] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>September 24, 2024</u>          <u>/s/ Joshua Richard Treece</u>
                                                                              *Counsel for Appellee*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 24th day of September, 2024, I caused this Brief of Appellee to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Kaley J. Gordon-Shupp
Terry Neill Grimes
TERRY N. GRIMES, ESQ., PC
320 Elm Avenue, SW
Roanoke, Virginia 24016
(540) 982-3711

*Counsel for Appellant*

/s/ Joshua Richard Treece
*Counsel for Appellee*