NO. 24-1377

In The

# United States Court Of Appeals
# For The Fourth Circuit

## BRADFORD M. KENDRICK,

*Plaintiff – Appellant,*

v.

## CARTER BANK & TRUST, INC.,

*Defendant – Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT DANVILLE**

————————

**REPLY BRIEF OF APPELLANT**

————————

**Terry N. Grimes**
**Kaley J. Gordon-Shupp**
**TERRY N. GRIMES, ESQ., PC**
**320 Elm Avenue, SW**
**Roanoke, VA 24016**
**(540) 982-3711**

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ....................................................................... iii

REPLY BRIEF ..........................................................................................1

I.    A QUESTION OF FACT EXISTS AS TO WHO MADE THE DECISION TO TERMINATE KENDRICK........................................1

II.    A QUESTION OF FACT EXISTS AS TO WHEN THE DECISION TO TERMINATE KENDRICK WAS MADE .................3

III.    THE BANK'S FOUNDER AND CEO, WORTH HARRIS CARTER, JR., RAN CARTER BANK...................................................3

IV.    AFTER KENDRICK WAS DEMOTED, THE BANK ASSIGNED TWO SHAM TITLES WITH NO JOB DESCRIPTIONS AND NO DUTIES .....................................5

V.    THE BANK'S ASSERTION THAT KENDRICK DID NOT COMPLAIN OF AGE DISCRIMINATION IN 2017 IS NOT TRUE....................................................................................7

VI.    THE DISTRICT COURT ERRED BY FAILING TO PERMIT KENDRICK TO DEPOSE BOARD CHAIR JAMES HASKINS ........8

VII.    A QUESTION OF FACT EXISTS AS TO WHY KENDRICK WAS TERMINATED ..........................................................10

    A.    Whether The Filing of The Exhibit Is Grounds For Termination of Employment Or Protected Activity Appears To Be A Question of First Impression In This Circuit......................................................................12

    B.    Kendrick Asked The Bank to State Which Documents It Considered Confidential ..........................................14

    C.    The Information in Question Was Not "Confidential" As Defined By The Bank's Policy .................................15

i

VIII.   WHETHER THE BANK'S "SUCCESSION PLANNING" IS IN REALITY A FORM OF AGE DISCRIMINATION IS A QUESTION OF FACT ...................................................................16

IX.   WHETHER THE BANK'S CREATION OF A "YOUNG PROFESSIONALS GROUP" DISCRIMINATED AGAINST OLDER WORKERS WITH RESPECT TO THE TERMS AND CONDITIONS OF EMPLOYMENT IS A QUESTION OF FACT FOR THE JURY ..................................................18

X.   KARAVATAKIS' AND SPEARE'S AGE-RELATED STATEMENTS PROVIDE EVIDENCE OF AGE DISCRIMINATION ...........................................................19

XI.   THE BANK'S ARGUMENT THAT COB HASKIN'S STATEMENT THAT "WE NEED YOUNG, QUALIFIED DIRECTORS" IS IMMATERIAL IS WITHOUT MERIT................20

XII.   THE DISTRICT COURT ERRED BY STRIKING KENDRICK'S NOTICE OF SUPPLEMENTAL FACTS..................21

XIII.   THE EVIDENCE IS SUFFICIENT TO SUBMIT THE AGE DISCRIMINATION AND RETALIATION CLAIMS TO THE JURY ......................................................................25

CONCLUSION................................................................26

REQUEST FOR ORAL ARGUMENT..............................................27

CERTIFICATE OF COMPLIANCE ........................................28

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Atkins v. Virginia*,
536 U.S. 304 (2002)......................................................................22

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999).............................................. 22-23

*Duarte v. Truist Bank*,
2021 U.S. Dist. LEXIS 197784 (W.D.N.C. Oct. 14, 2021)..........................21

*Funk v. Stryker Corp.*,
631 F.3d 777 (5th Cir. 2011)..........................................................23

*Kempcke v. Monsanto Co.*,
132 F.3d 442 (8th Cir. 1998)..........................................................12

*Kramer v. Time Warner, Inc.*,
937 F.2d 767 (2d Cir. 1991)..........................................................22

*Matheny v. L.E. Myers Co.*,
Civil Action No. 2:16-cv-09304, 2018 U.S. Dist. LEXIS 30394
(S.D. W. Va. Feb. 26, 2018)....................................................21, 22

*Narbona v. Micron Precision, LLC*,
3:14-cv-00060-MOC-DSC, 2014 U.S. Dist. LEXIS 64335
(W.D.N.C. May 9, 2014) .............................................................11

*Quinlan v. Curtiss-Wright Corp.*,
204 N.J. 239 (N.J. 2010)........................................................12, 13

*Reeves v. Sanderson Plumbing, Inc.*,
530 U.S. 133 (2000).............................................................2, 10

*Samsung Elecs. Am., Inc. v. Chung*,
No. 3:15-CV-4108-L, 2020 U.S. Dist. LEXIS 24992
(N.D. Tex. Feb. 13, 2020)..............................................................23

*Shelton v. American Motors Corp.*,
  805 F.2d 1323 (8th Cir. 1987)......................................................................10

*Steves & Sons, Inc. v. Jeld-Wen, Inc.*,
  2018 U.S. Dist. LEXIS 148840 (E.D. Va. Aug. 30, 2018) ...........................11

*Tolan v. Cotton*,
  572 U.S. 650 (2014)........................................................................................1

*United States v. Cmty. Health Network, Inc.*,
  No. 1:14-cv-01210-RLY-MKK, 2023 U.S. Dist. LEXIS 74115
  (S.D. Ind. Apr. 28, 2023) ..............................................................................11

**Rules:**

Fed. R. Civ. P. 26(b)(1) ..................................................................................9

Fed. R. Civ. P. 26(b)(2) ..................................................................................9

Fed. R. Civ. P. 30............................................................................................9

Fed. R. Civ. P. 56............................................................................................1

Fed. R. Evid. 201 ....................................................................................22, 23

W.D. Va. Civ. R. 11 ......................................................................................21

**Other Authorities:**

American Psychiatric Association,
Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 2000)..................22

Ellis & Luckasson,
*Mentally Retarded Criminal Defendants*,
  53 Geo. Wash. L. Rev. 414 (1985) ...............................................................22

Mental Retardation:
Definition, Classification, and Systems of Supports (9th Ed. 1992)......................22

Tammy Binford,
*Changing Times Highlight Need for Employers to
Adapt to an Aging Workforce*, HR Daily Advisor (Aug. 17, 2018),
https://hrdailyadvisor.blr.com/2018/08/16/changing-times-highlight-need-
employers-adapt-aging-workforce/ .........................................................................17

Tammy Binford,
*The Aging Workforce: Succession Planning and Retention*,
HR Daily Advisor (Aug. 17, 2018), https://hrdailyadvisor.blr.com/
2018/08/17/aging-workforce-succession-planning-retention/ ................................17

Victoria A. Lipnic,
*The State of Age Discrimination and Older Workers in the U.S. 50 Years
after the Age Discrimination in Employment Act (ADEA)*, EEOC.GOV
(June 2018), http://www.eeoc.gov/reports/state-age-discrimination-and-
older-workers-us-50-years-after-age-discrimination-employment .........................16

# REPLY BRIEF

This is a classic case of systemic age discrimination. Instead of presenting the evidence in the light most favorable to Kendrick as required under Rule 56, Carter Bank instead presents the evidence in the light most favorable to the Bank, as if it were presenting closing argument to a jury. *See, Tolan v. Cotton*, 572 U.S. 650, 659 (2014) (reversing summary judgment where "the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion"). Applying the wrong standard of review, the Bank (and the district court below) ignores evidence favorable to Kendrick. (*See* Appellant Br. 1-15.) Material questions of fact should have precluded summary judgment.

## I.   A QUESTION OF FACT EXISTS AS TO WHO MADE THE DECISION TO TERMINATE KENDRICK.

The Bank claims that "[t]he decision to terminate Kendrick was made *only* by Carney, Speare, and van Dyke."[1] (Appellee Br. 49 (emphasis added).) This is simply not true. The evidence shows that Speare called former bank VP and IT employee Diann Nelson at Chairman of the Board James Haskins' request and told her "that

---

[1] Referring to HR director Paul Carney, IT director Matt Speare, and CEO Litz van Dyke. Both Carney and Speare were hired by van Dyke. Both Carney (age 51) and Speare (age 51) were among the 10 executives hired by Speare after he took over as CEO. (JA3049-3050). None were 60 or older. The ages ranged from 41 to 56. The average age was 50.5.

*the Board of Directors voted to terminate*" Kendrick (JA3043-3044, JA2842; *accord* JA3120 (Speare: "It was communicated to me that the decision was made *by the board*." (emphasis added)).) Though Nelson and Speare testified that the decision was made by the Board, van Dyke testified that "Matt Speare, Litz van Dyke and [HR] Paul Carney" made the decision. (JA3147-3148.) Carney also testified that "Matt Speare, [Carney], and Litz van Dyke" made the decision. (JA3215.) In contrast, Speare told Kendrick that he (Speare) had nothing to do with terminating Kendrick. (JA463, JA472-473.)

The evidence as to who made the decision to terminate Kendrick *is* plainly in conflict. This is important for several reasons. First, not only does a question of fact exist as to who made the decision to terminate Kendrick, the Bank's continuing false assertion that the decision "was made *only* by Carney, Speare, and van Dyke" proves that nothing the Bank says, whether on brief, through witness testimony, or through documents, can be taken at face value. The conflicting testimony raises credibility issues which must be resolved by the trier of fact.

Next, the fact that the Bank has offered conflicting evidence as to what ought to be a simple question—who made the decision to terminate Kendrick's employment—supports an inference that the Bank is dissembling to cover up a discriminatory purpose. *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 147 (2000) (holding that a "trier of fact can reasonably infer from the falsity of the

explanation that the employer is dissembling to cover up a discriminatory purpose." In such cases, "the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'"). The jury should therefore be permitted to consider the Bank's dishonesty as affirmative evidence of guilt.

## II.   A QUESTION OF FACT EXISTS AS TO WHEN THE DECISION TO TERMINATE KENDRICK WAS MADE.

The evidence also supports a finding that the decision to terminate Kendrick was made in January 2019, not May 2020 as the Bank suggests. (Appellee Br. 24.) In January 2019, the Bank put Kendrick on a "severance list,"

CONFIDENTIAL

From: Matthew M. Speare <Matt.Speare@carterbankandtrust.com>
Sent: Friday, January 04, 2019 9:28 AM EST
To: Paul E. Carney <Paul.Carney@carterbankandtrust.com>
Subject: The severance list

Brad Kendrick

(JA3168.) There was only one name on the list: Brad Kendrick. EVP/CAO Jane Ann Davis testified plainly that "severance is for … someone that is going to be leaving the bank." (JA3054.) The Bank may have delayed the execution date, but from this evidence, the jury could easily find that the decision to separate Kendrick from the Bank was made in January 2019, not May 2020.

## III.   THE BANK'S FOUNDER AND CEO, WORTH HARRIS CARTER, JR., RAN CARTER BANK.

One thing the parties agree on is that the Bank's founder and CEO, Worth Harris Carter, Jr., ran Carter Bank. No detail was too small. As noted by the Bank, Mr. Carter even made "salary decisions for each teller" and was "the sole person

making compensation decisions" for each of the "900 plus employees" who worked for the Bank. (Appellee Br. 4.) For better or worse, Mr. Carter made every decision of consequence, including whether the Bank employed Automated Teller Machines (ATMs), whether teller transactions were automated, and what core processing system the Bank used. (*See id.*) The suggestion that the Bank "suffered from substantial technological deficits under Kendrick's IT leadership" (Appellee Br. 7) is simply not true. Kendrick's "leadership" was not the problem. As the Bank concedes, Mr. Carter ran the Bank.

It was no secret that the Bank's core processing system, Coresoft, was flawed. But it was also Mr. Carter's "baby." (JA725-726.) The Bank's IT auditor, NetBank's David Hart stated, "Mr. Kendrick had no choice but to support Mr. Carter with Coresoft." (JA3235.) Mr. Carter developed the system with Murthy Veeraghanta, chairman of VSoft Corporation based in Atlanta with facilities in India. (JA535.) And Kendrick advised against using Coresoft "every chance [he] got." (JA535-536.) However, Kendrick did not write the checks for Carter Bank: Mr. Carter did. None of the IT or technology shortcomings can be laid at Kendrick's feet.

Kendrick's performance was always more than adequate, or at the very least, a question of fact exists as to whether his performance was adequate. David Hart of NetBank Audits performed IT audits for the Bank from 2009 through 2017. According to Hart, "any assertion that Mr. Kendrick was not knowledgeable of what

4

was going on with core processing systems and ATMs and FinTech programs and all of the other things that have some significance to the banking industry … is false." (JA3234.) As he put it: "I haven't come across too many IT officers that have done what Brad has and/or has his knowledge…. In my opinion, he was a very valuable asset that would be critical to a successful transition from the existing system to the new system." (JA3235.) Bank President Phyllis Karavatakis, Executive Vice President and Chief Administrative Officer Jane Ann Davis, and bank consultant Timothy O'Rourke all agreed that Carter Bank needed Brad Kendrick to help get the new operating system going. (JA3234.) And while Bank regulators had concerns about the Bank's operating system, they had no criticisms of Kendrick and were pleased with his performance. (JA542-543, JA813.)

The Bank's criticism of Kendrick's performance, as well as it's criticism of David Hart (Appellee Br. 9, 31), and the self-serving MYC report (*id.* at 6, 10, 11-13, 30), confirm that the Bank is ignoring the standard of review under Rule 56, and that at most a question of fact exists concerning the adequacy of Kendrick's performance.

## IV. AFTER KENDRICK WAS DEMOTED, THE BANK ASSIGNED TWO SHAM TITLES WITH NO JOB DESCRIPTIONS AND NO DUTIES.

After Kendrick was demoted, the Bank assigned to him the title of Chief Information Security Officer (CISO) and Business Continuity Plan (BCP) coordinator. Both were sham titles: Kendrick had no job description and no duties

5

(JA711, JA753-757, *see also* JA815 ("I was given chief information security officer and nothing to do, and BCP coordinator and that was—I was not used when Covid-19 came along.").) Moreover, Kendrick was never told that he had been named CISO or BCP Coordinator. He learned of the appointment only while taking minutes at an IT Steering Committee meeting. (JA749-750.) The jury may well find that the ruse was done deliberately to publicly shame and humiliate Kendrick and to discourage him to the point he would quit. Karavatakis and van Dyke made no effort to hide their animus. She told Kendrick plainly that "going forward *Litz and I* will be deciding what your job duties are … and if you don't like the duties we give you, we don't have anything for you." (JA557-558.) The fact that the jobs were illusory was confirmed by the Bank on brief: after Kendrick was fired, he "was never replaced." (Appellee Br. 19.) Of course he wasn't. The positions never really existed in the first place.

Because age discrimination at the Bank was purposeful and systemic, the Bank employed the same tactics with then 69-year-old regional manager Donna Burnopp. Like Kendrick, Burnopp worked for the Bank for more than 30 years and "had been in banking for 40-plus-years." (JA309.) When the Bank divided Burnopp's job into three roles and she applied for one of the roles—a job she had done for years—Karavatakis told her that "they had decided that there were other people that were more qualified for the positions and that they were going to look at

6

[Burnopp] as maybe a special project position." (JA308.) Burnopp observed that "the three people that got the positions were all younger than [her]," and "[two] of them [she] supervised." (JA310.) Whether as an architect or conspirator, the jury may find that it was not coincidental that Karavatakis was involved in the systemic discrimination at the Bank including the effort to get rid of Kendrick and Burnopp.

## V.    THE BANK'S ASSERTION THAT KENDRICK DID NOT COMPLAIN OF AGE DISCRIMINATION IN 2017 IS NOT TRUE.

The Bank's claim on brief that in 2017, Kendrick "was merely complaining that Karavatakis and Peterson (who are the same age or older) did not get along with him" (Appellee Br. 18) is simply false. In February 2017, Kendrick told then Vice-Chair Haskins: "I was being discriminated against *because of my age* because I was being bypassed and not being involved in management meetings. I was being left out of anything of running Carter Bank." (JA553 (emphasis added).) Kendrick could not report the discriminatory treatment to Mr. Carter because "[h]e was dying of cancer." So, Kendrick called Haskins instead. (*Id*.)

About a week later, Kendrick also complained to CAO Jane Ann Davis, who was "in charge of HR at the time." (JA555-556.) Then, about May or June 2017, after an IT Steering Committee, Kendrick also complained to Karavatakis and van Dyke. (JA557-558.) After that, there was no one else to complain to. As the Bank notes on brief, there was no "well-established Human Resources ("HR") department." (Appellee Br. 4.) Not only did the Bank not have an HR department, it

never provided any policy training to its employees. CAO Jane Ann Davis testified plainly that the Bank has "**never** provided proper training, education or accountability to our employees. *We need to do a better job of this*." (JA3063-3064, JA3075 (emphasis added).) The Bank's statement that Kendrick did not complain about age discrimination is false.

## VI.  THE DISTRICT COURT ERRED BY FAILING TO PERMIT KENDRICK TO DEPOSE BOARD CHAIR JAMES HASKINS.

As stated in opening brief, the district court erred by failing to permit Kendrick to depose James Haskins. Kendrick will respond briefly here to the Bank's argument (Appellee Br. 47-51).

The Bank argues that Haskins had no discoverable information. (Appellee Br. 48.) This is false. Haskins is a critical witness. He received Kendrick's age discrimination complaint and promised to investigate and has knowledge of any investigation that followed. He stated that the Bank wanted young directors. Also, there is evidence that the decision to terminate Kendrick was made by the Bank's Board of Directors. Kendrick should have therefore been permitted to depose the Board's Chairman, James Haskins.

According to the Bank, "Kendrick retained his Executive Vice President title until his termination in 2020." (Appellee Br. 7.) If true, it makes sense that Kendrick would have been terminated by the Board and not someone else, and certainly not the IT or HR directors. Therefore, Haskins knows who made the decision to

8

terminate Kendrick's employment, when they made that decision, and why. Additionally, as Chair of the Gov/Com and Board Chair, he likely participated in the decision to assign sham titles to Kendrick, ostracize him, and terminate his employment. The district court's failure to order his deposition hamstrung plaintiff throughout this litigation. Without Haskins' deposition, Kendrick never had a fair shot at discovery, and the record below was never fully developed.

The Bank's argument that Kendrick should have reserved a deposition slot in case the district court changed its mind and permitted the deposition, and otherwise take other steps to secure the deposition, is nonsense. After the Bank opposed the deposition, Kendrick filed a motion to compel discovery. (JA218.) The original judge assigned to the case took the motion under advisement. (JA233, §4.) After Haskins withdrew as counsel for the Bank (JA226), the Bank filed a Motion for Protective Order to Preclude the Deposition. (JA256.) The question was briefed. (JA260-306.) A magistrate judge granted the motion (precluding the deposition). (JA447.) The district court overruled plaintiff's objections (JA460) and prohibited the deposition. (JA3379 ¶B(1).) With respect to the Bank's argument concerning the number of depositions under Fed. R. Civ. P. 30, the Rule sensibly provides that the district court "*must* grant leave" when the deponent has information "that is relevant to any party's claim or defense" as provided by Rule 26(b)(1) and (2) (Emphasis added). The district court therefore should have permitted the deposition.

The case law is discussed adequately in Kendrick's opening brief (Appellant Br. 24-28.) The magistrate and district court's reliance on the judge-made "apex doctrine" and *Shelton* test was misplaced. As stated in opening brief, neither the "apex doctrine" nor the *Shelton* test have ever been expressly recognized by this Court, and in any event, neither applies here. Equally important, this is another case in which the judge-made law must yield to the plain language of the Federal Rules of Civil Procedure. Moreover, any notion that Haskins should be afforded some measure of comity because he is a local attorney who practices in the western district of Virginia must also yield to application of the discovery Rules. Plaintiff requests therefore that this Court remand with instruction to permit the deposition.

## VII. A QUESTION OF FACT EXISTS AS TO WHY KENDRICK WAS TERMINATED.

As stated, there is evidence that the Bank engaged in dissembling with respect to who made the decision to terminate Kendrick, thus entitling the factfinder "to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt,'" *Reeves*, 530 U.S. at 147. The evidence is also in conflict as to why the decision was made.

After Kendrick filed an amended complaint on May 8, 2020, the Bank issued a letter to Kendrick on May 29, 2020 terminating his employment allegedly because he "allowed confidential Carter Bank & Trust information to be posted on the PACER system" (JA3169.) He did not. The letter itself is suspect. Though the letter

is signed by Speare, Speare told Kendrick that he (Speare) had nothing to do with terminating Kendrick. (JA463, JA472-473.) Moreover, though the Bank argues that the word "allowed" should simply be ignored. To the contrary, "words have meaning." *Steves & Sons, Inc. v. Jeld-Wen, Inc*., 2018 U.S. Dist. LEXIS 148840, *28 (E.D. Va. Aug. 30, 2018); *see also Narbona v. Micron Precision, LLC*, 3:14-cv-00060-MOC-DSC, 2014 U.S. Dist. LEXIS 64335, at *3 (W.D.N.C. May 9, 2014) ("words have meaning"); *United States v. Cmty. Health Network, Inc.*, No. 1:14-cv-01210-RLY-MKK, 2023 U.S. Dist. LEXIS 74115, at *12 (S.D. Ind. Apr. 28, 2023) ("[W]hen a party uses particular words … its opponent is entitled to assume those words have meaning."). Contrary to the Bank's argument, there is no evidence that Kendrick "allowed" the exhibit to be filed on PACER. Kendrick merely "forwarded it to my attorney but I had nothing to do with uploading or anything." (JA836; *see also* JA844-845.) The district court erred by finding otherwise.

Moreover, the exhibit was immediately withdrawn at the Bank's request, and there is no evidence that it was ever seen by anyone other than counsel. Given that the Bank has engaged in dissembling with respect to who made the decision to terminate Kendrick, entitling the factfinder "to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt," and has offered conflicting evidence for when the decision to terminate was made, the Court (and the trier of fact) must also view with suspicion the Bank's proffered reason for the discharge.

11

A. **Whether The Filing of The Exhibit Is Grounds For Termination of Employment Or Protected Activity Appears To Be A Question of First Impression In This Circuit.**

Whether removing the exhibits or filing them on the CM/ECF is grounds for termination or is protected activity appears to be a question of first impression in this Circuit. As stated in Kendrick's opening brief (at 45-47), other courts have held that it is not. In *Kempcke v. Monsanto Co.*, 132 F.3d 442, 445 (8th Cir. 1998), the court reversed an award of summary judgment in an ADEA case involving an employee who removed documents from an employer and described the employee's conduct as "at least arguably oppositional or litigation activity, because it placed documents that might evidence discrimination in the hands of a legal professional who would litigate the issue on [plaintiff]'s behalf if he could not resolve the matter informally with Monsanto." *Id.* Similarly in *Quinlan v. Curtiss-Wright Corp.*, 204 N.J. 239 (N.J. 2010), the executive director of human resources, believing that the company had discriminated against her when it promoted a man less qualified than her and made him her supervisor, gathered approximately 1800 documents and provided them to her attorney. *Id.* at 246-49. When the company fired her for theft of the documents and violation of company policies, she filed suit for sex discrimination and retaliation. *Id.* at 249. Notably, "[a]fter finding that the attorney's use of the documents was itself protected and rejecting the argument that it was disruptive, the court concluded that plaintiff could prevail on her retaliation claim if the jury

believed that she was fired because of what the attorney did, rather than because she continued to take and copy documents." *Id.* at 251. The jury agreed with the plaintiff and awarded compensatory and punitive damages. *Id.* at 244. The trial court denied the company's motion for a new trial and "found that there was ample basis for the jury to conclude that defendant had covered up its discrimination both before and during trial, that it terminated plaintiff, a long-time employee, with no intermediate discipline, and that it used the terms 'theft' and 'breach of trust' in her termination letter in an effort to conceal its true motivation for her dismissal." *Id.* at 253. The jury in the case at bar may find the same thing.

On appeal, looking to federal precedent, the Supreme Court of New Jersey developed a test that balanced the rights of employers and employees and affirmed the judgment of the trial court. With respect to the removal of documents, the court noted that if an employee removed a document, "looked at it, copied it and shared it with an attorney for the purpose of evaluating whether the employee had a viable cause of action or of assisting in the prosecution of a claim, the factor will favor the employee." *Id.* at 269. The court noted that "[w]hen presented with that question, the jury found for plaintiff, concluding that she was the victim of retaliatory discharge" and found "no warrant to interfere with that finding." *Id.* at 273. The question here should therefore go to the jury.

**B.** **Kendrick Asked The Bank to State Which Documents It Considered Confidential.**

Despite repeated requests, the Bank refused to identify which documents or portions thereof it deemed "confidential" and even vigorously opposed entry of a protective order. This is unheard of in employment litigation. Because the Bank would not state what it considered confidential, *plaintiff* (not defendant) filed a motion for a protective order (JA105) again asking the Bank to state what documents it believed to be confidential. Inexplicably, the Bank *opposed* that motion (JA136), necessitating a hearing. At the hearing on June 18, 2020, plaintiff asked the court to order the Bank to identify which documents it deemed confidential. (JA154.) The court agreed and stated that "we'll have a protective order" and noted that "the entry of the order is not stipulated or agreed upon." (*Id.* at JA160-161.) Only after the Bank secured new counsel did it identify *any* documents as confidential.

And though the Bank claims that Kendrick was the "tip of the spear" with respect to enforcement of the Bank's security policies, the truth is, as stated above, the Bank provided *no training* to Kendrick or anyone else with respect to Bank policies. (*See* JA3053, JA3063-3064, JA3075.) The Bank cannot argue that Kendrick did not follow policy when the Bank admittedly failed to provide education or training to Kendrick and other employees.

### C.    The Information in Question Was Not "Confidential" As Defined By The Bank's Policy.

The Bank's repetition of the word "confidential" (*see, e.g.*, Appellee Br. 24-25, using "confidential" five times in one paragraph) does not make something confidential. The Bank's policy defines what is confidential:

> Confidential information includes all nonpublic information that might be of use to competitors, or unfavorable to us or our customers if disclosed. Confidential information includes, but is not limited to, the following: (1) information marked "Confidential," "Private," "For Internal Use Only," or similar legends, (2) technical, financial or economic information relating to past, current and future products, services or research, (3) business or marketing plans or projections, (4) earnings and other internal financial data, (5) personnel information, (6) vendor and customer lists and (7) other non-public information that, if disclosed, might be of use to CB&T's competitors, harmful to CB&T or its vendors, customers or other business partners, or constitute a violation of securities laws. CB&T directors, officers and employees, are entrusted with confidential information that must be safeguarded at all times.

(JA949.) By the Bank's own standard, the information in Exhibit 1 does not contain "confidential information." None of the information in question "might be of use to competitors, or unfavorable to us or our customers if disclosed." Moreover, it is not enough to have a written policy. Unless employes are educated and trained on it, the policy is useless.

15

## VIII. WHETHER THE BANK'S "SUCCESSION PLANNING" IS IN REALITY A FORM OF AGE DISCRIMINATION IS A QUESTION OF FACT.

Thirty-seven (37) times on brief, the Bank states that its effort to get rid of older workers is simply "succession planning."[2] Systematically getting rid of older workers may be one form of succession planning, but it may also violate the ADEA. In a report entitled "The State of Age Discrimination and Older Workers in the U.S. 50 Years After the Age Discrimination in Employment Act (ADEA)," the EEOC noted that "age discrimination persists based on outdated and unfounded assumptions about older workers, aging and discrimination."[3] "Ability, experience and commitment matter, not age," the reports states. *Id.* "To achieve the promise of the ADEA, it's time to recognize the value of age diversity in the workplace and the benefits of a multi-generational workforce." *Id.* The report also details the legal risks associated with age discrimination, pointing out that unlawful discharge is a common practice asserted in discrimination claims filed with the EEOC, as well as charges related to harassment and terms and conditions of employment. *Id.*

---

[2] *See* Appellee Br. 5, 11, 12 (three times), 19 (four times), 20, 21 (four times), 22 (twice), 25 (twice), 26 (five times), 27 (three times), 33 (twice), 34, 36 (five times), 37 (twice), and 50.

[3] Victoria A. Lipnic, *The State of Age Discrimination and Older Workers in the U.S. 50 Years after the Age Discrimination in Employment Act (ADEA)*, EEOC.GOV (June 2018), http://www.eeoc.gov/reports/state-age-discrimination-and-older-workers-us-50-years-after-age-discrimination-employment.

Another article entitled "The Aging Workforce: Succession Planning and Retention" notes that "[s]uccession planning presents another age discrimination risk. 'Costly succession planning mistakes occur when employers look to be rid of older employees in favor of younger employees with long-term potential or when employers fail to consider other older workers to replace willing retirees,'" citing Jodi R. Bohr, an attorney with Gallagher & Kennedy, P.A., in Phoenix, Arizona.[4] Another article entitled "Changing Times Highlight Need for Employers to Adapt to an Aging Workforce" notes that "one form of age discrimination involves the relatively new practice of 'microtargeting' on social media—the practice of directing posts about employment opportunities to certain demographics, such as younger workers."[5] The article notes that "although microtargeting hasn't yet been expressly condemned by the courts, it may prove to be a 'form of digital age discrimination' if the employer isn't also posting similar ads in other media outlets reaching the older age demographics." *Id.*

---

[4] Tammy Binford, *The Aging Workforce: Succession Planning and Retention*, HR Daily Advisor (Aug. 17, 2018), https://hrdailyadvisor.blr.com/2018/08/17/aging-workforce-succession-planning-retention/.

[5] Tammy Binford, *Changing Times Highlight Need for Employers to Adapt to an Aging Workforce*, HR Daily Advisor (Aug. 17, 2018), https://hrdailyadvisor.blr.com/2018/08/16/changing-times-highlight-need-employers-adapt-aging-workforce/.

The Bank's 37 references on brief to "succession planning" is a tell—an indicator that what the Bank is saying is not true. Whether the Bank's alleged "succession planning" is in reality just a form of age discrimination is a question of fact for the jury.

## IX. WHETHER THE BANK'S CREATION OF A "YOUNG PROFESSIONALS GROUP" DISCRIMINATED AGAINST OLDER WORKERS WITH RESPECT TO THE TERMS AND CONDITIONS OF EMPLOYMENT IS A QUESTION OF FACT FOR THE JURY.

In August 2018 van Dyke created a "Young Professionals Group" headed by HR Paul Carney. (JA3066.) Membership was by invitation only. Anyone over the age of 40 was excluded. (JA3055-3058.) The ages of the nine members of the inaugural class ranged from 24 to 32 years of age, and the average age was 29. (JA3055-3063; JA3066; *see also* JA3072 (referencing Carney's "conference call with Young Professionals").) The Bank claims that the Young Professionals Group "was just one of many development programs for Carter Bank employees." (Appellee Br. 24.) This is not true. The group was available only to employees under the age of 40, and most members were much younger. The Bank, acting through van Dyke and Carney, created a group that purposely and deliberately favored younger workers and excluded those over the age of 40. The jury may well find that the creation of the Young Professionals Group discriminated against Kendrick and other older workers with respect to the terms and conditions of employment.

18

X.    **KARAVATAKIS' AND SPEARE'S AGE-RELATED STATEMENTS PROVIDE EVIDENCE OF AGE DISCRIMINATION.**

Contrary to the argument of the Bank on brief, Karavatakis' and Speare's age-related statements provide evidence of age discrimination. Karavatakis was the Bank's President. She told Kendrick plainly that she wanted younger people working in IT (JA768-769) and stated during several IT Steering Committee Meetings, "Brad you need to be finding your replacement." (JA769.) She also asked about the ages of Kendrick's staff. "And she would ask me also, how old is Diann [Nelson, age 66] and how old is Lee [Eldridge, age 64 (JA3125-3127)]… . And I said, well, they're older than me," to which Karavatakis responded, "well, you need to be finding their replacements too." (JA769; *see also* JA768-769 ("[Karavatakis] resented me being in charge of IT and she wanted younger people in IT.").)

Similarly, Speare told Kendrick and other IT workers in the fourth quarter of 2017 that "all of us sitting around this table are not getting any younger and we need to be hiring younger people because it takes longer for older people to learn the new technologies." (JA819 (echoing Karavatakis).) Speare then displayed two PowerPoint slides that compared the average age of all employees at the Bank (47 years) with the average age of its IT employees (53.44 years).[6] (JA819-820.)

---

[6] The Bank argues that other persons at the meeting did not recall the statements. (Appellee Br. 21.) Here, as throughout its brief, the Bank ignores the standard of review under Rule 56. The conflicts in the evidence are reserved for resolution by the jury.

The Bank argues that the statements are simply "stray remarks" unrelated to any employment action against Kendrick or anyone else. This is not true. Stray remarks, like stray bullets, can be lethal. Karavatakis eventually got her way. All the older workers in IT—Lee Eldridge (age 64), Diann Nelson (age 66), and Kendrick (age 60)—are gone. Kendrick was assigned two sham titles, jobs with no descriptions and no duties, reduced to taking minutes in meetings, placed on a severance list and targeted for separation from the Bank, then after he complained about age discrimination and filed with the EEOC and later a complaint in federal court, he was fired. The fact that Kendrick was never replaced only proves that the titles were meaningless. It may have taken time, but the Bank got what it wanted: a younger workforce. The Bank calls this succession planning. The jury may call it age discrimination.

## XI.   THE BANK'S ARGUMENT THAT COB HASKIN'S STATEMENT THAT "WE NEED YOUNG, QUALIFIED DIRECTORS" IS IMMATERIAL IS WITHOUT MERIT.

The Bank argues that Chairman of the Board Haskin's statement that "we need young, qualified directors" is immaterial. (Appellee Br. 21-22.) The Bank misses the point.  A jury may find, as did the district court (Conrad) at the hearing of this matter on July 17, 2020, that "the comments about the age of directors, while not actionable in and of themselves, indicate a mindset of the board" and "may impute the decisions that were made about employees of the bank … as reflecting on the mindset of the

bank leadership" (JA198-199) and that age discrimination indeed infected many of the employment decisions at the Bank. (*Id.*)

## XII. THE DISTRICT COURT ERRED BY STRIKING KENDRICK'S NOTICE OF SUPPLEMENTAL FACTS.

The Bank argues that the district court did not err by granting its motion to strike Kendrick's Notice of Supplemental Facts. (Appellee Br. 55-56.) The argument is without merit. As stated in opening brief, Local Rule 11 does not prohibit the filing of supplemental evidence; the case cited by the district court, *Duarte v. Truist Bank*, 2021 U.S. Dist. LEXIS 197784 (W.D.N.C. Oct. 14, 2021), is inapt; the case law does not support the district court's ruling; and in any event, the evidence is a matter of public record. (Appellant Br. 49-51.)

As previously argued, Kendrick's Notice was not a brief. (Appellant Br. 49.) Kendrick filed a single sentence Notice and attached 626 pages of publicly available documents, which were discussed at the summary judgment hearing. (JA3563-4190 (Notice and Exhibit); JA3498-3500 (discussing the public availability of the documents and their contents at the summary judgement hearing).) Supplementing the summary judgment record with newly discovered evidence is permissible. *Matheny v. L.E. Myers Co.*, Civil Action No. 2:16-cv-09304, 2018 U.S. Dist. LEXIS 30394, at **3-4 (S.D. W. Va. Feb. 26, 2018). *Matheny* outlines three different theories from various courts under which it may be proper to supplement with newly discovered evidence: 1) when "new material is not merely cumulative or

corroborative of evidence" and "creates a new question of material fact that may impact the ruling", or 2) evidence "that, with reasonable diligence, could not have been discovered earlier", or 3) when the request to supplement "is not made in bad faith" and will not prejudice the other parties. *Id.* at \*3. Here, the evidence is not cumulative of other evidence, Kendrick supplemented the record promptly upon learning of the evidence, and there is no prejudice to the Bank—these are the Bank's own documents, and are a matter of public record.

Moreover, both the district court and the Bank overlook that the Supreme Court often cites cases, articles, books and other records in support of its opinions. In *Atkins v. Virginia*, 536 U.S. 304 (2002), for example, the Supreme Court cited various articles, such as Ellis & Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 429 (1985), *Atkins*, 536 U.S. at 317 n. 24, books such as Mental Retardation: Definition, Classification, and Systems of Supports, 5 (9th Ed. 1992), *Atkins*, 536 U.S. at 309 n. 18, and public records such as American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 41 (4th Ed. 2000), *Atkins*, 536 U.S. at 309 n. 189.

It is well-settled that the court may "consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991) ("the documents are required by law to be filed with the SEC, and no serious question as to their authenticity can exist"). Similarly, in *Bryant v.*

*Avado Brands, Inc*., 187 F.3d 1271, 1276 (11th Cir. 1999), after discussing Rule 201 and the applicable case law, the Eleventh Circuit "approve[d] of the Second Circuit's practice of judicially noticing relevant documents legally required by and publicly filed with the [SEC]." Similarly in *Samsung Elecs. Am., Inc. v. Chung*, No. 3:15-CV-4108-L, 2020 U.S. Dist. LEXIS 24992, *7 (N.D. Tex. Feb. 13, 2020), the court noted that "[c]ourts routinely take judicial notice of public records, including court documents and trademark registrations," citing *Funk v. Stryker Corp*., 631 F.3d 777, 783 (5th Cir. 2011)("[T]he district court took appropriate judicial notice of publicly-available documents and transcripts … which were matters of public record directly relevant to the issue at hand.") (citation omitted).

The Bank can hardly complain that the court should not consider information in pleadings and other documents *it filed* with courts or the SEC. The Bank's own filings (JA3565-4190) contain customer names, addresses, social security numbers, and account and loan information, none of which the Bank considered or treated as confidential. The documents contain, for example, the names and address and account information for West Virginia Governor Jim Justice and First Lady Kathy Justice (e.g., JA3616, JA3623, and JA3637). The documents also contain customers' social security numbers. Patricia H. Bowman's IRA account information lists her SSN as xxx-xx-8814,[7] and the beneficiaries Kathy Bocock Mickles and Fred

---

[7] The social security numbers are partially redacted on brief but appear in the Bank's public filings.

Dwayne Bocock have SSNs xxx-xx-5483 and xxx-xx-5570, respectively (JA4185). Additionally, Rebecca A. Abruzzino's SSN is listed as xxx-xx-4872 in a garnishment case (JA3598), and the SSN xxx-xx-9588 is associated with the Bank's attorney, Jonathan L. Hauser, Esq., Troutman Sanders LLP (JA3600). Some of the documents are signed by Bank officers (e.g., President Phyliss Karavatakis, JA3571), while others are signed by counsel for the Bank. The jury may well find that the fact that the Bank does not regard customers' names, addresses, social security numbers, and account information as confidential undermines the Bank's argument that Kendrick was terminated for allegedly allowing confidential information to be filed in this case. The fact that neither Karavatakis nor anyone else was terminated or otherwise disciplined for doing so provides further evidence of disparate treatment.

The district court also overlooked the Bank's SEC filings detailing the highly contentious litigation between the Bank and West Virginia Governor Jim Justice and the Bank (JA4191-4396) which is very much a matter of public record. *See.* e.g., https://investors.cbtcares.com/filings/documents/ (choose "Current Reports" from dropdown; select 8-K filings from January 25, February 15, and March 8, 2024). In one filing, for example, the Bank stated,

> ***Carter Bankshares, Inc. Issues Statement Regarding Grant of Judgment in Lawsuits against Governor Justice and Related Entities***
> On April 20, 2023 and May 15, 2023, Carter Bank & Trust ("Carter Bank"), a subsidiary of Carter Bankshares, Inc. (the "Company"),

> confessed judgment in the Circuit Court of the City of Martinsville, Virginia (the "Circuit Court") in 21 civil cases against James C. Justice, II, the Governor of West Virginia, his wife, Cathy L. Justice, his son, James C. Justice, III, and various companies that Governor Justice either owns or controls (together the "Justice Entities"). The claims in these 21 civil cases total approximately $301.9 million in principal debt plus interest, charges, fees and costs.

(JA4191). Kendrick asks therefore that this Court remand the case with instruction to the district court to consider the evidence.

## XIII. THE EVIDENCE IS SUFFICIENT TO SUBMIT THE AGE DISCRIMINATION AND RETALIATION CLAIMS TO THE JURY.

The evidence, whether viewed as direct or indirect evidence or through the McDonnel Douglas lens, is sufficient to overcome summary judgment and submit the case to the jury. To summarize, the Bank's Personnel Committee noted in February 2015 that "the overall age of our workforce is increasing." (JA3122.) Haskins (as Vice-Chair of the Board) noted in February 2017 (the same month Kendrick complained to him about age discrimination) that "we need young, qualified directors." (JA3129.) CEO van Dyke noted that "[t]here are some banks that have age limits for their board." (JA3161-3162.) The Bank's consultant stated that the workforce must reflect "the right balance of tenure, age, market representation diversity and expertise." (JA3140.) Van Dyke then hired 10 new directors—all under the age of 50, with an average age of 50.5—and stated that age "would be a factor in determining an appropriate candidate." (JA3159-3160.) Van Dyke created a Young Professionals Group which purposefully excluded members

of the protected class (employees over 40). (JA3055-3058.) President Karavatakis told Kendrick plainly that she wanted younger people working in IT (JA768-769) and that he "need[ed] to be finding [his] replacement." (JA769.) Donna Burnopp observed that "when Mr. Carter passed away [in April 2017]" the Bank "started talking about young employees and the different positions" and that the Bank was "trying to more or less become a younger bank." (JA318.) Kendrick, age 60, was assigned two new sham titles with no job description and no duties. Karavatakis noted stereotypically that older employees "who are at retirement age will simply choose to retire because they are not used to using technology." (JA1414.) HR Carney, a van Dyke hire, began working on "a severance concept" and asked "what do we do with these people [the older workers]?" (JA2449.) Tami Buttrey, another van Dyke hire, summed up the Bank's plan well when she wrote on August 31, 2018, "This year we are transforming our technology transformation. Next year it needs to be an employee transformation." (JA2445.) And that is precisely what happened. For reasons stated here and in opening brief, the evidence is sufficient to go to the jury.

## CONCLUSION

Kendrick therefore requests entry of an order reversing the judgment of the district court and remanding the case for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Kendrick requests oral argument.

Respectfully Submitted,

BRADFORD M. KENDRICK

By____/s/ *Terry N. Grimes*_____
Terry N. Grimes, Esq. (VSB No. 24127)
Kaley J. Gordon-Shupp, Esq. (VSB No. 96992)
TERRY N. GRIMES, ESQ., P.C.
320 Elm Avenue, SW
Roanoke, VA  24016
(540) 982-3711 – Telephone
(540) 345-6572 – Facsimile
tgrimes@terryngrimes.com
k.gordon-shupp@terryngrimes.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments): This document contains <u>6,377 words</u>.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface using Microsoft Word in <u>14 point Times New Roman</u>.

Respectfully Submitted,

BRADFORD M. KENDRICK

By___/s/ *Terry N. Grimes*_____
Terry N. Grimes, Esq. (VSB No. 24127)
Kaley J. Gordon-Shupp, Esq. (VSB No. 96992)
TERRY N. GRIMES, ESQ., P.C.
320 Elm Avenue, SW
Roanoke, VA  24016
(540) 982-3711 – Telephone
(540) 345-6572 – Facsimile
tgrimes@terryngrimes.com
k.gordon-shupp@terryngrimes.com

*Counsel for Appellant*